UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————X

KRISTY PFLUG,

                    Plaintiff,

       -against-                                  Case No. 20-cv-00018 (SIL)

COUNTY OF SUFFOLK,

                    Defendant.

———————————————————————X

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

DENNIS M. BROWN
Acting Suffolk County Attorney
*Attorney for Defendant, County of Suffolk*


By:  Hope Senzer Gabor
Assistant County Attorney
H. Lee Dennison Building
P.O. Box 6100
100 Veterans Memorial Highway
Hauppauge, New York 11788
(631)  853-5822

Dated: Hauppauge, New York
      September 8, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..ii

PRELIMINARY STATEMENT……………………………………………………………1

STATEMENT OF FACTS…………………………………………………………………...2

STANDARD OF REVIEW……………………………………………………………...13

ARGUMENT……………….............................................................................................15

POINT I
PLAINTIFF'S CLAIMS ARE BARRED BY THE GENERAL RELEASE SHE SIGNED……15

POINT II
PLAINTIFF'S DISCRIMINATION CLAIMS UNDER THE ADA MUST BE DISMISSED…16

    A.  Plaintiff Cannot State a *Prima Facie* Claim of Discrimination…………………………16

        1.  Plaintiff is Not Disabled Within the Meaning of the ADA…………………………17
        2.  Plaintiff Could Not Perform An Essential Function of Her Job……………………...18
        3.  Plaintiff Did Not Suffer an Adverse Employment Action Due to Her Alleged
            Disability………………………………………………………………….…………..20
        4.  Plaintiff's Claim of Disparate Impact Fails………………………………………20

    B.  Defendant Had a Legitimate Justification for its Actions and Plaintiff Cannot Prove that it
        Was Merely Pretext and the Real Reason was Discrimination…………………………..21

POINT III
PLAINTIFF CANNOT STATE A CLAIM FOR RETALIATION……………………….…22

POINT IV
THIS COURT SHOULD NOT FIND PENDENT JURISDICTION ON THE STATE CLAIMS
WHICH APPLY A SIMILAR STANDARD…………………………………………………...25

CONCLUSION……………………………………………………………………………..25

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Altieri v. Albany Pub. Library*,
    172 Fed Appx 331 [2d Cir Feb 1, 2006] ................................................................ 24

*Anderson v. Liberty Lobby, Inc.*,
    477 US 242, 106 S Ct 2505, 91 LEd  [1986] ...................................................... 14

*Borkowski v. Valley Cent. Sch. Dist.*,
    63 F3d 131 [2d Cir 1995] .................................................................................... 19

*Brady v. Wal-Mart Stores, Inc.*,
    531 F3d 127 [2d Cir 2008] .................................................................................. 16

*Budde v. H & K Distib Co*,
    216 F3d 1071, 2000 WL 900204 (Table) ............................................................ 14

*Burlington Northern and Santa Fe Ry. Co. v. White*,
    548 US 53, 126 S Ct. 2405, 165 LEd. 2d 345 [2006] ........................................ 23

*Celotex Corp. v. Catrett*,
    477 US 317, 106 S Ct 2548, 91 LEd 2d  265 [1986] ........................................ 13

*Clark County Sch. Dist. v. Breeden*,
    532 US 268 121 S Ct 1508, 149 LEd 2d 509 [2001] ........................................ 24

*Cosgrove v. Sears, Roebuck & Co.*,
    9 F3d 1033 [2d Cir. 1993] .................................................................................. 22

*Dister v. Continental Group, Inc.*,
    859 F2d 1108 [2d Cir 1988] ................................................................................ 15

*Fisher v. Vasser College*,
    114 F3d 1332 [2d Cir 1997] ................................................................................ 14

*Fitch v. R.J. Reynolds Tobacco Co.*,
    675 F Supp. 133 [SDNY 1987] .......................................................................... 24

*Fox v. Costco Wholesale Corp.*,
    918 F3d 65 [2d Cir 2019] .................................................................................... 20

*Graves v. Finch Pruyn & Co., Inc.*,
    457 F3d 181[2d Cir 2006] .................................................................................. 25

*Hollander v. Am. Cyanamid Co.*,
    895 F2d 80 [2d Cir 1990] .................................................................................... 24

*Hui-Wen Chang v. New York City Department of Education*,
    412 F Supp 3d 229 [EDNY 2019] ...................................................................... 15

*Husser v. N.Y. City Dep't of Educ.*,
    137 F Supp 3d 253, 2015 WL 5774741 [EDNY Sept 30, 2015] ...................... 23

*Jimenez v. City of N.Y.*,
    605 F Supp 2d 485 [SDNY 2009] ...................................................................... 24

ii

*King v. Bratton*,
  No. 96 CV 1131 (RJD), 2004 WL 3090605 [EDNY Aug 25, 2004].........................................14

*McCoy v. State of New York*,
  2007 WL 2404797 .........................................24

*McDonnell Douglas Corp. v. Green*,
  411 US 792, 93 S Ct 1817, 36 Led 2d 668 [1973].....................................16

*McNeil v. Union Pacific Railroad Company*,
  936 F3d 786 [8th Cir 2019].....................................20

*Meiri v. Dacon*,
  759 F2d 989 [2d Cir 1985].....................................15

*Meloff v. New York Life Ins. Co.*,
  51 F3d 372 [2d Cir 1995].....................................14

*Miller v. Norton*,
  No. 04-CV-3223, 2008 WL 905830 [EDNY Mar 31, 2008] .....................................24

*Natofsky v. City of New York*,
  921 F3d 337 [2d Cir 2019].....................................22

*Of City of New York*,
  287 F3d 138 [2d Cir 2002].....................................22

*Omni Quartz, Ltred. V. CVSA Corp*,
  287 F 3d 61 [2d Cir 2002].....................................15

*Pacheco v. New York Presbyterian Hosp.*,
  593 F Supp 2d 599 [SDNY 2009].....................................23

*Pampillonia c. RJR Nabisco, Inc.*,
  138 F3d 459 [2d Cir 1998].....................................15

*Phillips v. Bowen*,
  278 F3d 103 [2d Cir 2002].....................................23

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 US 133, 120 S Ct 2097, 147 LEd 2d 105 [2000] .....................................15

*Rouse v. City of N.Y*
  08 Civ 7419 (HB),2009 WL 1532054.....................................25

*Schnabel v. Abramson*,
  232 F.3d 83 [2d Cir 2000].....................................14

*Schoengood v. Hofgur*,
  2021 WL 1906501 [EDNY 2021].....................................21

*Shannon v. NYC Transit Auth.*,
  332 F 3d 95 [2d Cir 2003].....................................19

*Shultz v. Congregation Shearith Israel of City of New York*,
  867 F3d 298 [2d Cir 2017].....................................23

