UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KRISTY PFLUG,

                                Plaintiff,

    -against-

THE COUNTY OF SUFFOLK,

                               Defendant.
------------------------------------------------------------------------X

Docket No.: 20-cv-00018 (SIL)

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

Defendant, THE COUNTY OF SUFFOLK, by its attorney, DENNIS M. BROWN, Acting Suffolk County Attorney, submits the following statement of undisputed material facts pursuant to Local Rule 56.1 and in support of its motion for summary judgment. All referenced exhibits refer to those which will be annexed to the Declaration of Hope Senzer Gabor in Support of Defendant's Motion for Summary Judgment.

    1. Plaintiff commenced employment with Defendant, County of Suffolk ("County") at the Suffolk County Police Department as a Public Safety Dispatcher ("PSD") in December of 2002, as a PSD I. Gabor Decl. Ex. B, P1. Dep. Tr. 5:6-12.

    2. Plaintiff left her job at the County on July 4, 2013. Gabor Decl. Ex. B, Pl. Dep Tr. 13:25-14:2.

    3. According to Plaintiff, a PSD I receives information from a 911 emergency complaint

operator, which is sent through the computer. The dispatcher, who receives the calls reads the calls and dispatches the calls to the police sector cars and the PSD I coordinates all of those efforts with a particular precinct. Gabor Decl. Ex. B, Pl. Dep. Tr. 15:13-22.

    4. When Plaintff started working as a PSD I she was on the two tour rotating shift; she worked from 8:00 am to 4:00 pm, for five days and then had two days off, and then worked from 4:00 pm to 12:00 am and then had three days off. Gabor Decl. Ex. B, Pl. Dep Tr. 16:3-9.

    5. Plaintiff was not employed between July 4, 2013 and August of either 2018 or 2019. Gabor Decl. Ex. B, Pl. Dep. Tr. 12:19-13:6.

    6. The last job Plaintiff had ended in March of 2023, when she voluntarity left. Gabor Decl. Ex.. B, Pl. Dep. Tr. 11:2-10.

    7. When Plainitff first started working for the County in 2022, she worked mandated overtime. Gabor Decl. Ex. B, Pl. Dep. Tr. 16:10-12.

    8. Between 2002 and 2011, Plaintiff worked mandates; in the beginning it wasn't a lot, but then it started increasing. Gabor Decl. Ex. B, Pl. Dep. Tr. 18:21-19:3.

    9.  If, for instance a PSD I called in sick, in order to fill the vacancy, people who signed up for overtime would do so, if there was no one who signed up for the overtime, then someone would be mandated to come in. The mandate was based on seniority. Gabor Decl. Ex. B, Pl. Dep. Tr. 21:6-13.

    10. For most of her career, Plaintiff was supervised by PSD II's, who were her immediate supervisors. Above them were desk officers and then above them, were two or three sergeants. Above them, in the backroom was a lieutenant and a captain. For the past few years that Plaintiff worked for the County, PSD III's took over the sergeant's positions. Gabor Decl. Ex. B, Pl. Dep. Tr. 21:21-12.

11. In April 2011, Plaintiff requested and was granted a leave of absence from her position as a PSD I from April 10, 2011 to April 9, 2012. Gabor Decl. Ex. B, Pl. Dep. Tr. 28:27:20-28:21, Gabor Decl. Ex. C and Ex. D.

12. Plaintiff returned to work on April 10, 2012. Gabor Decl. Ex B, Pl. Dep. Tr. 29:9-16, Gabor Decl. Ex. E.

13. When she returned to work, Plaintiff was assigned to Rotating Squad 3. Her schedule was 8:00 am to 4:00 pm for five days, and then she would have two days off, and then she would work 4:00 pm to 12:00 am for five days, and then she would have three days off. Gabor Decl. Ex. B, Pl. Dep Tr. 29:10-30:3, Gabor Decl. Ex. E.

14. This new schedule as set forth above, was at Plaintiff's request; prior to her leave, she worked the midnight shift which was a steady shift. This was instituted prior to her return from leave. Gabor Decl. Ex. B, Pl. Dep. Tr. 31:8-15, 33:15-34:4.

