# EXHIBIT G

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
3  ---------------------------------------
   KRISTY PFLUG,
4
               Plaintiff,
5                                   Civil Action No.
       -against-                    20-CV-00018
6
   THE COUNTY OF SUFFOLK,
7
               Defendant.
8  ---------------------------------------

9        REMOTE VIDEOCONFERENCE DEPOSITION OF

10  JENNIFER WORTHINGTON, the Non-Party Witness

11  herein, taken by Plaintiff, pursuant to

12  Notice, on Wednesday, May 10, 2023, at 10:00

13  a.m., before Patricia Guarino, a Shorthand

14  Reporter and notary public, within and for the

15  State of New York.

16

17

18

19

20

21

22

23

24

25



```
 1

 2    A P P E A R A N C E S :

 3    THE LAW OFFICES OF YALE POLLACK
              Attorneys for Plaintiff
 4    66 Split Rock Road
      Syosset, New York 11791
 5
      BY:   YALE POLLACK, ESQ.
 6          (516) 634-6340
            ypollack@yalepollacklaw.com
 7

 8

 9
      DENNIS BROWN, Acting Suffolk County Attorney
10    SUFFOLK COUNTY ATTORNEY
              Attorneys for Defendant
11    100 Veterans Memorial Highway
      Post Office Box 6100
12    Hauppauge, New York 11788

13    BY:   HOPE SENZER GABOR
            Assistant County Attorney
14          (631) 853-5822
            hope.senzergabor@suffolkcountyny.gov
15

16                     *  *  *

17

18

19

20

21

22

23

24

25
```



1

2

3           IT IS HEREBY STIPULATED AND AGREED

4    that all objections, except as to the form of

5    the questions, shall be reserved to the time

6    of the trial;

7           IT IS FURTHER STIPULATED AND AGREED

8    that the within examination may be subscribed

9    and sworn to before any notary public with the

10   same force and effect as though subscribed and

11   sworn to before this court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2          Whereupon,
 3                    JENNIFER WORTHINGTON,
 4     after having been first duly sworn, was
 5     examined and testified as follows:
 6                COURT REPORTER:   Please state your
 7          name for the record.
 8                THE WITNESS:  Jennifer A.
 9          Worthington.
10                COURT REPORTER:   What is your
11          business address?
12                THE WITNESS:  30 Yaphank Avenue,
13          Yapank, New York 11980.
14     EXAMINATION BY MR. POLLACK:
15          Q.   Good morning, Ms. Worthington.   How
16     are you today?
17          A.   Good morning.
18                Fine.   Thank you.
19          Q.   Thank you for attending today.   I'm
20     just going to go through some basic ground
21     rules at the outset.
22                Have you ever been deposed before?
23          A.   No.
24          Q.   What's going to be happening today
25     is I'm going to be asking you a series of
```



```
 1                   J. Worthington
 2   questions regarding my client's claims against
 3   the county as well as defenses that have been
 4   asserted by the county.
 5              You're aware of Ms. Pflug, right,
 6   Kristy Pflug?
 7         A.   Yes.
 8         Q.   So we're going to be asking
 9   questions about Kristy Pflug today.  I'm going
10   to ask that you answer all questions verbally.
11   The court reporter cannot take down head nods,
12   anything of that like, any non-verbal
13   responses.  So it's important for a clean
14   record that you respond to my questions
15   verbally.  Okay?
16         A.   Yes.
17         Q.   And there's going to be points
18   during the deposition where you may anticipate
19   where my question is going.  You may start to
20   answer because you know how I'm going to
21   finish my question, but for the court
22   reporter's sake it's very important that you
23   let me finish my question before answering so
24   we have a clean transcript.  Okay?
25         A.   Yes.
```



```
 1                    J. Worthington
 2           Q.    If you need a break at any time --
 3      I'm not anticipating this to be a very long
 4      deposition, but if you do need a break at any
 5      time please let me know and we will give you
 6      the break that's necessary.  The only caveat
 7      with that is that if there is a question
 8      pending at the time you need the break you
 9      have to answer the question prior to taking
10      the break.  Okay?
11           A.    Yes.
12           Q.    And lastly your attorney may object
13      to certain questions that I pose today.
14      Unless she directs you not to answer the
15      question you should still answer the question
16      posed to you by me.  She may just say
17      "objection," but she may not say "don't answer
18      that question," so you can go ahead and still
19      answer the question that I ask.  Okay?
20           A.    Okay.
21           Q.    So you understand all these
22      instructions?
23           A.    Yes.
24           Q.    All right.  Great.
25                 I have to ask this, but are you
```



```
 1                  J. Worthington
 2    under the influence of any drugs or alcohol
 3    today?
 4         A.    No.
 5         Q.    Are you taking any medications that
 6    may influence your ability to truthfully
 7    respond to my questions today?
 8         A.    No?
 9         Q.    You've stated before you that you
10    haven't been deposed before, correct?
11         A.    Correct.
12         Q.    What did you do to prepare for
13    today's deposition?
14         A.    I spoke is to Hope Gabor.
15         Q.    When did you speak with her?  I'm
16    not asking for the contents of the
17    conversation, just when you spoke with her.
18         A.    I spoke with her yesterday.
19         Q.    How long was that conversation
20    about?
21         A.    10 minutes.
22         Q.    Did you review any documents in
23    anticipation for today's deposition?
24         A.    No.
25         Q.    Were you responsible for gathering
```

```
 1                    J. Worthington
 2    any documents to produce with respect to this
 3    deposition at all?
 4         A.    No.
 5         Q.    Can you please describe your
 6    highest degree of education?
 7         A.    My highest?  High school.
 8         Q.    When did you graduate high school?
 9         A.    1985.
10         Q.    Where was that?
11         A.    Geyserville, California.
12         Q.    That's located in California, the
13    State of California?
14         A.    Yes.
15         Q.    Did you come to New York at a
16    certain point?
17         A.    Did I come to...
18         Q.    Did you move to New York?
19         A.    I moved to New York in 1986.
20         Q.    Did you have a job waiting up for
21    you?
22         A.    No.
23         Q.    When you moved here what was your
24    first job that you attained?
25         A.    I worked at a pet store.
```



Case 2:20-cv-00018-SIL   Document 53-10   Filed 11/03/23   Page 10 of 55 PageID #: 378

