UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

KRISTY PFLUG,
                                           Civil Action No.:
                                           20-CV-00018-SIL

                            Plaintiff,

          -against-

THE COUNTY OF SUFFOLK,

                            Defendant.

-------------------------------------------------------------------------X

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Law Offices of Yale Pollack, P.C.
*Attorneys for Plaintiff*
66 Split Rock Road
Syosset, New York 11791
(516) 634-6340

Of Counsel:
Yale Pollack, Esq.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENTS.................................................................................................................. 11

    POINT I .................................................................................................................. 11

    THE RELEASE RELIED UPON BY DEFENDANT IS NOT
    ENFORCEABLE BECAUSE IT WAS PROCURED UNDER DURRESS
    AND PLAINTIFF NEVER RECEIVED THE CONSIDERATION
    ALLEGEDLY PROMISED THEREIN

    POINT II ................................................................................................................. 13

    PLAINTIFF'S DISABILITY CLAIMS MUST SURVIVE BECAUSE SHE
    SATISFIED THAT SHE WAS DISCRIMINATED AGAINST ON THE BASIS
    OF HER DISABILITY WITH NO REASONABLE ACCOMMODATIONS
    BEING EXPLORED PRIOR TO HER EMPLOYMENT BEING TERMINATED

    POINT III................................................................................................................ 20

    PLAINTIFF'S RETALIATION CLAIMS MUST SURVIVE

CONCLUSION................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Alston v. New York City Transit Auth.*,
1999 WL 540442 (S.D.N.Y. July 26, 1999). .............................................................. 10

*Bandhan v. Lab. Corp. of Am.*,
234 F.Supp.2d 313 (S.D.N.Y. 2002).......................................................................... 22

*Borkowski v. Valley Centr. Sch. Dist.*,
63 F.3d 131 (2d Cir. 1995)......................................................................................... 19

*Burrell v. City Univ. of N.Y.*,
894 F.Supp. 750 (S.D.N.Y.1995) ................................................................................ 10

*Colpoys v. County of Erie*,
2013 U.S. Dist. LEXIS 139653 (W.D.N.Y. Sept. 27, 2013) ...................................... 17

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
22 F.3d 1219 (2d Cir. 1994)........................................................................................ 10

*Goonan v. FRB of N.Y.*,
916 F. Supp. 2d 470 (S.D.N.Y. 2013)........................................................................ 20

*Jackson v. O'Reilly Auto. Stores, Inc.*,
2014 U.S. Dist. LEXIS 32754, 2014 WL 993269 (M.D. Tenn. Mar. 12, 2014) ......... 18

*Johnson v. Lebanese Am. Univ.*,
84 A.D.3d 427 (1st Dep't 2011) ................................................................................. 11

*Lamberson v. Six W. Retail Acquisition, Inc.*,
122 F. Supp. 2d 502 (S.D.N.Y. 2000)........................................................................ 22

*Lewis v. Livingston County Ctr.*,
30 F. Supp.3d 196 (W.D.N.Y. 2014) .......................................................................... 17

*Lopez v. S.B. Thomas, Inc.*,
831 F.2d 1184 (2d Cir. 1989)..................................................................................... 16

*Lovejoy-Wilson v. NOCO Motor Fuel*,
263 F.3d 208 (2d Cir. 2001)....................................................................................... 21

*Mangini v. McClurg*,
24 N.Y.2d 556 (1969) ................................................................................................. 11

*McBride v. BIC Consumer Prods. Mfg. Co.*,
583 F.3d 92 (2d Cir. 2009) ........................................................................................... 13

*McMillan v. City of New York*,
711 F.3d 120 (2d Cir. 2013) .......................................................................................... 13

*Price v. City of New York*,
2011 U.S. Dist. LEXIS 67421 (E.D.N.Y. Mar. 9, 2011) ............................................ 20

*Quinn v. Green Tree Credit Corp.*,
159 F.3d 759 (2d Cir. 1998) .......................................................................................... 21

*Reeder v. Cnty. of Wayne*,
177 F. Supp. 3d 1059 (E.D. Mich. 2016) ..................................................................... 18

*Rother v. NYS Dep't of Corr. & Cmty. Supervision*,
970 F. Supp.2d 78 (N.D.N.Y 2013) .............................................................................. 16

*Staron v. McDonald's Corp.*,
51 F.3d 353 (2d Cir. 1995) ............................................................................................ 19

*Tomka v. Seiler*,
66 F.3d 1295 (2d Cir.1995) ........................................................................................... 10

*Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*,
588 F. Supp.2d 419 (E.D.N.Y. 2008) ........................................................................... 20

*United States v. Bosurgi*,
530 F.2d 1105 (2d Cir. 1976) ........................................................................................ 10

*Ward v. District of Columbia*,
211 F. Supp. 3d 58 (D.D.C. 2016) ................................................................................ 18

*Weiner v. McGraw-Hill, Inc.*,
57 N.Y.2d 458 (1982) .................................................................................................... 11

*Wernick v. Fed. Reserve Bank*,
91 F.3d 379 (2d Cir. 1996) ............................................................................................ 19

*Wilkie v. Luzerne County*,
2016 U.S. Dist. LEXIS 124581 (M.D. Pa. Sept. 14, 2016) ......................................... 18

## PRELIMINARY STATEMENT

Plaintiff, Kristy Pflug ("Plaintiff"), respectfully submits this memorandum of law in opposition to Defendant, County of Suffolk's ("County" or "Defendant") motion for summary judgment.

