UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KRISTY PFLUG,                                           Civil Action No.:
                                                        20-CV-00018-SIL
                            Plaintiff,

            -against-                                   **DECLARATION**

THE COUNTY OF SUFFOLK,

                            Defendant.
------------------------------------------------------------------------X

      I, KRISTY PFLUG, declare as follows:

      1.      I am the plaintiff in the above-captioned action. As such, I am fully familiar with the facts and circumstances set forth herein.

      2.      I respectfully submit this Declaration in opposition to Defendant's motion for summary judgment.

**A.      Preliminary Statement**

      3.      I worked for Defendant County of Suffolk ("Defendant" or the "County") from 2002 until 2013. During my employment, I gave birth that had complications, rendering me with a disability. In 2013, Defendant overrode its anti-discrimination and reasonable accommodations policies and stated that no accommodations would be granted to employees, even when disabled, under any circumstances.

      4.      Upon my return to work, my doctors ordered that I not work over eight-hour shifts and so I provided such documentation to Defendant to be excused from any overtime mandate issued by Defendant. Instead of accommodating my reasonable requests, Defendant had me issue write ups that I was unable to perform overtime so that it could ultimately declare me unfit for duty and terminate my employment.

1

**B.     Background**

5.     In or about December 2002, I commenced my employment with Defendant as a Public Safety Dispatcher I ("PSD I"), the position I held until my employment terminated in July 2013.

6.     As a PSD I, my role consisted of obtaining information from 911 operators to dispatch to the police so that they could get whatever information was necessary in order to attend to the emergency.

7.     In the PSD I Job Description, it is noted that the main duty of a PSD I was to "[o]perate[] a two-way radio communication system to dispatch public safety personnel to calls for assistance.  May operate a telephone switchboard or complaint receiving system which receives requests from the public for police or other public safety assistance." *A copy of the Job Description is annexed as Exhibit "1."*

8.     Critically, nowhere in the Job Description did it state that PSD Is were required to work a certain amount of hours or, more importantly, that the ability to work overtime was an essential function of the job. *Id*.

9.     Furthermore, nothing in the Collective Bargaining Agreement between Defendant and the Suffolk Count Association of Municipal Employees, Inc. (the "CBA") stated that mandatory overtime was required of employees in order to perform the essential functions of their job. *A copy of the CBA is annexed as Exhibit "2."*

10.    When I commenced my position with Defendant, working overtime was voluntary.

11.    As well, when I was employed by Defendant, it issued Suffolk County's Anti Discrimination and Anti Harassment Policy Statement (the "Anti-Discrimination Statement"). *A copy of the Anti-Discrimination Statement is annexed as Exhibit "3."*  Pursuant to this Statement,

Defendant stated that it would not discriminate against individuals with disabilities and that it would provide reasonable accommodations to those with disabilities as required under the Americans with Disabilities Act. *Id*. The Statement further noted that no retaliation would take place to those who engage in protected activity by complaining of discrimination or for seeking a reasonable accommodation. *Id*.

**C.      The Overtime Mandate**

12. On August 3, 2012, the County issued a memorandum stating that "effective August 25, 2023, no employee will be exempted from working Mandated O/T. All employees will be considered part of the O/T Mandate pool." *A copy of the August 3, 2012 memorandum is annexed as Exhibit "4."*

13. Notwithstanding what was stated, the memo went onto state that those with medical conditions may be exempted. *Id.*

14. On January 11, 2013, Defendant issued a memorandum regarding mandatory overtime (the "Overtime Mandate Memo"), which stated as follows:

> As per Paul Margiotta of Labor Relations, ***no employee will be excused from overtime***. The overtime is part of the position. If they can't work overtime, they are unfit for duty and therefore cannot work their normal shift. If the employees push the issue, Civil Service Section 72 (unfit for duty and the employee will be forced to be absent for up to 1 year) proceedings can be implemented. ***The end result would be termination***.

*A copy of the Overtime Mandate Memo is annexed as Exhibit "5" (emphasis supplied).*

15. In other words, Defendant created a policy that overrode its Anti-Discrimination Statement and legal obligations under federal, state and local laws.