*Snowden v. Trustees of Columbia University*,
  612 Fed. Appx. 7 [2d Cir 2015].....................................19

iii

*St. Mary's Honor Ctr. v. Hicks*,
   509 US 502, 113 S Ct 2742, 125 LEd 2d 407 [1993] ............................................................... 15
*Stern v. Trustees of Columbia Univ.*,
   131 F3d 305 [2d Cir 1997] ........................................................................................................ 14
*Texas Dep't of Cmty. Affairs v. Burdine*,
   450 US 248, 101 S Ct 1089, 67 LEd 2d 207 [1981] ....................................................... 16, 22
*Treglia v. Town of Manlius*,
   313 F3d 713 [2d Cir 2002] ........................................................................................................ 22
*Tsombanidis v. W. Haven Fire Dep't*,
   352 F3d 565 [2d Cir 2003] ........................................................................................................ 21
*Van Zant v. KLM Royal Dutch Airlines*,
   80 F3d 708 [2d Cir 1996] .......................................................................................................... 14
*Western World Ins. Co. v. Stack Oil, Inc.*,
   922 F2d 118 [2d Cir 1990] ........................................................................................................ 14
*Wilson v. New York*,
   2017 WL 9674497 [EDNY 2017] .............................................................................................. 21
*Woolf v. Strada*,
   949 F3d 89 [2d Cir 2020] .......................................................................................................... 18

Statutes

42 USC § 12102(1)(A) and (2)(A) ................................................................................................. 18
42 USC § 12112(b)(5)(A) .............................................................................................................. 16

Rules

Fed. R. Civ. P. 56 ............................................................................................................................. 1
Fed. R. Civ. P. 56 (c) ..................................................................................................................... 13

## PRELIMINARY STATEMENT

Defendant, THE COUNTY OF SUFFOLK, by its attorney, DENNIS M. BROWN, Acting Suffolk County Attorney, by Hope Senzer Gabor, Assistant County Attorney, submits this Memorandum of Law in Support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56. The motion should be granted in its entirety. Even viewing the evidence in a light most favorable to Plaintiff, there are no genuine issues of material fact that need be decided by a jury, because Plaintiff's claims fail as a matter of law.

Plaintiff's Complaint (Gabor Decl. Ex. A), alleges seven claims of relief: (1) Failure to Accommodate, Americans with Disabilities Act (ADA); (2) Failure to Accommodate Human Rights Law-(NYSHRL); (3) Intentional Discrimination-ADA; (4) Intentional Discrimination NYSHRL; (5) Retaliation-ADA; (6) Retaliation-NYSHRL; and (7) Disparate Impact Discrimination- ADA.

Plaintiff, Kristy Pflug ("Plaintiff" or "Pflug") was a Public Safety Dispatcher I ("PSD I") employed by Suffolk County ("County"), who worked in the Suffolk County Police Department ("SCPD") as a civilian employee, dispatching 911 calls to police sector cars.  Prior to Plaintiff taking a year off for maternity leave, her shift was midnights: 12:00 am to 8:00 am.  After she returned from maternity leave, she requested that her shift be changed to the two tour: 8:00 am to 4:00 pm on certain days and 4:00 pm to midnight on certain days. That request was accommodated.

Overtime, voluntary and mandatory was always an essential function of every PSD's job. However, once she returned from her leave, Plaintiff was no longer willing to work the overtime, and objected to being mandated. Each time she refused to work a mandate, protocol dictated that she write an internal correspondence to the Commanding Officer, explaining her failure to abide by the mandate. During this period of time, since the department was short-staffed, it was imperative that all employees work overtime-they either volunteered for same or were mandated.

1

Eventually, since overtime was an essential function of the job, no PSD, including Plaintiff was exempt or excused from mandates.

Due to Plaintiff's refusal to work mandates, amongst other infractions, Plaintiff was brought up on departmental disciplinary charges and suspended.  When she returned from her suspension, Plaintiff resigned. Subsequently, Plaintiff entered into a Settlement and Release Agreement concerning the charges levied against her.

Defendant is entitled to summary judgment on all causes of action, and the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

The relevant facts of this case are alleged in the Complaint, deposition transcripts, and the various exhibits submitted by the parties marked as Exhibits "A" through "BB", all of which are annexed to the Declaration of Hope Senzer Gabor, dated September 8, 2023.  Although the specific and relevant facts appear in the argument sections below, some general undisputed facts are summarized below in an effort to facilitate the Court's understanding of the salient legal issues.

**Background**

Plaintiff commenced employment with Defendant, County of Suffolk ("County") at the Suffolk County Police Department as a Public Safety Dispatcher I ("PSD") in December of 2002. 56.1 ¶ 1, Gabor Decl. Ex. B, 5:6-12. Plaintiff left her job at the County on July 4, 2013. 56.1 ¶2, Gabor Decl. Ex. B, 13:25-14:2. Plaintiff was not employed between July 4, 2013 and August of either 2018 or 2019. 56.1 ¶ 5, Gabor Decl. Ex. B,  12:19-13:6, and the last job Plaintiff had, ended in March of 2023, when she voluntarily left. 56.1 ¶ 6, Gabor Decl. Ex. B, 11:2-10.

PSD's are employed by the SCPD in the Communications Section, which is a 365 day a year, 24 hour per day, 7 day a week unit, meaning that is fully operational and must be staffed at

all times.  56.1 ¶ 69, Gabor Decl. Ex. BB ¶ 3. A PSD I receives information from a 911 emergency complaint operator, which is sent through the computer.  The dispatcher, who receives the calls reads the calls and dispatches the calls to the police sector cars and the PSD I coordinates all of those efforts with a particular precinct. 56.1 ¶ 3, Gabor Dec. Ex B, 15:13-22.  There is a PSD assigned to every radio band in the County. In addition to the PSD's that are actively on the radio, the unit requires that there are additional PSD's on duty, to ensure that the PSD's working the radios are able to take a break or a meal period.  The radios must be manned at all times.  56.1 ¶ 70, Gabor Decl. Ex. BB ¶ 4.  In order to properly staff a shift, there are a minimum number of PSD's required.  When the minimum number is not met, overtime hours are implemented so that minimun staffing levels are maintained.  Employees can volunteer for overtime, however if there are not enough people who volunteer for overtime, then employees are mandated to work the overtime. Overtime is assinged in four hour increments; either four hours prior to a PSD's shift, or four hours after a PSD's shift.  Overtime has always been, and continues to be required of every PSD in order to cover minimum staffing levels. Upon hire, every PSD is made aware of the fact that the job requires overtime.  As such, **overtime hours are an essential function of the job of a PSD.** 56.1 ¶¶ 71-74, Gabor Decl. Ex. BB ¶¶ 5-8..