15. In order to change to the new shift, Plaintiff presented a note from her doctor which indicated that she should not work the midnight shift. Gabor Decl. Ex. B, Pl. Dep. Tr. 31:8-12, Gabor Decl. Ex, F

16. When she returned from her leave, within the first month, Plaintiff was mandated to work overtime, which she believes she did. Gabor Decl. Ex. B, Pl. Dep. Tr. 34.7-25.

17. Thereafter, Plaintiff was again mandated. There were mandates every week; and pretty much every day, somebody was being mandated. It went through the seniority list. Gabor Decl. Ex. B, Pl. Dep. Tr. 35:2-12.

18. There were people that volunteered for ovetime, however, if there weren't enough people who volunteered, then the mandates would start. Gabor Decl, Ex. B, Pl. Dep. Tr. 35:24-36:8.

19. When Plaintiff returned to work after her leave, the PSD II's that supervised her were Sandy Flammer and Jennifer Worthington, who would communicate with her concerning mandates. Gabor Decl. Ex. B, Pl. Dep. Tr. 36:12-37:6

20. Plaintiff had issues with reporting late for her shift. On May 25, 2012, a Supervisor's Record of Verbal Reprimand was issued to Plaintiff by PSD III Petrina Hubner. Therein, Plaintiff was reprimanded for arriving late to work on April 12, 2012 and was informally counseled. On May 4, 2012 Plaintiff was late returning from her meal break and was informally counseled, and on May 21, 2012, Plaintiff was 9 minutes late returning from her meal break. Plaintiff was advised that these instances of lateness were unacceptable and that she "must be at her workstation, equipped and ready to perform her job, at start of tour and/or at the completion of breaks." Gabor Decl. Ex. Y.

21. When Plaintiff returned from her leave in April, 2012, she was breastfeeding. Due to the mandates, Plaintiff requested that be provided with a room where she could breast pump. That accommodation was provided, relatively soon after she returned from her leave. Gabor Decl. Ex. B, Pl. Dep. Tr. 41:17-42:19.

22. There came a time when Plaintiff didn't want to work the mandates because "physically and mentally [she] was getting very stressed about working them." She presented notes trying to limit her hours to just the regular 8 hour shift. Gabor Decl. Ex. B, Pl. Dep. Tr. 43:11-21.

23. Duirng the same time period, Plaintiff testified that others ("quite a few") were having issues with working the mandates. At some point Plaintiff and the others were temporarily excused from working the mandates. The mandates effected everybody. Gabor Dec. Ex. B, Pl. Dep. Tr. 43:24-44:19.

24. According to the Union, all PSD's had to work X-Days, to make up for the fact that they had more days off than the rest of the County.  The PSD's were required to work six extra days per year. This effected all of the PSD's. Gabor Decl. Ex. B, Pl. Dep. Tr. 44:20-45:21.

25. On November 11, 2012, Plaintiff was issued a "Written Reprimand", due to the fact that on Saturday, November 3, 2012, although Plaintiff was scheduled to work an X-Day, she did not show up, and accordingly, she was marked as AWOL. PSD II Flammer asked her to write a 20-42 regarding her AWOL.  The reprimand also states that Plaintiff had been reprimanded several times in the past regarding time management.  If further states that On May 26, 2012 Plaintiff was issued a Verbal Reprimand for lateness, and on July 10, 2012, whe was docked 6.65 hours of sick time that she attempted to use for an X-Day. Gabor Decl. Ex. J.

26.  On November 15, 2012, Plaintiff submitted Internal Correpondence addressed to Lt. Rohrer, XO Communications which explained that she forgot that she was scheduled to work the X-Day, and when she was contacted by PSD II Lawlor on the date that she was scheduled to work the X-Day, she could not come in because "it was too late to get a family member to watch my baby so I couldn't come in." Gabor Decl. Ex. K, Gabor Dec. Ex. B,  Pl. Dep. Tr. 48:20-49:4.