```
 1                  J. Worthington
 2        Q.    How long did you work at that pet
 3   store?
 4        A.    Probably about a year, a
 5   year-and-a-half, maybe two.
 6        Q.    We're talking about like '86 to
 7   '88, something like that?
 8        A.    Well, '86 -- yes, '86.  And then in
 9   '87 I started working for New York State
10   Office of Mental Health in '87, so then the
11   pet store was part time.
12        Q.    Office of Mental Health you said?
13        A.    Yes.
14        Q.    Where was that?
15        A.    Pilgrim State in Brentwood.
16        Q.    Pilgrim State was the name of the
17   facility?
18        A.    Pilgrim Psych Center.
19        Q.    How long were you there?
20        A.    Till 1991.
21        Q.    Was that a state job or was that a
22   private job?
23        A.    That's a state job.
24        Q.    What was your position that you
25   held there?
```



Case 2:20-cv-00018-SIL   Document 53-10   Filed 11/03/23   Page 11 of 55 PageID #: 379

```
 1                   J. Worthington
 2          A.    Mental hygiene therapy aide.
 3          Q.    Is that the only roll that you had
 4   while you were there?
 5          A.    Also I worked as an EMT.
 6          Q.    You said the position ended in
 7   1991.  What happened after that?
 8          A.    I started working at police
 9   headquarters as a Public Safety Dispatcher.
10          Q.    Did you ever get promoted at any
11   point?
12          A.    Yes.
13          Q.    When?
14          A.    I believe it was 2010.
15          Q.    Was that to a Public Safety
16   Dispatcher II?
17          A.    Correct.
18          Q.    What were the differences between
19   your duties as a Public Safety Dispatcher I as
20   opposed to a Public Safety Dispatcher II?
21          A.    The floor supervisor -- floor
22   dispatcher.
23          Q.    What were you doing as Dispatcher
24   I?
25          A.    Dispatching precincts and 911
```



```
 1                    J. Worthington
 2    operator.  That's my title.
 3          Q.    As a I you're saying?
 4          A.    As a I you're police dispatcher and
 5    you're also a call taker.  Do both.
 6          Q.    Was Kristy Pflug working at the
 7    county at the time you became a Public Safety
 8    Dispatcher I?
 9          A.    No.
10          Q.    Was she working at the county at
11    the time you were promoted to Public Safety
12    Dispatcher II?
13          A.    I don't know.
14          Q.    Was there a time you were ever
15    Ms. Pflug's supervisor?
16          A.    Yes.
17          Q.    When was that?
18          A.    What year I don't know.
19          Q.    What was your title when you were
20    Ms. Pflug's supervisor?
21          A.    PSD II, Public Safety.
22    Dispatcher II.
23          Q.    In your role as a supervisor
24    what duties did you have over Ms. Pflug as a
25    PSD II?
```



```
 1                   J. Worthington
 2          A.    Scheduling -- scheduling, making
 3     sure that the radios are covered.  Being, you
 4     know -- I'd take care of the -- it was so long
 5     ago.  I did scheduling.  I watched all the
 6     calls for all the precincts, listened to all
 7     the calls that come in, listened to all the
 8     calls that go out.  I took care of the -- I'd
 9     do radio checks.  I'd do recorder checks, make
10     sure there's enough dispatchers, make sure
11     there's enough operators, make sure there's
12     enough operators and dispatchers for the next
13     tour and the tour after that.  And then I
14     would be giving people off or not giving
15     people off.  And we had the sex offender
16     hotline.  We had -- that's almost all of it.
17     I also would -- when there was nobody else to
18     cover the radios I would be on a radio or on a
19     phone, when there was not enough staffing.
20          Q.    Have you ever been promoted beyond
21     PSD II?
22          A.    Yes.
23          Q.    When?
24          A.    2017.
25          Q.    And was that to PSD III?
```



```
 1                    J. Worthington

 2          A.   Yes.

 3          Q.   What was the change in your duties

 4     when you went from PSD II to PSD III?

 5          A.   As a PSD III I am more of a liaison

 6     to the department higher-ups when there's

 7     incidents.  And I also have -- now I'm more

 8     watching all the calls going out.  Making sure

 9     that the calls are going out, making sure that

10     the PSD II's have the correct staffing.  I

11     have to make notifications for different

12     incidents, depending on the incident.  I have

13     the safe hotline.  I take care of the Raves.

14     I take care of making sure that we have all of

15     the detectives and everything like that if we

16     have an incident.  I take care of writing in

17     the PD records when they go on and off duty.

18     I check the duty log.  I make entries into a

19     duty log depending on what it is.  And I speak

20     directly to chiefs and commissioners, and I

21     talk to basically anybody that calls into my

22     office.