Defendant's entire motion is based on an unsupported argument that working mandatory overtime was an essential function of Plaintiff's job. This position is not supported by any evidence in the record. To the contrary, all documents in this case support that overtime was not even a function of a PSD I's job as evidenced by the following: (a) the Job Description for the PSD I making no mention of working a requisite number of hours to perform the job or mentioning overtime whatsoever; and (b) the CBA stating that overtime is provided as an (i) "opportunity" offered in seasonal and emergency situations only for those who have the "ability to do the work" and (ii) "no individuals shall be required to work more than a normal 40 hour workweek."

When Plaintiff presented her doctor's notes that she could not work more than eight-hour shifts, nothing was done to limit Plaintiff's working time and no reasonable accommodations were explored to see whether she could continue to work the essential functions of her job – which, as noted above, did not require overtime work. Instead, mandates continued to be imposed on Plaintiff with directives given to her that she had to submit internal correspondence to be excused from same, which the overtime memorandum expressly stated would lead to an unfit for duty determination resulting in termination.

These facts clearly support that Plaintiff has successful claims for disability discrimination, including the failure to accommodate, and retaliation so that Defendant's request should be denied.

The legal issue in this case is clear: whether Defendant violated the Americans with Disabilities Act, as amended (the "ADA") when it implemented a policy stating that under no

circumstances would any accommodations be granted to employees, regardless of whether they needed a medical accommodation.  Plaintiff was such an employee whose doctors advised against her working beyond eight-hour shifts on numerous occasions, which letters and accommodation requests were ignored by Defendant.  As found by the Equal Employment Opportunity Commission ("EEOC"), Defendant's no exceptions policy did violate the ADA and its defenses do not withstand scrutiny since it: (a) discriminated against individuals with disabilities; and (b) failed to engage in the interactive process with its employees prior to their employment being terminated.

For these reasons, there are issues of fact the preclude summary judgment being granted in Defendant's favor.

## STATEMENT OF FACTS

### A.    Plaintiff Commences Employment with the County

In or about December 2002, Plaintiff commenced her employment with Defendant as a Public Safety Dispatcher I ("PSD I"), the position she held until her employment terminated in July 2013.  *Pflug Dec., ¶5.*  As a PSD I, Plaintiff's role consisted of obtaining information from 911 operators to dispatch to the police so that they could get whatever information was necessary in order to attend to the emergency.  *Pflug Dec., ¶6.*

In the PSD I Job Description, it is noted that the main duty of a PSD I was to "[o]perate[] a two-way radio communication system to dispatch public safety personnel to calls for assistance. May operate a telephone switchboard or complaint receiving system which receives requests from the public for police or other public safety assistance."  *Pflug Dec., Ex. "1."*  Critically, nowhere in the Job Description did it state that PSD Is were required to work a certain amount of hours or, more importantly, that the ability to work overtime was an essential function of the job.  *Id.*

2

Furthermore, nothing in the Collective Bargaining Agreement between Defendant and the Suffolk County Association of Municipal Employees, Inc. (the "CBA") stated that mandatory overtime was required of employees in order to perform the essential functions of their job. *Pflug Dec., Ex. "2."* According to the CBA:

> Overtime work, ***as an opportunity***, in the same or related title shall be equalized among Departmental employees as far as is practical. Department Heads and supervisors may require the performance of overtime or "called-in" work for reasonable periods as an obligation in cases where, because of seasonal or extraordinary requirements related to the job or because of the absence of normal personnel for whatever reason, the work is necessary to meet the normal work demands of the function of the Department or some emergency exists. Seniority shall be a criterion in the selection of employees for overtime, ***provided that the employees have the ability to do the work***.

*Id., p. 7, §6.2 (emphasis supplied).* As well, the CBA stated that, in relevant part, that: "***No individuals shall be required to work more than a normal 40 hour workweek*** (e.g., in a work location where employees currently work a normal 40 hour workweek due to 'lock-in,' new employees would also work the same 40 hours)." *Id., p. 13, §8 (emphasis supplied).*

Moreover, when Plaintiff was employed by Defendant, it issued Suffolk County's Anti Discrimination and Anti Harassment Policy Statement (the "Anti-Discrimination Statement"). *Pflug Dec., Ex. "3."* Pursuant to this Statement, Defendant stated that it would not discriminate against individuals with disabilities and that it would provide reasonable accommodations to those with disabilities as required under the Americans with Disabilities Act. *Id.* The Statement further noted that no retaliation would take place to those who engage in protected activity by complaining of discrimination or for seeking a reasonable accommodation. *Id.*