3

16. The Overtime Mandate Memo was then sent to Suzanne McBride, our Union representative, and others to implement on January 12, 2013 at 12:01 a.m. *A copy of the January 11, 2013 email is annexed as Exhibit "6."*

17. Prior to taking leave in 2011, when I was pregnant, I did not refuse any overtime mandates.

18. On March 9, 2011, my doctor, Scott McWilliams, M.D., stated that I was being evaluated for cervical transverse myelitis. In the letter, the doctor recommended that I "not work overnight hours as significant sleep deprivation can produce certain stressors that my exacerbate symptomologies." *A copy of the March 9, 2011 letter is annexed as Exhibit "7."*

19. I was told that my cervical transverse myelitis substantially impacted my ability to, among other things, work, think, stand, bend, walk and lift.

20. In or about May 2011, I was granted a parental leave of absence through April 9, 2012. *Gabor Dec., Ex. "C."*

21. I went into labor on April 10, 2011 and returned about one year later.

22. As noted above, after I gave birth to my first child, I was diagnosed with transverse myelitis, which is the swelling of my spinal cord.

23. As a result, I started getting tingling in my feet that would then spread throughout my body.

24. I needed to undergo extensive testing to find out the reason for the swelling in my spinal cord.

25. My doctor told me that it could take about a year to rectify the numbness and tingling so the swelling of the cord could go down.

26. Also, terrible headaches came with my diagnosis. I even had a headache where I lost the ability to read briefly – called a confusional migraine, according to my neurologist.

27. I never had headaches or migraines before I gave birth.

28. Indeed, the setup at work with looking at numerous screens for 12 hours when we had mandates definitely made the headaches more frequent and worse. Plus, the stress of it all made everything worse.

29. On March 9, 2012, prior to returning to work, Dr. McWilliams, M.D., reiterated that I was being evaluated for cervical transverse myelitis and, again, recommended that I "not work overnight hours as significant sleep deprivation can produce certain stressors that my exacerbate symptomologies." *A copy of the March 9, 2012 letter is annexed as Exhibit "8."*

**D.    My Return to Work**

30. Prior to issuing the Overtime Mandate Memo, overtime was initially canvassed on a voluntary basis and then assigned based on oldest date worked if there were no volunteers for overtime.

31. I returned to work in July 2012.

32. On August 2, 2012, Dr. McWilliams provided a doctor's note stating that due to my medical conditions that I "not work over 8 hours in a single day for the next four to six weeks." *A copy of the August 2, 2012 letter is annexed as Exhibit "9."*

33. On August 29, 2012, yet another letter was submitted by Dr. Erika M. Jurasits, stating that "limitations to hours worked. May not work more than 8 hrs/day." *A copy of the August 29, 2012 letter is annexed as Exhibit "10."*

34. On August 30, 2012, due to complications my daughter was having with her health, Dr. Katherine Wightman wrote to advise that I should "Not be scheduled for to work longer than 8 hours in a 24 hour period." *Gabor Dec., Ex. AA*.

35. On November 17, 2012, I provided yet another "Certificate for Work Restrictions" from Dr. Jurasits instructing that my work schedule should be "limited." The letter stated that my prognoses is good "if treatment policy of limiting work schedule and counseling is followed." *A copy of the November 17, 2012 letter is annexed as Exhibit "11."*

36. The certificate also indicated that the claimants heightened anxiety as a result of the mandated overtime was resulting in headaches. *Id*.

37. Because I was breast-feeding, I was not taking any medications.

38. Again, the County failed to provide any accommodation to me.

39. In January 2013, the County issued the Overtime Mandate Memo.

40. On January 8, 2013, I submitted an Internal Correspondence, under protest, about being mandated. In the memorandum, I asked about the November 17, 2012 doctor's note I submitted stating I could not work for more than eight hours. *Gabor Dec., Ex. Q*.

41. Nothing was done to address the concern raised in my memorandum.

42. On April 16, 2013, I wrote another Internal Correspondence to address the hostile work environment I was being subjected to at the County. *A copy of the April 16, 2013 letter is annexed as Exhibit "12."*

43. Approximately one week later, I followed up with another Internal Correspondence, further detailing the hostile work environment to which I was being subjected at the County. *A copy of the April 22, 2013 letter is annexed as Exhibit "13."*

44. In addition to addressing improper treatment I had to endure, I noted that I was being targeted since my return to work as a disabled breastfeeding mother who needed to care for myself and my child. *Id.*

45. I knew that I could perform the work required of me within the eight-hour shift, which was the only accommodation I was asking for, as recommended by my doctors.