In April 2011, Plaintiff requested and was granted a leave of absence from her position as a PSD I from April 10, 2011 to April 9, 2012. 56.1 ¶ 11, Gabor Decl. Ex. B, 28:27:20-28:21, Gabor Decl. Ex. C and Ex. D.   Prior to this leave, Plaintiff conistently worked the midnight to 8:00 am shift. 56.1 ¶ 14, Gabor Decl. Ex. B, 31:8-15, 33:15-34:4. Plaintiff returned to work on April 10, 2012. 56.1 ¶ 12, Gabor Dec. Ex, B, 29:9-16. When she returned to work, Plaintiff was assigned to Rotating Squad 3.  Her schedule was 8:00 am to 4:00 pm for five days, and then she would have two days off, and then she would work 4:00 pm to 12:00 am for five days, and then she would

have three days off. 56.1 ¶ 13, Gabor Decl. Ex. B, 29:10-30:3, Gabor Decl. Ex. E. This new schedule, at Plaintiff's request, was instituted before she returned from leave. Prior to her leave, she worked the midnight shift which was a steady shift. 56.1 ¶ 14, Gabor Decl. Ex. B, 31:8-15, 33:15-34:4. In order to change to the new shift, Plaintiff presented a note from her doctor which indicated that she should not work the midnight shift. The note, dated March 9, 2011 states: "…it was recommended that Ms. Pflug not work overrnight hours as significant sleep deprivation and produce certain stressors that may exacerbate symptomatologies." This request was accommodated. 56.1 ¶ 16, Gabor Decl. Ex. B, 31:8-12, Gabor Decl. Ex. F.

**Mandates**

When Plainitff first started working for the County in 2002, she worked mandated overtime. 56.1 ¶ 7, Gabor Decl. Ex. B, 16:10-12. Between 2002 and 2011, Plaintiff worked mandates; in the beginning it wasn't a lot, but then it started increasing. 56.1 ¶ 8, Gabor Decl. Ex. B, 18:21-19:3.

Jennifer Worthington was employed by the County when Plaintiff was hired. 56.1 ¶ 56, Gabor Decl. Ex. G, 19:22-20:4. Ms. Worthington was a PSD II who was Plaintiff's supervisor when she returned from maternity leave. Her duties as a PSD II included: scheduling, making sure all the radios were covered, wathcing all the calls for all of the precincts, listening to the calls that came in, and listening to all the calls that went out, radio checks, recorder checks, making sure there were enough dispatchers and operators, for each tour, and if there was no one else to cover the radios, she would be on the radio or on a phone, when there was not enough staffing. 56.1 ¶ 53, Gabor Decl. Ex. G, 11:23-12:19. As a PSD II, Ms. Worthington was responsible for supervision of the dispatchers and call takers during her tour, which was either 8:00 am to 4:00 pm, 4:00 pm to midnights or overtime, which would be on a midnight shift, or the shift before her

or the shift after her.  If she was on a 8:00 am to 4:00 pm tour, then the overtime would either be a 4:00 am in the morning, or at 4:00 pm in the afternoon.  If she worked 4:00 pm to midnight, her overtime would be either at noon or midnight. 56.1 ¶ 54, Gabor Decl. Ex. G, 14:13-15:18.

Overtime mandates existed since Ms. Worthington came to work at the County as a PSD I, and when Plaintiff was employed at the County. Overtime mandates exist if there is not enough staffing and not enough people volunteer for the overtime. In that case, a person is mandated for a four hour block.  56.1 ¶ 60, Gabor Decl. Ex. G, 24:5-12, 25:2-10, 56.1 ¶¶ 71-72,Gabor Decl. Ex. BB  ¶¶ 5-6.  Overtime was assigned when there was a staffing shortage. There was either voluntary overtime, which someone would sign up for,  or mandated overtime. Mandated overtime was assigned when there were no volunteers left that signed up, and whoever was up next was assigned the mandated overtime. 56.1 ¶ 55, Gabor Decl. Ex. G, 16:11-17:7. 18:8-11, 56.1 ¶¶ 71-72, Gabor Decl. Ex. BB ¶¶ 5-6.  Overtime has always been, and continues to be required of every PSD in order to cover minimum staffing levels. Upon hire, every PSD is made aware of the fact that the job requires overtime.  As such, **overtime hours are an essential function of the job ob a PSD.** 56.1 ¶¶ 71-74, Gabor Decl. Ex. BB ¶¶ 5-8.

If a PSD I employee could not do the mandate on a particular day, that employee would, at the request of the PSD II, place in writing the reasons they could not do the mandate. As a result, the next person on the list would be mandated. 56.1 ¶ 61, Gabor Decl. Ex. G, 26:11-27:16. When Plaintiff was mandated, and she needed to take time off for childcare or a doctor's issue, Ms. Worthington, as her supervisor PSD II would ask for it in writing the then the next person on the list would be asked to work the overtime. 56.1 ¶ 63, Gabor Decl. Ex. G, 30:6-14.

After Plaintiff returned from maternity leave, Ms. Worthington, as her supervisor PSD II, mandated her to work overtime. 56.1 ¶ 62, Gabor Decl. Ex. G, 27:23-28:2. The mandates were

every week, and almost every day, someone was mandated to work overtime, which was assigned by seniorty. 56.1 ¶¶ 16, 17, Gabor Decl. Ex. B, 35:2-12.  There were people that volunteered for overtime, however, if there weren't enough people who volunteer, then employees were mandated. 56.1 ¶ 18, Gabor Decl. Ex. B, 35:24-36:8.

There came a time when Plaintiff didn't want to work the mandates because "physically and mentally [she] was getting very stressed about working them."  She presented notes trying to limit her hours to just the regular 8 hour shift.  56.1 ¶ 22, Gabor Decl. Ex. B, 43:11-21. Duirng the same time period, Plaintiff testified that others  were having issues with working the mandates.  At some point Plaintiff and some others were temporarily excused from working the mandates, however, the mandates effected everybody. 56.1 ¶ 23, Gabor Decl. Ex. B, 43:24-44:19. Ms. Worthington received a memo dated August 3, 2012 from Lt. Willam Rohrer, E.O. Communications Section addressed to Communications Supervisors regarding "Revised Policy Mandated O/T Exemptions".  This memo applied to a few people  (not Plaintiff) who had medical conditions who were previoulsy exempted from overtime mandates. This memo states: "Therefore, effective August 25, 2012, no employee will be exempted from working Mandated O/T.  All employees will be considered part of the O/T Mandate pool."  This memo indicated to Ms. Worthington, that those individuals who were on the exempt list could no longer be exempt. Because the memo came from her executive officer, it was Ms. Worthington's obligation to enforce the policy. 56.1 ¶ 64, Gabor Decl. Ex. G, 30:15-31:16, 32:8-11.  Gabor Decl. Ex. H.