27. On November 19, 2012, PSD II Dennis Lawlor sent an Internal Correpondence to William Rohrer, Lieutenant, C.O. Communications Section, describing his attempts to reach Plaintiff concerning her failure to show up to work for a scheduled X-Day.  PSD II Lawlor left Plaintiff a message, and when he didn't hear back from her, he called her again.  He spoke with a male who advised that he would let Plainitff know that she was supposed to be at work, and then the call was disconnected.  He then called back and he was advised by the male answering the phone that Plaintiff would call him back.  When Plaintiff called PSD Lawlor back, he questioned

her as to why she did not report to work for her X-Day, and attempted to get her to come into work. Plaintiff refused and replied, "I don't work x-days". Gabor Decl. Ex. L.

28. On yet another occasion, Plaintiff was late returning to work after a meal. On December 1, 2012, Plaintiff wrote an Internal Correspondence to Lt. Rohrer, with the Subject: Lateness from meal. Therein, Plaintiff explained why she was late. Gabor Decl. Ex. M. Gabor Decl. Ex. B, Dep. Tr. 51:21-52:24.

29. On December 23, 2012, Plaintiff was mandated to work 4:00 am to 8:00 am, attached to her regular 8:00 am to 4:00 pm tour. Plaintiff did not report for the mandate at 4:00 am, but reported for her scheduled tour at 8:00 am. Plaintiff could not recall if she communicated with anyone at the job to communicate that she would not be coming in for her 4:00 am mandated shift. Gabor Dec. Ex. B, Pl. Dep. Tr. 54:21-25

30. On December 23, 2012, Plaintiff sent an Internal Correspondence to Lt. Rohrer, memorializing that she did not report for the mandate at 4:00 am, but did report for her regular shift at 8:00 am. Gabor Decl. Ex. B, Pl. Dep. Tr. 53:3-21, 54:11-17, Gabor Decl. Ex. N.

31. On December 28, 2012, PSD II Sandra Flammer sent an Internal Correpondence to Lt. Rohrer concerning Plaintiff's refusal to work the 4:00 am mandated overtime on December 23, 2012. Therein, Ms. Flammer advised Lt. Rohrer that on December 21, 2012, she had a conversation with Plaintiff regarding 4:00 am mandates before an 8:00 am to 4:00 pm tour, wherein Plaintiff told Ms. Flammer that she didn't like coming in at 4:00 am because she didn't want to inconvenience her in-laws by making them get up in the middle of the night to watch her daughter, and that since her husband would be staring his vacation soon, she would be more apt to come in at 4:00 am. During that conversation, Ms. Flammer recounts that Plaintiff advised her that the department "better not" mandate her on Christmas since she was mandated on

6

Thanksgiving. On Saturday, December 22, 2012 PSD II DeAbreu mandated Plaintiff to come in on Sunday, December 23, 2012 at 4:00 am, however Plaintiff did not come in for the mandate at 4:00 am, (she called in sick) but showed up for her regular 8:00 am to 4:00 pm tour. Gabor Decl. Ex. O, Pl. Dep. Tr. 55:4-22, 56:12-17, 60:16-21.

32. Plaintiff testified that the policy concerning mandates became "either Fit for Duty or Not Fit for Duty", maybe sometime around Christmas 2012. Pl. Dep. Tr. 58:16-59:3.

33. In fact, on January 11, 2013, an email memo was sent from the SCPD Human Resources Bureau to Lt. William Rohrer and others, with the subject: Mandated Overtime". The memo states: "As per Paul Margiotta of Labor Relations, no employee will be excused from overtime. The overtime is part of the position. If they can't work overtime, they are unfit for duty and therefore cannot work their normal shift." Gabor Decl. Ex. H.

34. At that time, no else refused to work mandates, other than Plaintiff, who continued to decline working the mandates. "And I was not trying to be super disobedient. I came in for my shift, I just wasn't coming in the mandate." Pl. Dep. Tr. 59:20-22, 60:6-8.