23          Q.   How many PSD III's are there?

24          A.   Ten, I think.  Nine or ten.

25          Q.   When you were a PSD I who were you
```



```
 1                    J. Worthington
 2     reporting to?
 3          A.    Sergeants.
 4          Q.    Do you have particular names?
 5          A.    Maybe Sergeant Doram, Lahey,
 6     Hamilton.  I did have PSD II's also, but there
 7     was no PSD III's.
 8                 PSD II's, I think Cliff Ackerly and
 9     Patricia Dunn.
10          Q.    What precinct were you working when
11     you were a PSD I?
12          A.    Mostly 2, 3, Command.
13          Q.    When you were a PSD II who reported
14     to you?
15          A.    Who reported to me?
16          Q.    Yes.
17          A.    Reported to me.
18          Q.    Who were you responsible for
19     supervising?
20          A.    Dispatchers and call takers.
21          Q.    Were you responsible for certain
22     dispatchers and call takers for like a certain
23     precinct or was it everybody?
24          A.    My tour.
25          Q.    Which consisted of what?
```



```
 1                  J. Worthington
 2          A.   Which would consist of the
 3     dispatchers and the call takers during my
 4     tour.
 5          Q.   What was your tour?
 6          A.   It was either 8:00 to 4:00, 4:00 to
 7     12:00 or overtime, which would be on a
 8     midnight shift or the shift before me or the
 9     shift after me.
10          Q.   And when was overtime?  So it was
11     either --
12          A.   If I was on an 8:00 to 4:00 the
13     overtime would either be at 4:00 in the
14     morning or at 1600, 4:00 p.m.
15               If I worked a 4:00 to 12:00 the
16     overtime would be either at noon or at
17     midnight.  It's attached to the tour that I'm
18     working.
19          Q.   So it's 8:00 p.m. to 4:00 a.m.?
20          A.   What do you...
21          Q.   When you're saying the two tours,
22     what are the two tours?
23          A.   Two tours are 8:00 in the morning
24     to 1600 -- 8:00 to 4:00 or 4:00 to 12:00.
25          Q.   4:00 p.m. to 12:00 a.m., right?
```

```
 1                    J. Worthington
 2          A.   Yes.
 3          Q.   So if someone was working before
 4     the first tour it would be from 4:00 a.m. to
 5     8:00 a.m.?
 6          A.   Yes.
 7          Q.   And if someone was working after
 8     the second tour it would be from 12:00 a.m. to
 9     4:00 a.m.?
10          A.   Yes.
11          Q.   And you mentioned overtime.  What
12     does that mean?  When did overtime come into
13     play.
14          A.   If there was a staffing shortage
15     people would work overtime or I would work
16     overtime before or after my shift or on a day
17     off.
18          Q.   How was that assigned?
19          A.   How was that...
20          Q.   How did people know if they had to
21     work overtime on any given day?
22          A.   There's voluntary overtime or
23     mandated overtime.
24          Q.   How did voluntary overtime work?
25          A.   You would sign up for it.
```



```
 1                    J. Worthington
 2         Q.    How would mandatory overtime work?
 3         A.    At the time I don't recall how it
 4    worked, but it's usually whoever is left that
 5    hasn't signed up, depending on whether they
 6    were working -- it was basically whoever was
 7    next up.
 8         Q.    Is it based on seniority or
 9    something else?
10         A.    It was rotating.
11         Q.    Did you receive any Human Resources
12    training while you were at Suffolk County?
13         A.    No.
14         Q.    If someone complained that they
15    felt that they were being treated differently
16    because of some type of disability do you know
17    how to handle that?
18         A.    Somebody comes to me for a
19    disability?
20         Q.    If someone came to you, yes, saying
21    "I can't work overtime because I have some
22    medical issues" what would you do?
23              MS. GABOR:   Are you talking
24         present?
25              MR. POLLACK:   I'm talking back
```



```
 1                    J. Worthington
 2          when Ms. Pflug was hired or employed?
 3          A.    I don't recall.
 4          Q.    Would it go to some other volunteer
 5    to see if they would pick up --
 6          A.    Yes.
 7          Q.    -- that person?
 8                Was overtime mandatory?
 9          A.    No, not always.
10          Q.    When was it mandatory?
11          A.    When there was not enough staffing.
12          Q.    How frequently did that happen?
13                MS. GABOR:   Objection.
14                What time frame are you talking
15          about?
16                MR. POLLACK:   When Ms. Pflug was
17          employed.
18                MS. GABOR:   Did you establish when
19          she was employed.  I don't know if Ms.
20          Worthington testified to that.
21          Q.    Do you know when Ms. Pflug was
22    employed by the county?
23          A.    No.
24          Q.    Do you know if she was a PSD I
25    while you were a PSD II?
```



```
 1                    J. Worthington
 2        A.    Yes.
 3        Q.    So I'm focusing on the time when
 4   you were a PSD II supervising Ms. Pflug as a
 5   PSD I.  Okay?
 6        A.    Okay.
 7        Q.    How did the mandates work when Ms.
 8   Pflug was employed as a PSD I and you were a
 9   PSD II?
10        A.    I do not remember how they worked
11   then.
12        Q.    Would there be somebody else within
13   the county who would know how the mandates
14   worked?
15        A.    No -- or if they did they're
16   retired.
17        Q.    When did you first meet Ms. Pflug?
18        A.    I don't remember.
19        Q.    Was it in a professional setting?
20        A.    It would be here at headquarters,
21   yes.
22        Q.    And you were employed at the time
23   she was hired?
24        A.    Yes.
25        Q.    Do you know if Ms. Pflug remained a
```

```
 1                    J. Worthington
 2     PSD I throughout the entirety of her
 3     employment with Suffolk?
 4          A.   Yes.
 5          Q.   How would you describe Ms. Pflug's
 6     work performance while she was employed under
 7     you as a PSD II?
 8          A.   I believe she was a competent
 9     dispatcher.  I never had a problem with her on
10     the radio.
11          Q.   Do you know there was a time that
12     she had to take off work to give birth to her
13     child?
14          A.   That was before I was her
15     supervisor.
16          Q.   But you are aware?
17          A.   Yes.
18          Q.   Do you know how long she was out
19     for?
20          A.   No.
21          Q.   When she returned to work were you
22     her supervisor?
23          A.   When I returned?
24          Q.   When she returned.
25          A.   Oh, when she returned.  Yes.
```