**B.**   **Defendant Implements Its No Accommodations Policy**

On August 3, 2012, the County issued a memorandum stating that "effective August 25, 2023, no employee will be exempted from working Mandated O/T.  All employees will be considered part of the O/T Mandate pool."  *Pflug Dec., Ex. "4."* Notwithstanding what was stated, the memo went onto state that those with medical conditions may be exempted.  *Id.*

However, on January 11, 2013, Defendant issued a new memorandum regarding mandatory overtime (the "Overtime Mandate Memo"), which stated as follows:

> As per Paul Margiotta of Labor Relations, ***no employee will be excused from overtime***.  The overtime is part of the position.  If they can't work overtime, they are unfit for duty and therefore cannot work their normal shift.  If the employees push the issue, Civil Service Section 72 (unfit for duty and the employe will be forced to be absent for up to 1 year) proceedings can be implemented.  ***The end result would be termination***.

*Pflug Dec., Ex. "5" (emphasis supplied).*

In other words, Defendant created a policy that overrode its Anti-Discrimination Statement and legal obligations under federal, state and local laws.  The Overtime Mandate Memo was then sent to Suzanne McBride, the Union representative, and others to implement on January 12, 2013 at 12:01 a.m.  *Pflug Dec., Ex. "6."*

**C.**   **Plaintiff's Prepares to Return to Work**

Prior to taking leave in 2011 after giving birth, she did not refuse overtime mandates.  *Pflug Dec., ¶17.*

On March 9, 2011, prior to Plaintiff taking leave, Plaintiff's doctor, Scott McWilliams, M.D., stated that she was being evaluated for cervical transverse myelitis.  In the letter, the doctor recommended that Plaintiff "not work overnight hours as significant sleep deprivation can produce certain stressors that may exacerbate symptomologies."  *Pflug Dec., Ex. "7."*

4

In or about May 2011, Plaintiff was granted a parental leave of absence from June 8, 2011 through April 9, 2012. *Gabor Dec., Ex. "C."*

As noted above, both before and after Plaintiff gave birth to her child, she was diagnosed with transverse myelitis, which is the swelling of her spinal cord. *Pflug Dec., ¶22.* As a result, Plaintiff started getting tingling in her feet that would then spread throughout her body. *Pflug Dec., ¶23.* Plaintiff needed to undergo extensive testing to find out the reason for the swelling in her spinal cord. *Pflug Dec., ¶24.* Plaintiff's doctor told her that it could take about a year to rectify the numbness and tingling so the swelling of the cord could go down. *Pflug Dec., ¶25.*

## D.     Plaintiff Returns to Work with Restrictions

On March 9, 2012, prior to returning to work, Dr. McWilliams, reiterated that Plaintiff was being evaluated for cervical transverse myelitis and, again, recommended that she "not work overnight hours as significant sleep deprivation can produce certain stressors that my exacerbate symptomologies." *Pflug Dec., Ex. "8."*

Plaintiff returned to work in July 2012. *Pflug Dec., ¶31.*

On August 2, 2012, Dr. McWilliams provided another doctor's note stating that due to her medical conditions that she "not work over 8 hours in a single day for the next four to six weeks." *Pflug Dec., Ex. "9."*

On August 29, 2012, yet another letter was submitted by a different doctor, Dr. Erika M. Jurasits, stating that "limitations to hours worked.  May not work more than 8 hrs/day." *Pflug Dec., Ex. "10."*

On August 30, 2012, due to complications Plaintiff's daughter was having with her health, Dr. Katherine Wightman wrote to advise that Plaintiff should "Not be scheduled for to work longer than 8 hours in a 24 hour period." *Gabor Dec., Ex. AA.*

On November 17, 2012, Plaintiff provided yet a "Certificate for Work Restrictions" from Dr. Jurasits instructing that her work schedule should be "limited." The letter stated that Plaintiff's prognoses is good "if treatment policy of limiting work schedule and counseling is followed." *Pflug Dec., Ex. "11."* The certificate also indicated that Plaintiff's heightened anxiety as a result of the mandated overtime was resulting in headaches. *Id.* Because Plaintiff was breast-feeding, she was not taking any medications. *Pflug Dec., ¶37.* Again, the County failed to provide any accommodation to her. *Pflug Dec., ¶38.*

In January 2013, the County issued the Overtime Mandate Memo. *Pflug Dec., Ex. 5.*

On January 8, 2013, Plaintiff submitted an Internal Correspondence, under protest, about being mandated. In the memorandum, Plaintiff asked about the November 17, 2012 doctor's note she submitted stating that she could not work for more than eight hours. *Gabor Dec., Ex. Q.* Nothing was done to address the concern raised in Plaintiff's memorandum. *Pflug Dec., ¶41.*