46. On or about June 4, 2013, Defendant, out of the blue, issued a series of disciplinary charges against me.

47. These charges were actually filed against me on the very same day that I had been preparing to leave my County position due to the discrimination I was enduring based on Defendant's failure to accommodate my disabilities.

48. On that day, the County was well aware of my planned retirement as there was a resignation party planned for me that day where we were going to "celebrate" my last day at the County.

49. Instead, as noted above, I was brought into Internal Affairs at the County and presented with the charges, despite my intention to quit that very same day.

50. The County would not allow me to resign without addressing the charges.

51. Ultimately, the County forced me to sign a release in exchange for compensation for one month – which reimbursement I never received in full – due to the unjustified suspension for that period of time.

52. I received nothing of value for this release given that I already resigned from my position before it was signed.

53. I was under duress being told I must sign it to move on from the charges so I can leave on good graces with the County.

54. The County, again, wholly ignored my requests for an accommodation, prompting my forced resignation on July 4, 2013.

55. Although clearly qualified, when I attempted to be reinstated to my position at the County in 2014, my request was denied for no legitimate reason.

56. Subsequent to my termination, I filed a Charge of Discrimination with the Equal Employment Opportunity Commission, which determined that there was "probable cause" that Defendant violated my rights under the law. *A copy of the EEOC Determination is annexed as Exhibit "14."*

57. The EEOC rejected any claim that I signed my rights away in the release and found, in relevant part, as follows:

> A review of the evidence received during our investigation suggest Respondent by way of policies enacted in 2012 and 2013 restricted and or denied Charging Party's right to request and obtain a reasonable accommodation. Furthermore, by refusing to address any request for reasonable accommodation, Respondent failed to engage in the interactive process.
>
> Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on the basis of disability in violation of the Americans with Disabilities Act, as amended (ADA).

*Id.*

58. Finally, in addressing the purported release that Defendant relies upon for dismissal of my claims, it initially must be noted that I was told that those were only going to be for me giving up my right to fight the suspension that was imposed on me in exchange for financial consideration. Nobody ever advised that this was a release of all claims I may have against the County.

59. This was provided to me on a take it or leave it basis and, therefore, under duress, I signed the document at the insistence of my Union representative. Had I known it was a general release of all claims, I never would have signed it.

60. In any event, I never received the consideration promised in the agreement in order for it to be effective.

61. Furthermore, despite promising not to challenge unemployment in the release, Defendant did make such a challenge to my application, thereby, again, nullifying any consideration provided to me as promised in the release.

62. After a hearing, the Board found that I was entitled to unemployment benefits, stating as follows:

> The credible evidence establishes that claimant quit her job because she had been working mandated overtime twice per week and her doctor advised her not to work overtime. … She requested to be exempt from overtime and the employer denied this request. Because her doctor advised her not to work overtime and the employer would not accommodate this request, she had a compelling reason to quit.

*A copy of the Unemployment Determination is annexed hereto as Exhibit "15."*

63. The release became void once Defendant rescinded on its obligations thereunder by challenging my unemployment benefits, which was consideration to be provided to me in exchange for same.

64. Annexed as Exhibit "16" are copies of the relevant pages of the Public Safety Committee minutes from November 29, 2012.

65. Annexed as Exhibit "17" are copies of the relevant pages of the Audit from the Suffolk County Office of the Comptroller Audit Division for the period January 1, 2014 through March 31, 2015.

9

66. Annexed as Exhibit "18" are copies of the relevant pages of the Budget Review Office October 17, 2014 Review of the 2015 Recommended Operating Budget.

I declare under the penalty of perjury under the laws of the State of New York and the United States of America that the foregoing is true and correct, and that I executed this Declaration on the 20th day of October 2023 in Suffolk County, New York.

<i>/s/ Kristy Pflug</i><br>
KRISTY PFLUG