Thereafter, on January 11, 2013, an email memo was sent from the SCPD Human Resources Bureau to Lt. William Rohrer and others, with the subject: "Mandated Overtime".  The memo states: "As per Paul Margiotta of Labor Relations, no employee will be excused from overtime.  The overtime is part of the position.  If they can't work overtime, they are unfit for duty

and therefore cannot work their normal shift." 56.1 ¶ 33, Gabor Decl. Ex. I. At that time, no else refused to work mandates, other than Plaintiff, who continued to decline working the mandates. "And I was not trying to be super disobedient. I came in for my shift, I just wasn't coming in for the mandate." 56.1 ¶ 34, Gabor Decl. Ex. B, 59:20-22, 60:6-8. Plaintiff acknowledged this policy and testitied that madates became "either Fit for Duty or Not Fit for Duty, maybe sometime around Christmsas 2012. 56.1 ¶ 32, Gabor Decl. Ex. B, 58:16-59:3.

Although Plaintiff requested to be placed on the two tour after she returned from maternity leave, she soon realized that the two tours were getting more mandates. However, she did not ask to be changed back to midnights, although she "should have done thant." 56.1 ¶ 40, Gabor Decl. Ex. B, 93:19-94:7.

### Accommodations

As set forth *supra,* when Plaintiff returned from maternity leave, she sought an accommodation to be placed on a different shfit than the one she was working prior to her leave. Prior to this leave, Plaintiff consistently worked the midnight to 8:00 am shift. 56.1 ¶ 14, Gabor Decl. Ex. B, 31:8-15, 33:15-34:4. When Plaintiff returned to work on April 10, 2012, 56.1 ¶ 12, Gabor Decl. Ex. B, 29:9-16, she was assigned to Rotating Squad 3: 8:00 am to 4:00 pm for five days, and then she would have two days off, and then she would work 4:00 pm to 12:00 am for five days, and then she would have three days off. 56.1 ¶ 13, Gabor Decl. Ex. B, 29:10-30:3, Gabor Decl. Ex. E. This new schedule as set forth above, was instituted prior to her return from leave. Before her leave, Plaintiff worked the midnight shift which was a steady shift.. 56.1 ¶ 14, Gabor Decl. Ex. B, 31:8-15, 33:15-34:4. In order to change to the new shift, Plaintiff presented a note from her doctor which indicated that she should not work the midnight shift. This request was accommodated. 56.1 ¶ 16, Gabor Decl. Ex. B, 31:8-12.

When Plaintiff returned from her leave in April, 2012, she was breastfeeding.  Due to the mandates, Plaintiff requested that she be provided with a room where she could breast pump. That accommodation was provided, relatively soon after she returned from her leave. 56.1 ¶ 21, Gabor Decl. Ex. B, Pl. Dep. Tr. 41:17-42:19. Plaintiff requested a private room to pump milk, and she was provided with one "right away".  When the request came in for Plaintiff to have the room, Ms. Worthington explored the New York State parameters to learn what was needed for the room. 56.1 ¶ 59, Gabor Decl. Ex. G, 22:25-23:12, 29:22-30:5.

**Plaintiff is disciplined**

Plaintiff had issues with reporting late for her shift.  On May 25, 2012, a Supervisor's Record of Verbal Reprimand was issued to Plaintiff by PSD III Petrina Hubner.  Therein, Plaintiff was reprimanded for arriving late to work on April 12, 2012 and was informally counseled.  On May 4, 2012 Plaintiff was late returning from her meal break and was informally counseled, and on May 21, 2012, Plaintiff was 9 minutes late returning from her meal break.  Plaintiff was advised that these instances of lateness were unacceptable and that she "must be at her workstation, equipped and ready to perform her job, at start of tour and/or at the completion of breaks." Gabor Decl. Ex.  Y.

According to the Union, all PSD's had to work X-Days (six extra days per year), to make up for the fact that they had more days off than the rest of the County. This effected all of the PSD's. 56.1 ¶ 24, Gabor Decl. Ex. B, 44:20-45:21. On November 11, 2012, Plaintiff was issued a "Written Reprimand", due to the fact that on Saturday, November 3, 2012, although Plaintiff was scheduled to work an X-Day, she did not show up, and accordingly, she was marked as AWOL. The reprimand also states that Plaintiff had been reprimanded several times in the past regarding time management.  If further states that on May 26, 2012 Plaintiff was issued a Verbal Reprimand

8

for lateness, and on July 10, 2012, whe was docked 6.65 hours of sick time that she attempted to use for an X-Day. 56.1 ¶ 25, Gabor Decl. Ex. J. On November 15, 2012, Plaintiff submitted Internal Correpondence addressed to Lt. Rohrer, CO Communications which explained that she forgot that she was scheduled to work the X-Day, and when she was contacted by PSD II Lawlor on the date that she was scheduled to work the X-Day, she could not come in because "it was too late to get a family member to watch my baby so I couldn't come in." 56.1 ¶ 26,  Gabor Decl. Ex.  K **,** Gabor Ex. B, 48:20-49:4.  This explaination contained no reference to Plaintiff's alleged "disability". On November 19, 2012, PSD II Dennis Lawlor sent an Internal Correpondence to William Rohrer, Lieutenant, C.O. Communications Section, describing his attempts to reach Plaintiff concerning her failure to show up to work for a scheduled X-Day.  PSD II  Lawlor left Plaintiff a message, and when he didn't hear back from her, he called her again.  He spoke with a male who advised that he would let Plainitff know that she was supposed to be at work, and then the call was disconnected.  He then called back and he as advised by the male answering the phone that Plaintiff would call him back.  When Plaintiff called PSD Lawlor back, he questioned her as to why she did not report to work for her X-Day, and attempted to get her to come into work.  Plaintiff refused and replied, "I don't work x-days". 56.1 ¶ 27, Gabor Decl. Ex. L.

On yet another occasion, Plaintiff was late returning to work after a meal. On December 1, 2012, Plaintiff wrote an Internal Correspondence to Lt. Rohrer, with the Subject: Lateness from meal.  Therein, Plaintiff explained why she was late. 56.1. ¶ 28, Gabor Decl. Ex. M,  Gabor Ex. B, 51:21-52:24.  This explaination contained no reference to Plaintiff's alleged "disability".

On December 23, 2012, Plaintiff was mandated to work 4:00 am to 8:00 am, attached to her regular 8:00 am to 4:00 pm tour. Plaintiff did not report for the mandate at 4:00 am, but reported for her scheduled tour at 8:00 am. Plaintiff could not recall if she communicated with anyone at

the job to advise that she would not be coming in for her 4:00 am mandated shift. 56.1 ¶ 29, Gabor Dec. Ex. B, 54:21-25. On December 23, 2012, Plaintiff sent an Internal Correspondence to Lt. Rohrer, memorializing that she did not report for the mandate at 4:00 am, but did report for her regular shift at 8:00 am.  56.1 ¶ 30, Gabor Decl. Ex. B, 53:3-21, 54:11-17, Gabor Decl. Ex. N. This explaination contained no reference to Plaintiff's alleged "disability".