35. On December 25, 2012, PSD III Chris Glynn, sent an Internal Correspondence to Lt. William Rohrer which memorializes a conversation with Plaintiff, wherein she refused to work a mandate on December 25, 2012. Although the Plaintiff stated that she could not work the 4:00 am mandate because she was sick, she advised PSD III Glynn that she could work the regular tour. PSD III Glynn noted in the Internal Correspondence that this has become a pattern with Plaintiff. PSD III indicated that he intended to issue a formal Written Reprimand, however he was advised that since there was existing disciplinary action against Plaintiff, he was advised not to do so. Gabor Decl. Ex. P, Gabor Decl. Ex. B, Pl. Dep. Tr. 64:7-22, 65:9-19.

36. Plaintiff testified that even though the union was aware that "something was coming

7

because you could only refuse so much until you would get in trouble", the union did not help. Pl. Dep. Tr. 66:21-24, 67:3-5.

37. On January 8, 2013, Plaintiff sent yet another Internal Correspondence to Lt. Rohrer concerning a mandate. The correspondence indicates that on that date, Plaintiff was mandated to stay at 4:00 pm, and that due to a doctor's appointment she could not work the mandate. Gabor Decl. Ex. Q, Gabor Decl. Ex. B, Pl. Dep. Tr. 69:21-70:20.

38. Because Plaintiff refused to work the mandate on January 8, 2013, a Supervisor's Complaint Report was filed stating: PSD Pflug refused a direct order by the undersigned, her direct supervsor, to stay for mandated overtime at 1600 hours. In doing so, another dispathcer was mandated to cover her AWOL. This was not PSD Pflug's first refusal of a direct order by a Communications Supervisor for a mandate." Plaintiff knew that there would be ramifications for her refusal to work mandates, and she knew that she "was on borrowed time." Plaintiff "knew something was going to happen" and that is why she tried to quit. Gabor Decl. Ex. R, Gabor Decl. Ex. B, Pl. Dep. Tr. 70:21-71:18, 71:24-72:8.

39. Plaintiff testified that between three and six months after she returned to work from maternity leave in April of 2012, when she started giving push back and refusals to work mandated overtime, she was sent to meet with someone at Employee Assistance. This occurred when she reported for her regular shift and it was recommended that she meet with Employee Assistance to determine that she was "either Fit or Not Fit for Duty." Plaintiff never spoke to the union about this. Gabor Decl. Ex. B, Pl. Dep. Tr. 86:11-16, 87:25.90:3-4.

40. Plaintiff testified that when she returned to work after her maternity leave, even

8

though she requested to be placed on the two tour instead of midnights, and realized that the two tours were getting more mandates, she did not ask to be changed back to midnights, although she "should have done that". Gabor Decl. Ex. B, Pl. Dep. Tr. 93:19-94:7.

41. One week before June 5, 2013, Plaintiff testified that she verbally resigned, to be effective on June 5, 2013. She believes she told PSD II's Jen Worthingon and Sandy Flammer. Gabor Decl. Ex. B, Pl. Dep. Tr. 94:14- 95:17.

42. On June 5, 2013, after Plaintiff had ordered breakfast, she was approached by Petrina Hubner and was brought to Internal Affairs. Present were Lieutenant Fischer, Internal Affairs Investigator Lieutenant Soto, and one or two other investigators. Plaintiff was provided with union representation. Gabor Dec. Ex. B, Pl. Dep. Tr. 96:18-97:23.

43. Plaintiff received and acknowledged receipt of communication from Police Commissioner, Edward Webber that she was suspended from duty without pay, effective June 4, 2013 at 1042 hours. Gabor Decl. Ex. S, Gabor Decl. Ex. B, Pl. Dep. Tr. 98:19-99:9.

44. At the Internal Affairs meeting, Plaintiff was presented with Departmental Charges containing fourteen (14) charges of misconduct. Gabor Decl. Ex. T, Gabor Decl. Ex. B, Pl. Dep. Tr. 99:12-100:16.