```
 1                    J. Worthington
 2         Q.    Did you notice any issues with her
 3   work upon returning from leave, from giving
 4   birth to her child?
 5         A.    No.
 6         Q.    Besides you were there any other
 7   supervisors who were responsible for
 8   supervising Ms. Pflug?
 9         A.    There would be two of us PSD II's,
10   but during the time of rotation of us II's
11   were being transferred around to different
12   teams, so I couldn't be exact with who was
13   supervisors.
14         Q.    As we sit here today you don't know
15   if there were any other supervisors for Ms.
16   Pflug during the time she was a PSD I?
17         A.    So there were other PSD II's.  Yes,
18   I had a partner, and yes, there were PSD
19   III's.
20         Q.    Who was your partner?
21         A.    Like I said it could have been one
22   of three.  So there was Sandi Shomalik,
23   Michele Ramirez, Brian Applebee.  Sandi
24   Shomalik, S-A-N-D-I -- at the time she was
25   Flammer, but now it's Shomalik,
```



Case 2:20-cv-00018-SIL   Document 53-10   Filed 11/03/23   Page 23 of 55 PageID #: 391

```
 1                    J. Worthington
 2    S-H-O-M-A-L-I-K.
 3         Q.   Do you know who her PSD III's were
 4    at the time she was a PSD I?
 5         A.   Patrina Hubner, Ann Guglielmo,
 6    Anthony Bocchimuzzo.
 7         Q.   You said you never had issues with
 8    Ms. Pflug's performance when she was working
 9    as a PSD I underneath you, correct?
10         A.   As a dispatcher I never received
11    any complaints from the road.
12         Q.   Did you receive any other
13    complaints outside of her being a dispatcher?
14         A.   Other than observing her late
15    coming from meals or to work.
16         Q.   And when you were dealing with
17    those issues of her coming in late from meals
18    or to work, were those when you were a PSD II?
19         A.   Yes.
20         Q.   So that these did not exist
21    prior to her taking leave when you were both
22    PSD I's, correct?
23         A.   I do not know.  She was on a
24    different shift.
25         Q.   Are you aware that Ms. Pflug ever
```

```
 1                    J. Worthington
 2    requested a private room or anything of the
 3    like so she could pump milk while she was at
 4    the facility?
 5          A.    Yes.
 6          Q.    What's your knowledge of what her
 7    requests were?
 8          A.    I know that she was provided with a
 9    room.
10          Q.    Was she provided with one right
11    away?
12          A.    I believe so.
13          Q.    Are you aware that she at some
14    point in time she had to go home to express
15    milk and then come back because there was no
16    room for her at the facility?
17          A.    No.
18          Q.    You are not aware that she had to
19    fight for that room in order for her to
20    express milk while at work?
21                MS. GABOR:    Objection.
22                You can answer.
23          A.    No.
24          Q.    Was there a time that the county
25    implemented an overtime mandate?
```



1                   J. Worthington

2          A.    The county?

3          Q.    The police department.

4          A.    I don't know.

5          Q.    Do you know if the county had

6    overtime mandate for its PSD I's back when Ms.

7    Pflug was employed as a PSD I underneath you?

8          A.    Yes.

9          Q.    What was the mandate?

10         A.    If there was not enough staffing

11   and there was not enough people signed up a

12   person was mandated for a four hour block.

13         Q.    Were there any exceptions to that

14   mandate?

15         A.    No, unless you couldn't do it.

16         Q.    When was there an ability for

17   someone to say "I can't do it"?

18         A.    If you couldn't do the overtime and

19   you couldn't be mandated you would have to

20   document the reason why.  We'd send you home

21   and then the next person would get mandated,

22   which sometimes would be me.

23         Q.    Did you ever have to cover for

24   Kristy?

25         A.    I don't know.



```
 1                    J. Worthington
 2         Q.    Do you know when this overtime
 3    mandate was implemented?
 4         A.    Mandates have been since we've
 5    started, since I've been there.
 6         Q.    Do you know why there was an
 7    overtime mandate?
 8         A.    If there was not enough staffing
 9    and not enough people signed up a person would
10    get mandated.
11         Q.    Do you know if the county ever
12    explored hiring additional personnel to handle
13    the workload instead of assigning people to
14    work mandated overtime?
15              MS. GABOR:   Objection.
16              You can answer.
17         A.    I don't know.
18         Q.    Did you ever receive complaints
19    from any of the dispatchers regarding them
20    being mandated for overtime?
21         A.    Verbal?
22         Q.    Either.
23         A.    Yes.
24         Q.    What type of verbal complaints
25    would you receive?
```

```
1                    J. Worthington
2         A.   "I don't believe we're doing this
3    again."  Just aggravation comments.  That
4    would be it.
5         Q.   Who would express those comments?
6         A.   Everybody.
7         Q.   Were there written complaints?
8         A.   I never received one.
9         Q.   Were there ever exemptions provided
10   from the mandate?
11        A.   What do you mean, like if they said
12   it that day?
13        Q.   Yes.
14        A.    If they said it that day they would
15   have to explain why they can't work the
16   overtime, the mandate, and then we would have
17   to have them put it in writing and then the
18   next person to be mandated would have to cover
19   what they couldn't do.
20        Q.   All they had to do was put it in
21   writing as to the reasons they couldn't --
22        A.   I can't -- sorry.
23        Q.   All they would have to do is put it
24   in writing as to the reasons they couldn't
25   provide the mandate and then somebody else
```



```
 1                  J. Worthington
 2   would be tapped to cover?
 3        A.   If I were to say -- this is an
 4   example.  I'm being mandated.  I can't do the
 5   mandate because I have a doctor's appointment
 6   or some other reason -- child care, medical
 7   reason -- I would tell my supervisor, if I was
 8   a PSD I, "I can't do the mandate."  I, as the
 9   PSD II, would ask them to put it in writing,
10   and then from there, accept the writing, the
11   person would go home and then the next person
12   to be mandated would work the overtime.
13   Because if we're in a mandate situation we
14   just stay a mandate unless somebody
15   volunteers, but usually by the time you get to
16   mandate all the volunteers have been taken.
17        Q.   You're saying you were never privy
18   to any type of analysis as to what it would
19   cost to hire additional personnel to work the
20   overtime as opposed to paying overtime for
21   those who were already employed?
22        A.   No.
23        Q.   Do you know if Ms. Pflug was
24   mandated to work overtime after she returned
25   from maternity leave and you were her PSD II?
```