On April 16, 2013, Plaintiff wrote another Internal Correspondence to address the hostile work environment she was being subjected to at the County. *Pflug Dec., Ex. "12."* Approximately one week later, Plaintiff followed up with another Internal Correspondence, further detailing the hostile work environment to which she was being subjected at the County. *Pflug Dec., Ex. "13."* In addition to addressing improper treatment Plaintiff had to endure, she noted that she was being targeted since her return to work as a disabled breastfeeding mother who needed to care for herself and her child. *Id.*

Plaintiff knew that she could perform the work required of her within the eight-hour shift, which was the only accommodation she was asking for, as recommended by her doctors. *Pflug Dec., ¶45.* Yet, on or about June 4, 2013, Defendant, out of the blue, issued a series of disciplinary charges against Plaintiff. *Pflug Dec., ¶46.* These charges were actually filed against Plaintiff on

the very same day that she had been preparing to leave her County position due to the discrimination she was enduring based on Defendant's failure to accommodate her disabilities.  *Pflug Dec., ¶47.*

On that day, the County was well aware of Plaintiff's planned retirement as there was a resignation party planned for her that day where they were going to "celebrate" Plaintiff's last day at the County.  *Pflug Dec., ¶48.*  Instead, as noted above, Plaintiff was brought into Internal Affairs at the County and presented with the charges, despite her intention to quit that very same day.  *Pflug Dec., ¶49.*  The County would not allow Plaintiff to resign without addressing the charges.  *Pflug Dec., ¶50.*

Ultimately, the County forced Plaintiff to sign a release in exchange for compensation for one month – which reimbursement she never received in full – due to the unjustified suspension for that period of time.  *Pflug Dec., ¶51.*  Plaintiff received nothing of value for this release given that she already resigned from her position before it was signed.  *Pflug Dec., ¶52.*  Plaintiff was also under duress being told she must sign it to move on from the charges so that she could leave on good graces with the County and not lose certain benefits.  *Pflug Dec., ¶53.*

Plaintiff was told that those the only released claims were going to be for her giving up her right to fight the suspension that was imposed on her in exchange for financial consideration.  *Pflug Dec., ¶58.*  Nobody ever advised Plaintiff that this was a release of all claims she may have against the County.  *Pflug Dec., ¶58.*  This was provided to Plaintiff on a take it or leave it basis and, therefore, under duress, she signed the document at the insistence of her Union representative, Barry Peek, Esq.  *Pflug Dec., ¶59.*  Had Plaintiff known it was a general release of all claims, she never would have signed it.  *Pflug Dec., ¶59.*

In any event, Plaintiff never received the monies promised in the release in order for it to be effective.  *Pflug Dec., ¶60.*  As well, despite promising not to challenge unemployment in the

release, Defendant did make such a challenge to Plaintiff's application, thereby, again, nullifying any consideration provided to her as promised in the release.

After a hearing, the Board found that I was entitled to unemployment benefits, stating as follows:

> The credible evidence establishes that claimant quit her job because she had been working mandated overtime twice per week and her doctor advised her not to work overtime. … She requested to be exempt from overtime and the employer denied this request. Because her doctor advised her not to work overtime and the employer would not accommodate this request, she had a compelling reason to quit.

*Pflug Dec., Ex. "15."* The release became void once Defendant rescinded on its obligations thereunder by challenging Plaintiff's unemployment benefits, which was consideration to be provided to her in exchange for same.

The County, again, wholly ignored Plaintiff's requests for an accommodation, prompting her forced resignation on July 4, 2013. *Pflug Dec., ¶54.* Although clearly qualified, when Plaintiff attempted to be reinstated to her position at the County in 2014, her request was denied for no legitimate reason. *Pflug Dec., ¶55.*

**E.     EEOC Issues a Probable Cause Determination**

Subsequent to her termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, which determined that there was "probable cause" that Defendant violated her rights under the law. *Pflug Dec., Ex. "14."*

The EEOC rejected any claim that I signed my rights away in the release and found, in relevant part, as follows:

> A review of the evidence received during our investigation suggest Respondent by way of policies enacted in 2012 and 2013 restricted and or denied Charging Party's right to request and obtain a reasonable accommodation.  Furthermore, by refusing to address any

8

request for reasonable accommodation, Respondent failed to engage in the interactive process.

Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on the basis of disability in violation of the Americans with Disabilities Act, as amended (ADA).

*Id.*

## F.     <u>Additional Evidence Negating the Need for the Overtime Mandate</u>

As noted in a Public Safety Meeting in 2012, the County noted that it was "severely understaffed." *Exhibit "15," p. 1.* Employees of the County complaint about how they could be mandated at times during their shifts – requiring them to work twelve hours – which completely disregarded other obligations in life, such as family or medical issues. *Id., p. 4.*

Ms. McBride noted at the meeting that: "[f]or the PSD function, we are budgeted for 68; we currently have 55 that are filled." *Id., p. 10.* This meant that the County was allowing thirteen vacancies to remain open and, instead of filling them, they still mandated employees – even those with medical conditions such as Plaintiff – to work overtime.