On December 28, 2012, PSD II Sandra Flammer sent an Internal Correpondence to Lt. Rohrer concerning Plaintiff's refusal to work the 4:00 am mandated overtime on December 23, 2012. Therein, Ms. Flammer advised Lt. Rohrer that on December 21, 2012, she had a conversation with Plaintiff regarding 4:00 am mandates before an 8:00 am to 4:00 pm tour, wherein Plaintiff told Ms. Flammer that she didn't like coming in at 4:00 am because she didn't want to inconvenience her in-laws by making them get up in the middle of the night to watch her daughter. This explaination contained no reference to Plaintiff's alleged "disability". During that same conversation, Ms. Flammer recounts that Plaintiff advised her that the department "better not" mandate her on Christmas since she was mandated on Thanksgiving.  On Saturday, December 22, 2012, PSD II DeAbreu mandated Plaintiff to come in on Sunday, December 23, 2012 at 4:00 am, however Plaintiff did not come in for the mandate at 4:00 am, (she called in sick)  but showed up for her regular 8:00 am to 4:00 pm tour. 56.1 ¶ 31,Gabor Decl. Ex. O,  Gabor Decl. Ex. B, 55:4-22, 56:12-17, 60:16-21.

On December 25, 2012, PSD III Chris Glynn, sent an Internal Correspondence to Lt. William Rohrer which memorialized a conversation with Plaintiff, wherein she refused to work a mandate on December 25, 2012. Although the Plaintiff stated that she could not work the 4:00 am mandate because she was sick, she advised PSD III Glynn that she could work the regular tour.

PSD III Glynn noted in the Internal Correspondence that this has become a pattern with Plaintiff. 56.1 ¶ 35, Gabor Decl. Ex. P, Gabor Decl. Ex. B,  64:7-22, 65:9-19.

On January 8, 2013, Plaintiff sent yet another Internal Correspondence to Lt. Rohrer concerning a mandate.  The correspondence indicates that on that date, Plaintiff was mandated to stay at 4:00 pm, and that due to a doctor's appointment she could not work the mandate. 56.1 ¶ 37, Gabor Decl. Ex. Q,  Gabor Decl. Ex. B, Pl. Dep. Tr. 69:21-70:20. This correspondence contained no reference to Plaintiff's alleged "disability". Because Plaintiff refused to work the mandate on January 8, 2013, a Supervisor's Complaint Report was filed stating: "PSD Pflug refused a direct order by the undersigned, her direct supervsor, to stay for mandated overtime at 1600 hours. In doing so, another dispathcer was mandated to cover her AWOL.  This was not PSD Pflug's first refusal of a direct order by a Communications Supervisor for a mandate."

Plaintiff knew that there would be ramifications for her refusal to work mandates, and she knew that she "was on borrowed time." Plaintiff "knew something was going to happen" 56.1 ¶ 38, Gabor Decl. Ex. R, Gabor Decl. Ex. B, 70:21-71:18, 71:24-72:8, and that that the union was aware that "something was coming because you could only refuse so much until you would get in trouble". 56.1 ¶ 36, Gabor Decl. Ex. B, 66:21-24, 67:3-5.

**Departmental Charges are Filed against Plaintiff**

Seeing the handwriting on the wall, one week before June 5, 2013, Plaintiff testified that she verbally resigned, to be effective on June 5, 2013. 56.1 ¶ 41, Gabor Decl. Ex. B, 94:14- 95:17. On June 5, 2013, Plaintiff  was summoned to Internal Affairs.  Present were Lieutenant Fischer, Internal Affairs Investigator Lieutenant Soto, and one or two other investigators.  Plaintiff was provided with union representation. 56.1 ¶ 42, Gabor Decl. Ex. B, 96:18-97:23. At the Internal Affairs meeting, Plaintiff received and acknowledged receipt of a Notice of Charges and

Specifications and Hearing Procedures from Police Commissioner, Edward Webber.  56.1 ¶ 43, Gabor Decl. Ex. S, Gabor Decl. Ex. B,  98:19-99:9. Plaintiff was presented with Departmental Charges containing fourteen (14) charges of misconduct, and a Suspension withoug pay, effective June 4, 2013 at 1042 hours. 56.1 ¶ 44, Gabor Decl. Ex. T, Gabor Decl. Ex. B, 99:12-100:16. Even though Plaintiff testified that she verbally resigned to be effective on June 5, 2013,  she did not do so; she took the suspension so that she could get an extra month of not having to pay for insurance. 56.1 ¶ 45, Gabor Decl. Ex. B,  100:19-101:4, 101:13-102:5. Thereafter, Plaintiff went to the union concerning the charges and she was assigned a union lawyer. 56.1 ¶ 46, Gabor Decl. Ex. B, 102:5-103:10.

**Plaintiff resigns and enters into a Stipulation and Agreement and General Release**

After her suspension, Plaintiff was reinstated as of Wednesday, July 3, 2013.  Plaintiff returned to the workplace on July 4, 2013 for the 8:00 am to 4:00 pm shift.  At the end of that shift, Plaintiff was advised that she was mandated to work that night.  In response, Plaintiff tendered her resignation, she believes to Jen Worthington. 56.1 ¶ 47, Gabor Decl. Ex. U, Gabor Decl., Ex. B, 105:106:16.

With reference to the Departmental Charges containing fourteen (14) charges of misconduct, Plaintiff entered into a Stipulation and Agreement and General Release, which was signed by Plaintiff on September 3, 2013. 56.1 ¶ 48, Gabor Decl. Ex. V, Gabor Decl. Ex. B, 108:7-24.  In return for executing the Stipulation and Agreement and General Release: 1) Plaintiff pleaded no contest to the Charges and Specifications; 2) the County withdrew eleven (11) working days of the thirty day suspension, and Plaintiff was reimbursed $2,466.20; 3) the County agreed to provide Plaintiff with a neutral reference, and the County agreed not to interfere with Plaintiff's attempt to apply for unemployment benefits; and 4) the Plaintiff agreed to execute the General

12

Release.  The Plaintiff executed the Stipulation and Agreement and General Release on September

3, 2013.56.1 ¶ 49, Gabor Decl. Ex. V, Gabor Decl. Ex. B, 109:12-110:14.