45. Even though Plaintiff testified that she verbally resigned to be effective on June 5, 2013, but she did not do so; she took the suspension so that she could get an extra month of not having to pay for insurance. Gabor Decl. Ex. B, Pl. Dep. Tr. 100:19-101:4, 101:13-102:5.

46. Therafter, Plaintiff went to the union concerning the charges. She testified that she went to the union "and it was a giant disappointment." Plaintiff was assigned a union lawyer who told her that: "I could fight it, but he said everything is lined up against you in the

9

County…you're not going to win". Even though Plaintiff felt it was unfair, she was advised to "take whatever the County offers and go on your way." Pl. Dep. Tr. 102:5-103:10.

47. After her suspension, Plaintiff was reinstated as of Wednesday, July 3, 2013. Plaintiff returned to the workplace on July 4, 2013 for the 8:00 am to 4:00 pm shift. At the end of that shift, Plaintiff was advised that she was mandated to work that night. In response, Plaintiff tendered her resignation, she believes to Jen Worthington. Gabor Dec. Ex. U, Gabor Decl. Ex. B, Pl. Dep. Tr. 105:106:16.

48. With reference to the Departmental Charges containing fourteen (14) charges of misconduct, Plaintiff entered into a Stipulation and Agreement and General Release, although she did not want to sign it and felt pressured to do so by the union lawyer. The Stipulation and Agreement and General Release was signed by Plaintiff on September 3, 2013. Gabor Decl. Ex. V, Gabor Decl. Ex. B, Pl. Dep Tr. 108:7-24.

49. In return for executing the Stipulation and Agreement and General Release: 1) Plaintiff pleaded no contest to the Charges and Specifications; 2) the County withdrew eleven (11) working days of the thirty day suspension, and Plaintiff was reimbursed $2,466.20; 3) the County agreed to prvide Plaintiff with a neutral reference, and the County agreed not to interfere with Plaintiff's attempt to apply for unemployment benefits; and 4) the Plaintiff agreed to execute the General Release. The Plaintiff executed the Stipulation and Agreement and General Release on September 3, 2013. Gabor Decl. Ex. V, Gabor Decl. Ex. B, Pl. Dep. Tr. 109:12-110:14.

50. The Release specifically states: "Kristy Pflug, as RESLEASOR,…hereby releases and holds harmless the COUNTY OF SUFFOLK, as RELEASEE,…from all actins, causes of action, suits debts, dues, sums of money, accounts, reckonings, bonds, bills, specialities,

covenants, contracts, controversies, agreements, promises, variences, trespasses, damages, judgments, extens, executions, claims and demans whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR,…ever had, now have or hereafrter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day and date of this GENERAL RELEASE, including but not limited to any and all claims of any kind or any nature whatsoever which were reaised, or could have been raised, in connection with the RELEASOR'S employment or service with RELEASEE arising from the disciplinary charges brought against her." Gabor Decl. Ex. V.

51. Approximately six months after signing the Stipulation and Agreement and General Release, on March 11, 2014, Plainitff sent a letter to Suffolk County Police Commissioner requesting that: "I am now writing to you in the hopes that I will be able to have my job back as soon as possible." A response to Plaintiff's letter was sent to her on March 17, 2014, which states: "Unfortunately, at this time, we do not have budgetary approval to fill a position of Public Safety Dispatcher I." Gabor Decl. Ex. W, Gabor Decl. Ex. X, Gabor Decl. Ex. B, Pl. Dep. Tr. 111:12-112:8.

52. In 1991, Jennifer Worthington started working for Suffolk County as a Public Safety Dispatcher. She was promoted to PSD II in 2010, and in 2017, she was promoted to PSD III. Gabor Decl. Ex. G, Worthington Dep. Tr. 10:6-16, 12:20-13:2.

53. When she was a PSD II Jennifer Worthington was Plaintiff's supervisor. At that time, Ms. Worthington's duties included: scheduling, making sure all the readios were covered, wathicing all the calls for all of the precincts, listening to the calls that came in, and listened to all the calls that went out, readio checks, recorder checks, making sure there were enough dispatchers and operators, for each tour, and if there was no one else to cover the radios, she

would be on the radio or on a phone, when there was not enough staffing. Gabor Decl. Ex. G, Worthington Dep. Tr. 11:23-12:19.