```
 1                  J. Worthington
 2         A.    Yes.
 3         Q.    Do you know how soon after she
 4    returned that she was mandated?
 5         A.    No.
 6         Q.    Was there any type of seniority
 7    list with regards to mandates?
 8         A.    I don't -- I don't remember what it
 9    was then.
10         Q.    Are you aware that there's a law
11    requiring entities to accommodate individuals
12    with disabilities?
13              MS. GABOR:    Objection.
14         A.    Yes.
15         Q.    What's your understanding of that
16    law?
17         A.    It depends on the disability I
18    guess.  I mean, you're supposed to provide
19    whatever they need to work the job with their
20    disability, I think.
21         Q.    Have you ever heard of the
22    Americans With Disabilities Act?
23         A.    Yes.
24         Q.    Have you ever heard of the New York
25    State Human Rights Law?
```



Case 2:20-cv-00018-SIL   Document 53-10   Filed 11/03/23   Page 30 of 55 PageID #: 398

```
 1                    J. Worthington
 2        A.    I know of it.
 3        Q.    What's your knowledge of the
 4   Americans With Disabilities Act?
 5              MS. GABOR:   Objection.
 6              You can answer.
 7        A.    I really don't know how it's
 8   written.
 9        Q.    Okay.  Do you understand what
10   employers are obligated to do under that act?
11        A.    Other than give them whatever they
12   need so they can perform their job with their
13   disability.  That's all I know.
14        Q.    Is your understanding the same with
15   the New York State Human Rights Laws?
16              MS. GABOR:   Objection.
17              You can answer.
18        A.    Yes, it's the same.
19        Q.    Have you ever heard the term
20   "interactive process" before?
21        A.    No.
22        Q.    Did you ever explore any reasonable
23   accommodations to be made to Ms. Pflug so she
24   could continue performing the essential
25   functions of her job?
```



                        J. Worthington

1
2        A.   When the request came for her to
3   have the room, I explored the New York State
4   whatever -- I don't know what it's called --
5   to know what we needed for the room.
6        Q.   What about if she needed to take
7   time off for childcare or a doctor's issues to
8   be excused from the mandate?
9        A.   She would do exactly what I said
10  before.  She would have to come to the
11  supervisor, explain to the supervisor.  We
12  would ask for it in writing and then we would
13  move on to the next person and work the
14  overtime.
15       Q.   I'm now showing you a document that
16  we're marking as Plaintiff's Exhibit 1.
17            (Plaintiff Exhibit 1 was so
18             marked for identification.)
19            Can you see that on the screen?
20       A.   Yes.
21       Q.   Take your time to look at it and
22  let me know when you're done.
23       A.   Okay.
24       Q.   You've reviewed this document?
25       A.   I remember it.



```
 1                   J. Worthington
 2        Q.    Who is Lieutenant Rohrer.
 3        A.    He was executive officer of
 4   Communications.
 5        Q.    Do you know why this document came
 6   about?
 7        A.    I believe it was Labor Relations
 8   said that people couldn't be exempt for
 9   medical issues anymore.  There was a standing
10   few people that had medical conditions where
11   their doctors had said they couldn't work the
12   extra hours, and then I guess it was -- I
13   think it was getting abused maybe.  I don't
14   really remember.  But I just remember this.
15   And I remember that the people or whoever was
16   on that list could no longer be exempt.
17        Q.    Do you know if Ms. Pflug was on
18   that list?
19        A.    I don't know.
20        Q.    Do you know why this memo was being
21   issued in 2012?
22             MS. GABOR:    Objection.
23             You can answer if you know.
24        A.    No, I don't know.
25        Q.    When this memo was issued, did this
```



```
 1                    J. Worthington
 2     override any accommodations that were
 3     previously provided to individuals with
 4     medical issues?
 5          A.   Yes.
 6          Q.   At the time you were a PSD II?
 7          A.   Yes.
 8          Q.   Do you believe it was your
 9     obligation to enforce this policy?
10          A.   Yes.  It came from my executive
11     officer.
12          Q.   Now I'm showing you a document we
13     marked as Plaintiff's Exhibit 2.
14               (Plaintiff Exhibit 2 was so
15                marked for identification.)
16               Take your time to look at this
17     document and let me know when you're done.
18          A.   Reviewing it.
19               MS. GABOR:   Does this have any
20          particular Bates number or anything
21          like that that you could identify it
22          as?
23               MR. POLLACK:   I wish I could make
24          out the bottom right number.  I think
25          it's like 407.
```



```
 1                    J. Worthington
 2              MS. GABOR:   What about the first
 3        one, if we can go back to that?
 4              MR. POLLACK:   Pflug 00021.
 5        A.   Okay.
 6        Q.   And who is Paul Margiotta?
 7        A.   I don't know.
 8        Q.   Who is Maureen Looby?
 9        A.   She was in personnel.  That's all I
10   know.
11        Q.   Do you ever interact with her?
12        A.   Maybe.  I don't know.  I wouldn't
13   know her if she was walking down the hall.
14        Q.   Do you recall seeing this document?
15        A.   No.
16        Q.   Are you aware that individuals who
17   had previously requested accommodations were
18   going to be sent for fitness for duty
19   evaluations?
20        A.   No.
21        Q.   Do you know if Ms. Pflug was
22   contained on this list that's been blacked
23   out?
24        A.   No.
25        Q.   Are you aware if someone was deemed
```