The Comptroller's Office noted that the overtime mandates resulted in "increased payroll costs to the County of up to $301,868." *Exhibit "16," p. 10.* The Comptroller's Office noted that: "While we realize overtime is necessary during major emergency events, those events do in fact end. Therefore the spike in overtime should end as well. As indicated in our report, excessive overtime was in fact the norm in the Communications Division." *Id. p. 44.*

The County's Budget Review Office stated that the County was severely understaffed due to overtime mandates, which resulted overtime expenditures were "in excess of $800,000 in 2011 and 2012 and were $1.5 million in 2013." *Exhibit "17," p. 2.* The Budget Review Office noted that "[n]ot only is that a substantial amount of overtime for a relatively small number of moderately

9

salaried civilian positions, it also puts a tremendous burden on these employees to perform at a high level of competence without creating extremely poor working conditions." *Id.*

## STANDARD OF REVIEW

"Summary judgment is a drastic remedy to be granted only where the requirements of Rule 56, F.R.Civ.P., have clearly been met." *United States v. Bosurgi*, 530 F.2d 1105, 1110 (2d Cir. 1976).

The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Tomka v. Seiler,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ. of N.Y.,* 894 F.Supp. 750, 757 (S.D.N.Y. 1995). If "a reasonable finder of fact could return a verdict for the nonmoving party, there is a genuine factual dispute and summary judgment should not be granted." *Alston v. New York City Transit Auth.*, 1999 WL 540442, at *3 (S.D.N.Y. July 26, 1999).

"[W]hen deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* "Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Id.* "Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

10

With these principles in mind, Defendant's motion should be denied.

## ARGUMENTS

### POINT I

**THE RELEASE RELIED UPON BY DEFENDANT IS NOT ENFORCEABLE BECAUSE IT WAS PROCURED UNDER DURESS AND PLAINTIFF NEVER RECEIVED THE CONSIDERATION ALLEGEDLY PROMISED THEREIN**

Defendant argues that the release signed by Plaintiff bars any claims she has against the County prior to September 2013.

For a release to extend to claims both known and unknown, it must have been both "'fairly and knowingly made.'" *Mangini v. McClurg*, 24 N.Y.2d 556, 566 (1969). "The requirement of an 'agreement fairly and knowingly made' has been extended . . . to cover other situations where because the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party." *Id.* at 567 (citations omitted). A release is not valid unless the party giving the release receives something of value to which the party was not otherwise entitled. *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458 (1982).

In *Johnson v. Lebanese Am. Univ.*, 84 A.D.3d 427 (1st Dep't 2011), the First Department found that an issue of fact existed as to whether the release was "fairly and knowingly made" with regard to plaintiff's discrimination claims. *Id.* at 430. The court found that all that was being given to the plaintiff in the release was monies to which he was already entitled, similar to what happened with Plaintiff who simply (was supposed) to receive money back for an unlawful suspension. Notably, Plaintiff planned on resigning the day of her suspension and when she returned, she was simply given the money that she was out the month for before she officially resigned on July 13, 2012. In *Johnson*, the First Department denied the defendants' motion for

11

summary judgment, holding that:

> [W]e must assume, for purposes of this motion for summary judgment, where we are required to give plaintiff the benefit of all favorable inferences that can be drawn from the evidence, that the amount offered to plaintiff constituted wages and benefits he had already earned. If that is the case, it would certainly constitute "overreaching" for defendants to tie the payment of those wages to plaintiff's executing a release. We note that, because of the constraints placed on plaintiff's ability to collect those alleged wages, it was not unreasonable for him not to look up the definition of the term "ex-gratia."

*Id.* at 431.

Indeed, the release at issue states that it was being issued "in lieu of proceeding with disciplinary charges against" Plaintiff (*Gabor Dec., Ex. "V"*), which disciplinary charges were never warranted in the first instance, especially since Plaintiff was going to resign the very same day those charges were issued.  It was nothing but a farce.

Furthermore, Defendant did not hold up its end of the bargain in the release in that it never reimbursed Plaintiff with the $2,455.20 consideration promised in the agreement and it also interfered with Plaintiff's attempt to apply for unemployment benefits.  Finally, Plaintiff was never afforded sufficient consultation with counsel in order to understand the import of what she was signing as, again, she simply thought this related to her suspension and not all claims she may have against the County.

For these reasons, just has held by the EEOC, the release does not bar Plaintiff's ADA claims against the County and, at the very least, there are issues of fact as to whether the consideration promised by Defendant under the release was actually rendered to Plaintiff.

## POINT II

## PLAINTIFF'S DISABILITY CLAIMS MUST SURVIVE BECAUSE SHE SATISFIED THAT SHE WAS DISCRIMINATED AGAINST ON THE BASIS OF HER DISABILITY WITH NO REASONABLE ACCOMMODATIONS BEING EXPLORED PRIOR TO HER EMPLOYMENT BEING TERMINATED

Defendant sets forth the standard for a plaintiff to establish a prima facie case of disability discrimination in its brief, which, as discussed below, is satisfied in his action.  Furthermore, "[d]iscrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (*quoting* 42 U.S.C. § 12112(b)(5)(A)); *see also McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) ("An employer may also violate the ADA by failing to provide a reasonable accommodation.").  "A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan*, 711 F.3d at 125-26.