The Release specifically states:

> Kristy Pflug, as RESLEASOR,…hereby releases and holds harmless the COUNTY OF SUFFOLK, as RELEASEE,…from all actions, causes of action, suits debts, dues, sums of money, accounts, reckonings, bonds, bills, specialities, covenants, contracts, controversies, agreements, promises, variences, trespasses, damages, judgments, extens, executions, claims and demans whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR,…ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day and date of this GENERAL RELEASE, including but not limited to any and all claims of any kind or any nature whatsoever which were raised, or could have been raised, in connection with the RELEASOR'S employment or service with RELEASEE arising from the disciplinary charges brought against her.
> 56.1 ¶ 50,  Gabor Decl. Ex. V.

**Plaintiff requests to be rehired by the County**

On March 11, 2014, approximately six months after signing the Stipulation and Agreement

and General Release, Plainitff sent a letter to the Suffolk County Police Commissioner requesting

that: "I am now writing to you in the hopes that I will be able to have my job back as soon as

possible."  56.1 ¶ 51, Gabor Decl. Ex. W. Plaintiff received a response to Plaintiff's letter dated

March 17, 2014, which states: "Unfortunately, at this time, we do not have budgetary approval to

fill a position of Public Safety Dispatcher I." 56.1 ¶ 51,Gabor Decl. Ex. X , Gabor Decl. Ex. B,

111:12-112:8.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56 (c). *see also Celotex Corp. v. Catrett,* 477 US 317, 327, 106 S Ct 2548,

13

91 LEd 2d  265 [1986].  To withstand summary judgment, a plaintiff must present  "concrete evidence from which a reasonable [fact-finder] would return a verdict in its favor." *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 256, 106 S Ct 2505, 91 LEd 202 [1986]. A plaintiff cannot escape summary judgment by asserting the existence of "some unspecified material facts, or defeat the motion through mere speculaton or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F2d 118, 121 [2d Cir 1990].  When an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. *King v. Bratton,* No. 96 CV 1131 (RJD), 2004 WL 3090605, at *4 [EDNY Aug 25, 2004], *Budde v. H & K Distib Co,* 216 F3d 1071, 2000 WL 900204 (Table) at *1 [2d Cir June 29, 2000], *Stern v. Trustees of Columbia Univ.,* 131  F 3d 305, 312 [2d Cir 1997], *Meloff v. New York Life Ins. Co.,* 51 F3d  372, 375 [2d Cir 1995].  In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern,* 131 F3d at 312, *Schnabel v. Abramson,* 232 F.3d 83, 90-91 [2d Cir 2000],  *Fisher v. Vasser College,* 114 F3d 1332, 1339 [2d Cir 1997] (*en banc*), *cert. denied,* 522 US 1075 [1998], V*an Zant v. KLM Royal Dutch Airlines,* 80 F3d 708, 714 [2d Cir 1996] (plaintiff must "produce not simply 'some' evidence, but sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proferred by the employer were false, and that more likely than not [discrimination] was the real reason for the dischrge"). The claims asserted in the Complaint are, as a matter of law, insufficient to raise any genuine issue of triable fact.

The fact that this case involves a claim of discrimination, where intent and state of mind are inherently in issue, does not mean these general principles are rendered less applicable. The Supreme Court has "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 US 133, 148, 120 S Ct 2097, 147 LEd 2d 105 [2000] (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 US 502, 524, 113 S Ct 2742, 125 LEd 2d 407 [1993]). Although courts are authorized to be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Continental Group, Inc.*, 859 F2d 1108, 1114 [2d Cir 1988], "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Meiri v. Dacon*, 759 F2d 989, 998 [2d Cir 1985] (observing that "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion"). As will be demonstrated fully below, Plaintiff's claims cannot be sustained and Defendant's motion for summary judgment should be granted in its entirety.

## **ARGUMENT**

### **POINT I**

### **PLAINTIFF'S CLAIMS ARE BARRED BY THE GENERAL RELEASE SHE SIGNED**

The Stipulation and Agreement and General Release Plaintiff signed on September 3, 2013 (Gabor Decl. Ex. V), is clear and unambiguous.  "'Under New York law, a release that is clear and unambiguous on its face and which is knowlingly and voluntarily entered into will be enforced.'" *Hui-Wen Chang v. New York City Department of Education,* 412 F Supp 3d 229, 243 [EDNY 2019], quoting *Pampillonia c. RJR Nabisco, Inc.* 138 F3d 459, 463 [2d Cir 1998]. "'The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment.'" *Id*. at 244, quoting  *Omni Quartz,*

*Lted. V. CVSA Corp,* 287 F 3d 61, 64 [2d Cir 2002].  Since Plaintiff released all claims against the County up until the time she signed the Release on September 3, 2013, and the last day she worked for the County was July 5, 2013, she cannot now pursue claims against the County which occurred prior to the date of the Release.

**POINT II**

**PLAINTIFF'S DISCRIMINATION CLAIMS UNDER THE ADA MUST BE DISMISSED**

Claims of disability discrimination under the ADA are governed by the three-step burden shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 US 792, 93 S Ct 1817, 36 Led 2d 668 [1973]. The plaintiff must first establish a *prima facie* case of unlawful discrimination. Only if the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to rebut the *prima facie* case by producing a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff then bears the ultimate burden of proving that the defendant's stated justification for its action was merely pretext and the real reason was discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 US 248, 253, 101 S Ct 1089, 67 LEd 2d 207 [1981].

**A.  Plaintiff Cannot State a *PrimaFacie* Claim of Discrimination**

In order to demonstrate a *prima facie* case of disability discrimination under the ADA, a plaintiff must show, "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.,* 531 F3d 127, 134 [2d Cir 2008] (citation omitted). The ADA requires an employer to reasonably accommodate an employee's known disability, unless the accommodations would impose an undue hardship on the employer. 42 USC § 12112(b)(5)(A).

16

### 1. Plaintiff is Not Disabled Within the Meaning of the ADA

Although Plaintiff's Complaint alleges: "The Plaintiff suffered from physical or mental impairments that substantially limited one or more major life activities", she has failed to proffer any evidence to support this position. Gabor Decl. Ex. A ¶ 30. Prior to her return from leave, Plaintiff presented a note from her doctor which indicated that she should not work the midnight shift. The note, dated March 9, 2011 states: "…it was recommended that Ms. Pflug not work overnight hours as significant sleep deprivation and produce certain stressors that may exacerbate symptomatologies." 56.1 ¶ 15, Gabor Decl. Ex. F.  As per the note, Plaintiff was accommodated: she was placed on the 8:00 am to 4:00 pm and 4:00 pm to 12:00 am rotation.  The note makes no mention of Plaintiff's inability to work mandated overtime.  Plaintiff presented a second note from a different doctor entitled: "Certificate for Work Restrictions", dated November 17, 2012, stating: "Patient was diagnosed with Transverse Myelitis resulting in Headaches. Anxiety causing worsening headaches secondary to work related mandated hours." "Restrictions: Limited work schedule to her normally scheduled hours." 56.1 ¶ 66, Gabor Decl. Ex. Z.  Plaintiff also presented a third note, dated August 30, 2012, from her daughter's pediatrician which states that Plaintiff's daughter "…is suffering with a serious medical condition and it is imperative that Kristy not be scheduled for to work longer that 8 hours in a 24 hour period."  This note has nothing to do with Plaintiff's alleged disability; it merely refers to her daughter's unidentified "medical condition." 56.1 ¶ 67, Gabor Decl. Ex. AA.