54. As a PSD II, Ms. Worthington was responsible for supervision of the dispatchers and call takers during her tour, which was either 8:00 am to 4:00 pm, 4:00 pm to midnights or overtime, which would be on a midnight shift, or the shift before her or the shift after her. If she was on a 8:00 am to 4:00 pm tour, then the oevertime would either be a 4:00 am in the morning, at at 4:00 pm in the afternoon. If she worked 4:00 pm to midnight, her overtime would be either at noon or midnight. Gabor Decl. Ex. G, Worthington Dep. Tr. 14:13-15:18.

55. Overtime was assigned when there was a staffing shortage. There was either voluntary overtime, which someone would sign up for, or mandated overtime. Mandated overtime was assigned when there were no volunteers left that signed up, and whoever was up next was assigned the mandated overtime. Gabor Decl. Ex. G, Worthington Dep. Tr. 16:11-17:7. 18:8-11.

56. Ms. Worthington was employed by the County when Plaintiff was hired. Plaintiff was a PSD I throughout the entirety of her employment with Suffolk County. Gabor Decl. Ex. G, Worthington Dep.Tr. 19:22-20:4.

57. Ms. Worthington was aware that Plaintiff had taken time off when she gave birth. When Plaintiff returned, Ms. Worthington was her supervisor. Gabor Decl. Ex. G, Worthington Dep. Tr. 20:11-25.

58. During the time that Ms. Worthington was a PSD II suprvising Plaintiff, there were other PSD II's supervising Plaintiff; it could have been Sandi Flammer (Shomilik), Michele Ramirez or Brain Applebee. At that time, the PSD III's were Petrina Hubner, Ann Guglielmo and Anthony Bocchimuzzo. Gabor Decl. Ex. G, Worthington Dep. Tr. 21:9-22:6.

59. Ms. Worthington is aware that Plaintiff requested a private room to pump milk, and that she was provided with one "right away". When the request came in for Plaintiff to have the room, Ms. Worthington explored the New York State parameters to learn what was needed for the room. Gabor Decl. Ex. G, Worthington Dep. Tr. 22:25-23:12, 29:22-30:5.

60. Overtime mandates existed since Ms. Worthington came to work at the County as a PSD I, and when Plaintiff was employed at the County. Overtime mandates exist if there is not enough staffing and not enough people volunteer for the overtime. In that case if there was not enough staffing, a person was mandated for a four hour block. Gabor Decl. Ex. G, Worthington Dep. Tr. 24:5-12, 25:2-10.

61. If a PSD I employee could not do the mandate on a particular day, that employee would, at the request of the PSD II, place in writing the reasons they could not do the mandate. As a result, the next person on the list would be mandated. Gabor Decl. Ex. G, Worthington Dep. Tr. 26:11-27:16.

62. After Plaintiff returned from maternity leave, Ms. Worthington, as her supervisor PSD II mandated her to work overtime. Gabor Decl. Ex. G, Worthington Dep. Tr. 27:23-28:2.

63. When Plaintiff was mandated, and she needed to take time off for childcare or a doctor's issue, Ms. Worthington, as her supervisor PSD II would ask for it in writing the then the next person on the list would be asked to work the overtime. Gabor Decl. Ex. G, Worthington Dep. Tr. 30:6-14.

64. Ms. Worthington recalled that she received a memo dated August 3, 2012 from Lt. Willam Rohrer, E.O. Communications Section addressed to Communications Supervisors regarding "Revised Policy Mandated O/T Exemptions. She testified that this memo applied to a few people who had medical conditions who were previoulsy exempted from overtime mandates.

13

This memo states: "Therefore, effective August 25, 2012, no employee will be exempted from working Mandated O/T. All employees will be considered part of the O/T Mandate pool." Ms. Worthington testified that this memo indicated that those individuals who were on the exempt list could no longer be exempt. Because the memo came from her executive officer, it was Ms. Worthington's obligation to enforce the policy. Gabor Decl. Ex. H, Gabor Decl. Ex. G, Worthington Dep. Tr. 30:15-31:16, 32:8-11. .