```
 1                        J. Worthington
 2    not fit for duty what would happen to them?
 3          A.    No.
 4          Q.    Do you know if they would be
 5    terminated?
 6          A.    I don't know.
 7          Q.    Now I'm showing you another
 8    document that we've marked as Plaintiff's
 9    Exhibit 3.   SC409 is the Bates stamp number.
10               (Plaintiff Exhibit 3 was so
11                marked for identification.)
12               Do you know who John Hanley is?
13          A.    Yes, I know who he is now.
14          Q.    Did you know who he was in 2013?
15          A.    I believe he was my deputy
16    inspector.
17          Q.    Do you know who Mark Fisher is?
18          A.    Yes.
19          Q.    And what was he in 2013?
20          A.    I can't be sure.
21          Q.    What about William Rohrer.
22          A.    He was our lieutenant.
23          Q.    What was Harold Jantzen?
24          A.    I don't know a position.
25          Q.    Can you take your time to read this
```



```
 1                    J. Worthington
 2    e-mail?
 3                 (Pause.)
 4         A.    I never saw that before.
 5         Q.    But this is similar to the one that
 6    we looked at as Plaintiff's Exhibit 1,
 7    correct, with a no mandate -- overtime mandate
 8    exemption?
 9         A.    Exemption.
10         Q.    Right.
11         A.    It's similar, but it doesn't say
12    that part down the bottom.
13         Q.    Right, but when you're reading the
14    second paragraph it says, "no employee will be
15    excused from overtime," correct?
16         A.    That's what it says.
17         Q.    Do you see where it further says,
18    "If they can't work overtime, they are unfit
19    for duty and therefore cannot work their
20    normal shift"?
21         A.    I see that.
22         Q.    And do you further see "If the
23    employees push the issue, Civil Service
24    Section 72 (unfit for duty and the employee
25    will be forced to be absent for up to 1 year)
```



```
 1                    J. Worthington
 2    proceedings can be implemented.  The end
 3    result would be termination."
 4          A.    I see it.
 5          Q.    So is it your understanding based
 6    on this memo that an employee who needed
 7    accommodation that cannot be deemed fit for
 8    duty would be subject to termination?
 9          A.    That's what it says.
10          Q.    Are you aware that Ms. Pflug
11    submitted doctors letters both before and
12    after these memos that we referenced seeking
13    excusal from the overtime mandate?
14          A.    No.
15          Q.    I'm now showing you a document we
16    marked as Plaintiff's Exhibit 4, Bates stamped
17    SC-428.
18                (Plaintiff Exhibit 4 was so
19                 marked for identification.)
20                Can you take a look at this
21    document from March 9, 2011?
22                (Pause.)
23          A.    Okay.
24          Q.    Do you see where it says, "With
25    this in mind, it was recommended that Ms.
```



```
 1                    J. Worthington
 2      Pflug not work overtime hours as significant
 3      sleep deprivation can produce certain
 4      stressors that may exacerbate symptomologies"?
 5              A.    It actually says "not overnight
 6      hours."
 7              Q.    I'm sorry if I misspoke.
 8              A.    It says "overnight hours."
 9                    She submitted this because she
10      couldn't work midnights anymore.  Before she
11      went out maternity she was on midnights.
12                    This is the paperwork she submitted
13      so she could not -- so she didn't have to work
14      overnight.  So she worked the 2 tour, 8:00 to
15      4:00 and 4:00 to 12:00.
16              Q.    Do you know if this was
17      accommodated?
18              A.    She didn't come back to midnight.
19      She went to 2 tour, which was then on my
20      shift.
21              Q.    What were the 2 tour hours?
22              A.    8:00 to 4:00 and 4:00 to 12:00.
23              Q.    8:00 a.m. to 4:00 p.m.?
24              A.    Yes.
25              Q.    And 4:00 p.m. to 12:00 a.m.?
```



```
 1                    J. Worthington
 2          A.    Yes.
 3          Q.    Now I'm showing you a document
 4    marked as Plaintiff's Exhibit 5, Bates stamp
 5    SC-475.
 6                 (Plaintiff Exhibit 5 was so
 7                  marked for identification.)
 8                 This is a similar note that we
 9    reviewed prior as Exhibit 4.
10                 Do you know whose handwriting is on
11    that document?
12          A.    It says Bill R.
13          Q.    Do you know who that is?
14          A.    Well, if it's signed Bill R. can I
15    guess?
16                 MS. GABOR:   No, don't guess.
17          A.    Then I don't know.
18          Q.    Do you know what it means by the
19    "12-8 position is posted"?
20          A.    Midnight to 8:00 a.m.
21          Q.    And that's different than the 2
22    tour, correct?
23          A.    Yes.
24          Q.    I'm now showing you a document
25    marked as Plaintiff's Exhibit 6, Bates stamped
```



```
 1                    J. Worthington
 2    SC-478.
 3                    (Plaintiff Exhibit 6 was so
 4                     marked for identification.)
 5                    Do you see this document from
 6    August 30, 2012?
 7         A.    Yes.
 8         Q.    And this is a different letter than
 9    the ones that we just reviewed previously,
10    correct?
11         A.    Yes.
12         Q.    And this letter is addressing
13    issues with Ms. Pflug's daughter, Annabelle,
14    correct?
15         A.    Yes.
16         Q.    It's stating that "It is imperative
17    that Kristy not be scheduled to work longer
18    than 8 hours in a 24 hour period," correct?
19         A.    Yes.
20         Q.    Do you know if this was abided by?
21         A.    I don't know, but if you scroll
22    down.
23                    (Scrolling.)
24                    That's me.
25         Q.    That's your signature?
```



```
 1                    J. Worthington
 2         A.    Well, the "PSD 440," that's me.
 3         Q.    Okay.
 4         A.    "PSD 440," that's me.  So I
 5    received it and I forwarded it up the chain.
 6         Q.    But that doesn't mean it was
 7    adhered to, correct?
 8         A.    Unknown.
 9         Q.    Do you know if it would have placed
10    an undue hardship on the county to limit Ms.
11    Pflug to working eight-hours days as suggested
12    by her doctors?
13              MS. GABOR:   Objection.
14              You can answer.
15         A.    I don't know.
16         Q.    If she couldn't work it would have
17    gone to others who were available, correct?
18         A.    Yes.
19         Q.    I'm now showing you a document
20    marked as Plaintiff's Exhibit 7.
21              (Plaintiff Exhibit 7 was so
22               marked for identification.)
23              Take your time to read this
24    document, please.
25              (Pause.)
```