## A.    Defendant Discriminated Against Plaintiff on the Basis of Her Disability

Initially, Defendant's motion for summary judgment to dismiss Plaintiff's disability discrimination claims must be denied because Plaintiff suffered from a disability within the meaning of the ADA (traverse myelitis), she performed the essential functions of her job and suffered an adverse employment action as a result of Defendant's conduct when she was constructively discharged from her employment.

13

1.     **Plaintiff Suffered from a Disability Within the Meaning of the ADA**

As noted in the numerous doctor's notes provided by Plaintiff to Defendant, she suffered from transverse myelitis, which is the swelling of her spinal cord.  Based on these doctor's notes, each doctor suggested that Plaintiff's working hours be limited because, inter alia, it could lead to more severe symptoms being realized if she had to work extended hours beyond her eight-hour workday.

Defendant contends Plaintiff's migraines do not constitute a disability under the ADA, wholly ignoring Plaintiff's transverse myelitis that resulted in the swelling of Plaintiff's spinal cord, which impacted Plaintiff's major life activities such as working, thinking, standing, bending, walking and lifting.  Such was set forth in Plaintiff's doctor's notes regarding same, including the impact that her transverse myelitis had on her daily activities.  *Pflug Dec., Exs. "7" through "11."*

Therefore, Plaintiff has satisfied that she suffered from a disability under the ADA.

2.     **Plaintiff Could Perform the Essential Functions of Her Job**

Defendant next contends that Plaintiff could not perform the essential functions of her job because she could not work overtime mandates.  As addressed above, this argument does not hold water because Plaintiff performed the essential functions of her job throughout her employment. Defendant's faulty premise is that working overtime was an essential function of a PSDs job, which is a wholly conclusory statement.

In Plaintiff's PSD I Job Description, it is noted that the duty of a PSD I is to "[o]perate[] a two-way radio communication system to dispatch public safety personnel to calls for assistance. May operate a telephone switchboard or complaint receiving system which receives requests from the public for police or other public safety assistance."  *Pflug Dec., Ex. "1."*  Nowhere in the Job Description does it state that a PSD I is required to work a certain amount of hours as part of his

14

or her job. *Id.* The PSD I Job Description does not state that that working overtime is an essential function of the job. *Id.* The PSD I Job Description does not state that that the ability to work overtime is an essential function of the job. *Id.*

Furthermore*,* nothing in the Collective Bargaining Agreement between SCPD and the Suffolk County Association of Municipal Employees, Inc. (the "CBA") stated that mandatory overtime was required of PSD Is in order to perform the essential functions of their job. *Pflug Dec., Ex. "2."* To the contrary, it stated that no employee was required to work more than forty hours a week and that overtime was provided as an "opportunity." *Id.*

Also, when Plaintiff was employed by Defendant, it issued the Anti-Discrimination Statement. *Pflug Dec., Ex. "3."* Pursuant to this Statement, Defendant stated that it would not discriminate against individuals with disabilities and that it would provide reasonable accommodations to those with disabilities as required under the Americans with Disabilities Act. *Id*. The Statement further noted that no retaliation would take place to those who engage in protected activity by complaining of discrimination or for seeking a reasonable accommodation. *Id*.

Here, Plaintiff was able to perform the functions of the PSD position, just as she had been able to from the commencement of her employment in 2002 until she was constructively terminated in July 2013. Indeed, Plaintiff's supervisor, Jennifer Worthington, acknowledged Plaintiff to be a "competent dispatcher. I never had a problem with her on the radio." *Gabor Dec., Ex. G, p. 20:8-10.* There were no issues with Plaintiff's performance even after she returned from giving birth to her child. *Gabor Dec., Ex. G, p. 21:2-5.*

Ms. Worthington was aware that the ADA required employers to "give them whatever they need so they can perform their job with their disability." *Gabor Dec., Ex. G, p. 29:11-13.*

15

Plaintiff's doctors requested a reasonable accommodation for Plaintiff by excusing her from working in excess of eight hours per day, which was denied by Defendant.

As a result, Plaintiff has established that she could perform the essential functions of her job, whether with or without a reasonable accommodation.

### 3.    Plaintiff Was Constructively Discharged from Her Employment

Defendant contends that the charges Plaintiff was presented with cannot be challenged. However, Defendant ignores the fact that these charges were nothing more than pretext for terminating Plaintiff given that they were issued to her on the very same day a going away party was planned for her departure.

By this time, Plaintiff could no longer endure the mandates being imposed on her and it was clear that if she kept writing that she could not work the mandates that she was be deemed "unfit for duty" and the end result would be "termination." *Pflug Dec., Ex. "5."*

"A constructive discharge claim may … lie where an employee resigns in the face of an impending and inevitable termination." *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp.2d 78 (N.D.N.Y 2013); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1989) (finding constructive discharge where employee was told that he would be fired at the end of a 90-day period).