Under the ADA, "The term 'disability' means, with respect to an individual-(A) is a physical or mental impairment that **substantially limits one or more major life activities** of such individual."  "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

17

lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 USC § 12102(1)(A) and (2)(A) (emphasis added). According to Plaintiff's doctor, transverse myelitis results in headaches, which are exacerbated by anxiety "secondary to work related mandated hours."   Plaintiff's anxiety surrounding her being mandated to work overtime, which may have resulted in headaches does not substantially limit one or more of her major life activities.  Plaintiff was clearly able to work her normal scheduled work hours without incident.  The Second Circuit addressed the question of whether a headache (migraine) condition substantially limits one or more major life activities, where the plaintiff experienced migraines due to stress at work, which he alleged substantially limited his ability to work. The Second Circuit affirmed the District Court's conclusion that plaintiff was not disabled for purposes of the ADA, due to his migraines, because "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  *Woolf v. Strada,* 949 F3d 89, 95 [2d Cir 2020]. Similarly, Plaintiff is not disabled within the meaning of the ADA.

### 2.   Plaintiff Could Not Perform An Essential Function Of Her Job

Even assuming, *arguendo*, that Plaintiff suffered from a disability within the meaning of the ADA, she could not, with any accommodation, perform an essential function of her job. Due to the nature of the job of a PSD I, who works dispatching emergency 911 calls to police precincts, the Communications Section where Plaintiff worked always had to be fully staffed on a 365 day a year, 24 hour per day, 7 day a week basis.  Therefore, an essential function of Plaintiff's job was the ability to work overtime. Plaintiff cannot prove that she was qualified to perform this essential function of her job as a PSD I because she alleged that due to "physical and mental" issues, she could not, when mandated, work either an additional four hours before her regular shift or 4 hours after her regular shift.

"Determining the essential functions of a position requires 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice. Relevant factors include, among other things, 'the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positons.'" *Snowden v. Trustees of Columbia University,* 612 Fed. Appx. 7, 9-10 [2d Cir 2015]. An employer is not required to accommodate an individual with a disability by eliminating an essential job function and that "having someone else do part of a job may sometimes mean eliminating the essential functions of the job." *Id.* at 10, citing *Borkowski v. Valley Cent. Sch. Dist.,* 63 F3d 131, 140 [2d Cir 1995]. "A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position". A "reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. NYC Transit Auth.,* 332 F 3d 95, 100 [2d Cir 2003]. "Employers formulate jobs to fit the needs of the enterprise, and cannot fill jobs without deciding what attributes are essential to those needs. The essential character of a particular job qualification is therefore a matter of judgment and opinion." *Id.* 103-104. It is undisputed that all PSD's were required to work mandated overtime, which is an essential function of the job of a PSD. Since Plaintiff alleges that the only accommodation that would satisfy her would be to eliminate her essential job responsibility of working mandated overtime, this accommodation request was clearly unreasonable.

In a case with a similar fact pattern to the instant matter, involving a 24-hour dispatch call center employee, the Eighth Circuit addressed the question of whether mandatory overtime is an essential function of the job. "The district court ruled that the ability to work mandatory overtime

is an essential function of a call center dispatcher.  The Court concluded that because McNeil's 'no overtime' restriction disqualified her from the job, McNeil failed to make a *prima facie* showing that Union Pacific discriminated when it failed to accommodate the restriction…The court observed that if a dispatcher were unable to work overtime, then either other employees would have to work overtime more often or the safety of Union Pacific operations would be impaired." *McNeil v. Union Pacific Railroad Company,* 936 F3d 786, 790 [8th Cir 2019].  "For these reasons, we agree with the district court that McNeil was not qualified for the dispatcher position as a matter of law, because she was unable to work mandatory overtime." *Id.* at 791. Likewise, summary judgment must be granted in the County's favor, because as a matter of law, Plaintiff was not qualified to perform her job as a PSD I because, according to her deposition testimony, she was unable to work mandatory overtime.

### 3. Plaintiff Did Not Suffer an Adverse Employment Action Due to Her Alleged Disability

"An adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment." *Fox v. Costco Wholesale Corp.,* 918 F3d 65, 71 [2d Cir 2019] (internal quotation marks and citation omitted).  Although Plaintiff was brought up on departmental charges, she cannot maintain that those charges were as a result of her alleged disability.  To the contrary, out of the fourteen charges of misconduct, eight involved her absences from work which lacked sufficient accruals to cover the absences, three involved disobedience of orders for failing to report for mandated overtime, two involved absences without leave for her failure to report for an extra day of work ("X day") and one involved her failure to renew her Department Identification Card to reflect a name change.

### 4. Plaintiff's Claim of Disparate Impact Fails

Although Plaintiff's Complaint alleges a cause of action for "disparate impact" (Gabor Decl. Ex. A   ¶¶ 68-76), Plaintiff has failed to articulate sufficient facts to sustain her claim.  "In order to show disparate impact plaintiffs must demonstrate '(1) the occurrence of certain outwardly neutral practices; and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *Schoengood v. Hofgur,* 2021 WL 1906501 at *3 [EDNY 2021] quoting *Tsombanidis v. W. Haven Fire Dep't,* 352 F3d 565, 574-575 [2d Cir 2003].  "The basis for a successful disparate impact claim involves a comparison between two groups-those affected and those unaffected by the facially neutral policy. The comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Id.*at 575.  "The Court of Appeals has noted the customary use of statistical evidence and the importance of developing appropriate comparison groups in demonstrating disparate impact." *Wilson v. New York,* 2017 WL 9674497 at *15 [EDNY 2017].  Here, Plaintiff has not proffered any evidence to prove disparate impact; there is no statistical evidence nor is there any comparison between groups in order to determine if an alleged protected group has been impacted differently than the other group of individuals.  Accordingly, this claim must be dismissed.