65. During her deposition, Ms. Worthington was asked to read a letter dated March 9, 2011, addressed "To Whom It May Concern" and signed by Scott McWilliams , M.D. Ms. Worthington testified that this letter was submitted bacause Plaintiff couldn't work midnights. The letter states: "With this in mind, it was recommended that Ms. Pflug not work overnight hours…" The request was accommodated; when she returned from maternity leave, Plaintiff was no longer assigned to the midnight shift-she worked the 2 tour-8:00 am to 4:00 pm, and 4:00 pm to 12:00 am. Gabor Decl. Ex. F, Gabor Decl. Ex. G, Worthington Dep. Tr. 36:20-38:2.

66. Plaintiff presented a second note from a different doctor entitled: "Certificate for Work Restrictions", dated November 17, 2012, stating: "Patient was diagnosed with Transverse Myelitis resulting in Headaches. Anxiety causing worsening headaches secondary to work related mandated hours." "Restrictions: Limited work schedule to her normally scheduled hours." Gabor Decl. Ex. Z.

67. Plaintiff also presented a third note, dated August 30, 2012, from her daughter's pediatrician which states that Plaintiffs daughter "…is suffering with a serious medical condition and it is imperative that Kristy not be scheduled for to work longer thatn 8 hours in a 24 hour period." This note has nothing to do with Plaintiff's alleged disability; it merely refers to her daughter's unidentified "medical condition." Gabor Decl. Ex. AA.

68. Colleen Jaen is employed by the Suffolk County Police Department (SCPD), Communications Section. On October 20, 1997, she was hired as a Public Safety Dispatcher (PSD) I. In 2013, she was promoted to Public Safety Dispatcher II, and in 2000, she was promoted to Public Safety Dispatcher III. Gabor Decl. Ex. BB, ¶¶ 1-3.

69. The SCPD Communications Section is a 365 day a year, 24 hour per day, 7 day a week unit, meaning that is fully operational and must be staffed at all times. Gabor Decl. Ex. BB ¶ 3.

70. In the unit, there is a PSD assigned to every radio band in Suffolk County. In addition to the PSD's that are actively on the radio, the Communication Section requires that there are additional PSD's on duty, to ensure that the PSD's working the radios are able to take a break or a meal period. The radios must be manned at all times. Gabor Decl. Ex. BB ¶ 4.

71. In order to properly staff a shift, there are a minimum number of PSD's required. When the minimum number of employees is not met, overtime hours are implemented, in order to cover the minimum staffing levels. Employees can volunteer for overtime, however if there are not enough people who volunteer for overtime, then employees are mandated to work the overtime. Gabor Decl. Ex. BB ¶ 5.

72. Overtime is assigned in four hour increments; either four hours prior to a PSD's shift, or four hours after a PSD's shift. Gabor Decl. Ex. BB ¶ 6.

73. Overtime has always been, and continues to be required of every PSD in order to cover minimum staffing levels. Upon hire, every PSD is made aware of the fact that the job requires overtime. Gabor Decl. Ex. BB ¶ 7

74. As such, overtime hours are an essential function of the job of a PSD. Gabor Decl. Ex. BB ¶ 8.

Dated: Hauppauge, New York
       September 8, 2023

                        Respectfully submitted,

                        DENNIS M. BROWN
                        Suffolk County Attorney
                        *Attorneys for the Defendant*
                        *The County of Suffolk*
                        100 Veterans Memorial Highway
                        Post Office Box 6100
                        Hauppauge, New York 11788
                        (631) 853-4049

            BY:    *Hope Senzer Gabor*
                        Hope Senzer Gabor
                        Assistant County Attorney

TO:    Yale Pollack, Esq.
         THE LAW OFFICES OF YALE POLLACK, P.C.
         *Attorneys for Plaintiff*
         66 Split Rock Road
         Syosset, New York 11791
         ypollack@yalepollacklaw.com