```
 1                   J. Worthington
 2              MS. GABOR:    What's the Bates
 3         number on this?
 4              MR. POLLACK:    SC-416?
 5         A.    Okay.
 6         Q.    Is that your signature on the
 7    bottom left?
 8         A.    No.
 9         Q.    Do you know if this doctor's note
10    was followed in that Ms. Pflug was limited to
11    her regularly scheduled hours and not mandated
12    to work overtime?
13         A.    I don't know.
14         Q.    Is there an internal correspondence
15    that's required to be submitted by employees
16    within the department for certain instances?
17         A.    Internal correspondences, yes, for
18    certain incidents, yes.
19         Q.    Do they have a name like a 42 or
20    some other abbreviated nickname?
21         A.    It's a P -- I think it's a
22    PCDS-2042.  I'm not sure if this is correct,
23    but I think it's PCDS-2042.
24         Q.    Is this one of the DS2042's that
25    you would have been referring to?
```

```
 1                    J. Worthington
 2          A.   Yes.  Oh, it's on the bottom.
 3    Right there PDCS-2042.
 4          Q.   Okay.  And we're looking at the
 5    bottom left of Exhibit 8 which is marked as
 6    Bates SC-421.
 7                 (Plaintiff Exhibit 8 was so
 8                  marked for identification.)
 9          Q.   Do you see this document?
10          A.   Yes.
11          Q.   And is this a DS-2042 that we were
12    just referencing?
13          A.   Yes, it is one.
14          Q.   Do you know why Ms. Pflug was
15    required to submit this DS-2042?
16          A.   No.
17          Q.   Can you read it and let me know if
18    that would possibly refresh your recollection?
19                 (Pause.)
20          A.   Can you scroll?
21          Q.   Of course.
22                 (Scrolling.)
23          A.   Okay.  I guess because she couldn't
24    do a mandate.  I don't -- I guess that's what
25    it is.
```



```
 1                    J. Worthington
 2              MS. GABOR:   Don't guess.
 3         A.    I don't know.
 4         Q.    You said that they would have to
 5    submit internal correspondences to show why
 6    they may not be able to work for a mandate
 7    earlier, correct?
 8         A.    Yes.
 9         Q.    Is this something that Ms. Pflug
10    would have done to abide by that obligation?
11         A.    Well, this says -- the Subject is
12    "Lateness from meal," not for a mandate.
13         Q.    Well, if you look lower it says,
14    "Since I am mandated, once again, to stay
15    until 0400 hours I did not feel safe to leave
16    my cell phone at home."
17              Do you see that?
18         A.    Right.  And then it says that "I
19    would be a few minutes late."  So she was late
20    from her meal.  So she is submitting this to
21    explain why she is late from her meal.  She
22    couldn't find her phone.
23         Q.    Did she have to submit this if she
24    was a minute late or is there like a period of
25    time that they're excused before they would
```



```
 1                    J. Worthington
 2     have to submit this or if they're a minute
 3     late they have to submit something like that?
 4          A.   No.  No.  There's no specifics.  I
 5     don't know why this was submitted.
 6          Q.   I'm now showing you another DS-2042
 7     marked SC-462.
 8               (Plaintiff Exhibit 9 was so
 9                marked for identification.)
10               Do you know why she would have been
11     required to submit this?
12          A.   It says she's submitting it because
13     of her mandate.
14          Q.   And it says that she had a doctor's
15     appointment, correct?
16          A.   Yes.
17          Q.   And earlier you testified that for
18     health issues, doctor's appointments and
19     childcare you would find others to cover,
20     correct?
21          A.   Yes.
22          Q.   Do you know why she would have been
23     required to submit this if somebody else was
24     able to cover her shift?
25          A.   If nobody able to cover her shift,
```



```
1                    J. Worthington
2    that's the reason you would do it.  If a
3    person is being mandate it means that there's
4    no more volunteers left.
5         Q.   So what would happen if there were
6    no other people left to take over Ms. Pflug's
7    shift?
8         A.   If she couldn't work it we move on
9    to the next mandate.
10        Q.   So if you were able to work on to
11   the next mandate why was she required to
12   submit an internal correspondence regarding
13   her need for a doctor's appointment?
14        A.   I don't know.
15        Q.   And do you see where it asks --
16   where it mentions that she wants to inquire
17   about the doctor's note she handed in back on
18   November 17th that she cannot work over eight
19   hours?
20        A.   I see that.
21        Q.   Do you know why that wasn't adhered
22   to?
23        A.   No.
24             MS. GABOR:   Objection.
25        Q.   I'm now showing you a document
```



```
 1                    J. Worthington
 2   marked as Plaintiff's Exhibit 10.  It's a
 3   two-page document, SC-464 to 465.
 4                (Plaintiff Exhibit 10 was so
 5                 marked for identification.)
 6                I'm just going to again ask you to
 7   take your time to read this April 16, 2013
 8   memo and let me know when you're done and
 9   scroll when you're ready.
10                (Pause.)
11        A.    Scroll.
12                (Scrolling.)
13        A.    Okay.
14        Q.    Did you ever recall receiving a
15   copy of this?
16        A.    I signed it.  I signed.  That's
17   my -- that's me and I forwarded it up the
18   chain.
19        Q.    Which one is you?
20        A.    PSD -- the swirl, Jennifer,
21   PSD-2440.
22        Q.    And so what did you do with this
23   after receiving it?
24        A.    I forwarded it up the chain to my
25   next supervisor.
```