Since Defendant confirmed in the Overtime Mandate Memorandum that those refusing to work the mandates would be subject to discipline and termination, Plaintiff was not required to wait around for her inevitable termination, so she chose to resign to retain the benefits that she otherwise may not have received once she was terminated.

As a result, Plaintiff has satisfied the element of enduring an adverse employment action by having her employment constructively discharged.

16

**B.**     **Defendant Failed to Accommodate Plaintiff's Disability**

In addition, Defendant clearly failed to accommodate Plaintiff's disability by providing her with a reasonable accommodation under the law.

**1.     Plaintiff Suffered from a Disability within the Meaning of the ADA**

As established in Point II(A)(1), *supra*, Plaintiff suffered from a disability, being her transverse myelitis that affected her major life activities, as demonstrated by her doctors' notes.

**2.     Defendant Had Notice of Plaintiff's Disability**

The second element for a failure to accommodate claim is also clearly established because Plaintiff, in fact, presented the doctors' notes to Defendant, which it acknowledges it received.

**3.     Plaintiff Could Perform the Functions of Her Job**

As discussed above, Defendant's entire theory of this case is that working mandatory overtime was an essential function of Plaintiff's job, which is belied by the documentary evidence discussed above, including the Job Description and CBA.

Moreover, Defendant, as an employer, is not in the position of stating whether a certain job function is an essential as it is simply a factor a Court can consider. As noted in *Colpoys v. County of Erie*, 2013 U.S. Dist. LEXIS 139653 (W.D.N.Y. Sept. 27, 2013), "while the court may be obligated to give deference to the employer's judgment, it is not required to blindly yield to it. Indeed, courts must make an 'initial inquiry' into whether the 'employer actually requires all employees in the particular position to perform the allegedly essential function.'" *Id.* at *12-13.

In *Lewis v. Livingston County Ctr.*, 30 F. Supp.3d 196 (W.D.N.Y. 2014), the court was faced with a similar issue to that in this case; to wit, whether working mandatory overtime was an essential function of a CNA. The defendant argued that such was an essential function of a CNAs job, which the court rejected, noting the following:

17

> There is no Second Circuit precedent holding that, as a matter of law, mandated overtime work for CNAs is an essential function of that type of employment. Rather, whether the ability to work mandated overtime is an essential function of Plaintiff's employment is a fact-specific inquiry that the Court is unable to decide on a motion to dismiss. Instead, the court must undertake a "case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). "[U]ltimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004).

*Id.* at 209.  "Plaintiff was able to perform her regular job functions but she was unable to work certain periods of mandated overtime. She is not restricted from performing all of her job responsibilities."  *Id.; see also Ward v. District of Columbia*, 211 F. Supp. 3d 58, 64 (D.D.C. 2016) (finding a genuine issue of material fact existed with respect to whether overtime was an essential function of the plaintiff's job); *Reeder v. Cnty. of Wayne*, 177 F. Supp. 3d 1059, 1077-78 (E.D. Mich. 2016) (question of fact existed as to whether working overtime was truly an essential function of the plaintiff's position as a police officer); *Jackson v. O'Reilly Auto. Stores, Inc.*, 2014 U.S. Dist. LEXIS 32754, 2014 WL 993269, at *7 (M.D. Tenn. Mar. 12, 2014).

In *Wilkie v. Luzerne County*, 2016 U.S. Dist. LEXIS 124581 (M.D. Pa. Sept. 14, 2016), the plaintiff requested to be accommodated from mandatory overtime by limiting his shifts to eight hours due to his anxiety disorder.  In denying the defendant's motion for summary judgment, the court noted that the "interactive process" element requires plaintiff to establish that he could have been reasonably accommodated but for the County's lack of good faith. Plaintiff argues that a reasonable accommodation is possible because he simply requested a limitation of his overtime mandate , namely to work eight (8) hour shifts instead of twelve (12) or sixteen (16) hour shifts." As here, the County had no direct response to the plaintiff's assertion, instead simply relying on

the plaintiff not having a disability in the first instance." *Id.* at *19-20.  The court held that "The

issue of reasonable accommodation is a question for the trier of fact." *Id.* at *20 (citing Turner v.

Hershey Chocolate USA, 440 F.3d 604, 614 (3d Cir. 2006)).

### 4.      Defendant Unequivocally Failed to Provide Any Accommodation to Plaintiff

Reasonable accommodations may include: "job restructuring; part-time or modified work

schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices;

appropriate adjustment or modifications of examinations, training materials, or policies; the

provision of qualified readers or interpreters; and other similar accommodations for individuals

with disabilities."  29 C.F.R. 1630.2(o)(2)(ii).

"Whether or not something constitutes a reasonable accommodation is necessarily fact-

specific.  Therefore, determinations on this issue must be made on a case-by-case basis." *Wernick

v. Fed. Reserve Bank*, 91 F.3d 379, 385 (2d Cir. 1996) (internal citation omitted); *see

also Borkowski v. Valley Centr. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) ("'Reasonable' is a

relational term: it evaluates the desirability of a particular accommodation according to the

consequences that the accommodation will produce. This requires an inquiry not only into the

benefits of the accommodation but into its costs as well."). Therefore, "[t]o avoid unfounded

reliance on uninformed assumptions, the identification of the essential functions of a job requires

a fact-specific inquiry into both the employer's description of a job and how the job is actually

performed in practice." *Id.* at 140 (citations omitted).