### B. Defendant Had a Legitimate Justification for its Actions and Plaintiff Cannot Prove that it Was Merely Pretext and the Real Reason was Discrimination

Even if Plaintiff can present a prima facie case of disability discrimination (which she cannot), the County has set forth legitimate, non-discriminatory reasons for it actions in dealing with Plaintiff.  First and foremost, as explained *supra*, working overtime is an essential function of the job of a PSD I, from which no employee was excluded.  As per the memo from Lt. Rohrer, E.O. of the Communications Section, all employees were considered part of the O/T Mandate Pool, and no one was exempt. (Gabor Decl. Ex. H).  In addition, Labor Relations reinforced this

21

position by asserting that no employee would be excused from overtime, as it is a part of the position. (Gabor Decl. Ex. I), and that in order for the unit where Plaintiff worked as a PSD I to be properly staffed at all times, overtime is an essential function of the job. (Gabor Dec. Ex. BB). Clearly, Plaintiff was not singled out and allegedly discriminated against; every employee was treated the same and the overtime mandates applied universally to all employees.   The Plaintiff bears the ultimate burden of proving that the County's stated justification for its action was merely pretext and the real reason was discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 US 248, 253, 101 S Ct 1089, 67 LEd 2d 207 [1981].  Plaintiff cannot meet this burden.

## POINT III

### PLAINTIFF CANNOT STATE A CLAIM FOR RETALIATION

'"The elements of a retaliation claim under the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) and adverse decision or course of action was taken against plaintiff, and (iv) a causal connection exists between the protected activity and the adverse action.'" *Natofsky v. City of New York,* 921 F3d 337, 353 [2d Cir 2019] *quoting Weixel v. Bd. Of Ed. Of City of New York,* 287 F3d 138, 148 [2d Cir 2002]. A plaintiff may prevail on a claim of retaliation even where the underlying conduct complained of was not, in fact, unlawful. In order to prevail, however, the plaintiff has the burden to establish that she possessed a good faith, reasonable belief that the underlying challenged actions of the employer were illegal.  *Treglia v. Town of Manlius*, 313 F3d 713, 719 [2d Cir 2002]. This claim is also governed by the *McDonnell Douglas* burden-shifting framework. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F3d 1033, 1038-39 [2d Cir. 1993] (describing burdens of proof in retaliation claims brought under Title VII).

The Supreme Court has held that "the anti-retaliation provision…unlike the substantive provision, is not limited to discriminatory actions that effect the terms and conditions of the employment." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 US 53, 64, 126 S Ct. 2405, 165 LEd. 2d 345 [2006]. This means that in a retaliation case, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.* at 68, 126 S Ct. 2405 (internal citations and quotation marks omitted); *Burlington*, 548 US at 67, 126 S Ct. 2405 (emphasizing that actionable employer conduct must be "materially" adverse because "it is important to separate significant from trivial harms.").

Additionally, the Supreme Court has highlighted that the alleged adverse employment action must be viewed from the perspective of the reasonable employee, 'because [Title VII's] standard for judging harm must be objective' to avoid 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Pacheco v. New York Presbyterian Hosp.* 593 F Supp 2d 599,627 [SDNY 2009] citing *Burlington* at 68-69, 126 S.Ct. 2405; *Shultz v. Congregation Shearith Israel of City of New York*, 867 F3d 298, 309 [2d Cir 2017]. Notably, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen*, 278 F3d 103, 117 [2d Cir 2002].

Plaintiff alleges that that she requested an accommodation that she not be compelled to work mandated overtime hours and it appears that she is alleging that she was retaliated against when she was brought up on departmental charges.  To establish causation, the plaintiff must show that the defendant's retaliation was the "but for" cause of the adverse employment action. *Husser v. N.Y. City Dep't of Educ.*, 137 F Supp 3d 253, 271-72, 2015 WL 5774741, at *13 [EDNY Sept 30, 2015].  Assuming that her protected activity was the submission of a medical note: "Certificate

for Work Restrictions", dated November 17, 2012, stating: "Patient was diagnosed with Transverse Myelitis resulting in Headaches. Anxiety causing worsening headaches secondary to work related mandated hours." "Restrictions: Limited work schedule to her normally scheduled hours." 56.1 ¶ 66, Gabor Decl. Ex. Z, Plaintiff has failed to prove that the departmental charges were the "but for" cause of her alleged requests for a reasonable accommodation.  Indeed, Plaintiff was presented with departmental charges on June 5, 2013, and the Certififacte for Work Restrictions note is dated November 12, 2012, which is too temporally remote to be considered "retaliation." Courts in this Circuit have found that "when more than three months have passed between a protected activity and an allegedly retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation." *Jimenez v. City of N.Y.*, 605 F Supp 2d 485, 528 [SDNY 2009]; *see also Hollander v. Am. Cyanamid Co.*, 895 F2d 80, 86 [2d Cir 1990] (finding period of three months insufficient to establish temporal proximity); *Miller v. Norton*, No. 04-CV-3223, 2008 WL 905830, *7 [EDNY Mar 31, 2008] (finding no temporal proximity where more than one year elapsed between filing of complaint and failure to promote); *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F Supp. 133, 138 [SDNY 1987] (finding period of seven months insufficient); *Clark County Sch. Dist. v. Breeden*, 532 US 268, 273 121 S Ct 1508, 149 LEd 2d 509 [2001] ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.")"; *Altieri v. Albany Pub. Library*, 172 Fed Appx 331, 333 [2d Cir Feb 1, 2006] (noting the Second Circuit's stance that "even a three and one-half month interval between protected activity and alleged retaliation may be insufficient to establish a causal connection"); *McCoy v. State of New York*, 2007 WL 2404797 at *5-6 (noting the line of cases that hold that time periods ranging from three months to two years

24

are too long to establish a causal connection); *Rouse v. City of N.Y.*, 08 Civ 7419 (HB), 2009 WL 1532054 at *12 [SDNY June 2, 2009] ("the ten month period ... stretches the bounds of the time frame that courts have allowed to support an inference of causation based on temporal proximity.") Accordingly, Plaintiff failed to establish a claim for retaliation.

## POINT V

### THIS COURT SHOULD NOT FIND PENDENT JURISDICTION ON THE STATE CLAIMS WHICH APPLIES A SIMILAR STANDARD

"A claim of disability discrimination under the New York State Human Rights Law ... is governed by the same legal standards as govern federal ADA claims." *Graves v. Finch Pruyn & Co., Inc.*, 457 F3d 181, 184 n 3 [2d Cir 2006]. Thus, for the very same reasons that the substantive claims of ADA disability discrimination and retaliation under federal law must be dismissed, the state claims for the same causes of action must also be dismissed.

## CONCLUSION

For all the reasons and arguments presented, Defendant's motion pursuant to Federal Rule 56 should be granted in its entirety.

Dated:  Hauppauge, New York
        September 8, 2023

Yours, etc.
DENNIS M. BROWN

Acting Suffolk County Attorney
Attorney for Defendant
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788-0099
(631) 853-5822

*Hope Senzer Gabor*
By: Hope Senzer Gabor
Assistant County Attorney