```
 1                    J. Worthington
 2         Q.    I'm now showing you a four-page
 3   document marked as Plaintiff's Exhibit 11
 4   which is Bates stamp number SC-466 through
 5   469.
 6               (Plaintiff Exhibit 11 was so
 7                marked for identification.)
 8               We'll take some time for you to
 9   read it.  You let me know when I have to
10   scroll down.
11         A.    Okay.
12               (Scrolling.)
13               Okay.
14               (Scrolling.)
15               Okay.  I can't read after "other"
16   in the thing.
17         Q.    I understand.
18         A.    Okay.
19               (Scrolling.)
20         Q.    Is your signature on this?  No,
21   right?
22         A.    No.
23         Q.    Do you ever recall receiving
24   something like this?
25         A.    No.
```



```
 1                      J. Worthington
 2          Q.    Were you ever investigated about a
 3    possible discrimination or hostile work
 4    environment from any of your supervisors based
 5    on Ms. Pflug's complaint?
 6          A.    No.
 7          Q.    Do you see your name is mentioned
 8    in here, correct?
 9          A.    Yes.
10          Q.    Do you know what incident she's
11    referring to?
12          A.    No.
13          Q.    I'm now showing you document marked
14    as Plaintiff's Exhibit 12, Bates stamped -- I
15    can't really make it out -- SC-3-something.
16                (Plaintiff Exhibit 12 was so
17                 marked for identification.)
18                Can you take a look at this and let
19    me know after you finish reading the body of
20    the e-mail -- or the memo?
21          A.    Okay.
22          Q.    So based on this is it your
23    understanding that despite the doctors notes
24    and issues with her daughter that Ms. Pflug
25    was still being mandated after those doctors
```



```
 1                    J. Worthington
 2    notes were submitted?
 3               MS. GABOR:   Objection.
 4         A.   I don't know.
 5         Q.   Well, she wouldn't have wrote this
 6    unless she was still be subject to mandates,
 7    correct?
 8               MS. GABOR:   Objection.
 9         A.   I don't know what she would write.
10         Q.   Did you ever tell her she was
11    mandated?
12         A.   Yes.
13         Q.   Under what circumstances?
14         A.   When there was not enough staffing
15    and not enough voluntary overtime.
16         Q.   And did you do this after
17    understanding her childcare and healthcare
18    issues?
19         A.   I do not know.
20         Q.   Now I'm showing you a document
21    marked as Plaintiff's Exhibit 13, Bates
22    stamped Pflug 00055.
23               (Plaintiff Exhibit 13 was so
24                marked for identification.)
25               Do you know who Theresa Farrell is?
```



```
 1                    J. Worthington
 2          A.    No.
 3          Q.    Can you take a look at this and let
 4     me know after you're done reviewing it?
 5                (Pause.)
 6          A.    Can you move the cursor?
 7          Q.    Move what?
 8          A.    Move your cursor.
 9                Okay.   That's good.
10          Q.    Does this refresh your recollection
11     at all as to whether or not Ms. Pflug was
12     mandated after she submitted her doctors notes
13     and childcare notes?
14          A.    I guess with the times I guess so.
15     I don't know.
16          Q.    Are you aware that subsequent to
17     her termination that Ms. Pflug applied for
18     unemployment benefits?
19          A.    No.
20          Q.    Are you aware that she was awarded
21     unemployment benefits?
22          A.    No.
23          Q.    Now I'm going to show you a
24     document marked as Plaintiff's Exhibit 15,
25     which is the county's responses to our
```



```
 1                    J. Worthington
 2    interrogatory requests.
 3                    (Plaintiff Exhibit 15 was so
 4                    marked for identification.)
 5         Q.    Did you have the power to grant or
 6    deny an accommodation requested by Ms. Pflug?
 7         A.    No.
 8         Q.    Who did?
 9         A.    I don't know.
10         Q.    In response to Interrogatory Number
11    6 on page 5 it says, "Mandatory overtime is
12    assigned in the same manner as voluntary
13    overtime, but in reverse."
14                    Do you see that?
15         A.    Yes.
16         Q.    What does that mean?
17         A.    I don't know.  Don't know.
18         Q.    Okay.
19                    In response to Interrogatory Number
20    10, do you know who Labor Relations is that
21    they were referring to for approving or
22    disapproving overtime accommodations?
23         A.    I believe it's a department within
24    the county.
25         Q.    And in response to Interrogatory
```



```
 1                      J. Worthington
 2   Number 11 that codifies the document we looked
 3   at earlier with regard to no excusals from
 4   overtime, correct?
 5          A.   Yes.
 6          Q.   And you see in response to
 7   Interrogatory Number 13?
 8          A.   Yes.
 9          Q.   Now, is it codified anywhere or in
10   writing that mandatory overtime is an
11   essential function of the job?
12               MS. GABOR:   Objection.
13               It says mandatory overtime is part
14          of the job.
15          Q.   Is it written anywhere that
16   mandatory overtime is part of the job as a
17   PSD I?
18          A.   I don't know.
19          Q.   Do you see in response to
20   Interrogatory Number 14 it says, "On a yearly
21   basis training is conducted regarding
22   discrimination and harassment"?
23          A.   Yes.
24          Q.   Earlier you testified that you were
25   not subjected to such training, correct?
```



1                    J. Worthington

2          MS. GABOR:   Objection.

3          I don't believe she testified to

4     that.  You said something about Human

5     Resources to her.  I don't believe this

6     is similar.

7          Q.   Were you ever trained on how to

8  handle discrimination or harassment within the

9  workplace?

10         A.   Just a video we watch every year.

11         MR. POLLACK:  I think I'm pretty

12    much ready to wrap up.  Just give me

13    five minutes and then I'll let you know

14    if I have any further questions.

15         (Time noted:  11:19 a.m.)

16         (Recess.)

17         (Time noted:  11:23 a.m.)

18         MR. POLLACK:   I have no further

19    questions for this witness.

20         COURT REPORTER:   Mr. Pollack,

21    could you just state for the record

22    that you're ordering the transcript.

23         MR. POLLACK:   I am ordering the

24    transcript.

25         COURT REPORTER:   Ms. Gabor, are