Whether a certain accommodation is reasonable is a fact-specific inquiry and must be made

on a case-by-case basis.   Accordingly, such determinations are better reserved for summary

judgment or trial rather than the pleading stage. *See Staron v. McDonald's Corp.*, 51 F.3d 353,

356 (2d Cir. 1995) (reversing district court's dismissal of plaintiff's ADA reasonable

accommodation claim where determination of whether the modification was reasonable was fact specific); *Goonan v. FRB of N.Y.*, 916 F. Supp. 2d 470, 482 n.2 (S.D.N.Y. 2013) ("at this early stage in the litigation, it would be inappropriate to deem unreasonable Plaintiff's request for some combination of a transfer or permission to telecommute."); *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp.2d 419, 425 (E.D.N.Y. 2008) (plaintiff's reasonable accommodation claim not dismissed even where defendants argued it was unreasonable as a matter of law); *Price v. City of New York*, 2011 U.S. Dist. LEXIS 67421, at *27 (E.D.N.Y. Mar. 9, 2011) ("with respect to the reasonableness of an accommodation, it is premature at this stage of the litigation to dismiss plaintiff's claim. . . .").

In *Lewis*, *supra*, the court stated that "[a]lthough Defendant is correct in stating that Plaintiff is not entitled to select a specific accommodation (Dkt. 9-3 at 21), it does not follow that any accommodation offered by an employer is reasonable. Indeed, in this case, the alleged 'accommodation' offered to Plaintiff was the same accommodation offered to all able-bodied employees (Dkt. 9-2, Ex. C), and does not take into account Plaintiff's specific alleged disability." *Id.* at 211.

## POINT III

## PLAINTIFF'S RETALIATION CLAIMS MUST SURVIVE

Finally, Defendant's motion for summary judgment on Plaintiff's retaliation claims must be denied. First, Plaintiff clearly engaged in protected activity when she repeatedly submitted doctor's notes requesting that she be limited to an eight-hour working day, and Defendant clearly had knowledge of these notes and restrictions.

Indeed, this issue was directly addressed in *Reeder*, *supra*, wherein the court held the following:

> A plaintiff does not need to show that he or she is "disabled" within the meaning of the ADA to prevail on a disability-retaliation claim. *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007). Instead, a plaintiff need only show that he or she engaged in an activity protected by the ADA, such as requesting reasonable accommodations. *See id.*; *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) ("We have held that requests for accommodation are protected acts."). Since Plaintiff has presented evidence that he submitted doctors' notes in order to request the accommodation of being excused from mandatory overtime, he can be considered to have engaged in a protected activity under the ADA and PWDCRA.

177 F. Supp.3d at 1081.

Here, just as in *Reeder*, Plaintiff made multiple requests, as evidenced by doctors' notes, to be excused from mandatory overtime, which constitutes protected activity of which Defendant was aware.

Furthermore, Plaintiff expressly complained about being subjected to a hostile work environment in April 2013 on two separate occasions (*Pflug Dec., Exs. "12" and "13"*), only to be faced with disciplinary charges on June 4, 2013, with no serious infractions taking place between the time she submitted her hostile work environment complaints and the charges being lodged against her. The passage of two months in time between engaging in the protected activity and the charges being imposed on Plaintiff is sufficient to demonstrate a causal connection between the two actions. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (finding discharge following less than two months after filing a complaint was sufficient evidence of a causal connection to preclude summary judgment); *Lovejoy-Wilson v. NOCO Motor Fuel*, 263 F.3d 208, 224 (2d Cir. 2001) (two-month gap between filing complaint with management and adverse employment action provided inference of causation); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y. 2003) ("A period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally

21

proximate and causally related"); *Bandhan v. Lab. Corp. of Am.*, 234 F.Supp.2d 313, 319-20 (S.D.N.Y. 2002) (same); *Lamberson v. Six W. Retail Acquisition, Inc.*, 122 F. Supp. 2d 502, 512 (S.D.N.Y. 2000) (finding employee fired two months after making complaints was a sufficiently close temporal proximity to infer a causal connection).

Since Plaintiff has satisfied all the elements of her retaliation claim, Defendant's motion for summary judgment to dismiss such claim should be denied.

<u>**CONCLUSION**</u>

Based on the foregoing, Defendant's motion for summary should be denied, together with such other and further relief as the Court deems just and proper.

Dated: October 20, 2023
      Syosset, New York

           Respectfully submitted,
           **LAW OFFICES OF YALE POLLACK, P.C.**

By: _____
              Yale Pollack, Esq.
           *Attorneys for Plaintiff*
           66 Split Rock Road
           Syosset, New York 11791
           (516) 634-6340