

**SUFFOLK COUNTY**
**OFFICE OF THE COMPTROLLER**
**AUDIT DIVISION**

**John M. Kennedy, Jr.**
**Comptroller**

An Audit of the
Suffolk County Department of Fire, Rescue and Emergency Services
Payroll Procedures
For the Period
January 1, 2014 through March 31, 2015

**Report No.: 2016-04**
**Date Issued: August 30, 2016**

Exhibit 6

DIIORIO0368

# SUFFOLK COUNTY
# OFFICE OF THE COMPTROLLER

## John M. Kennedy, Jr.
Comptroller

## Louis A. Necroto, CPA
Chief Deputy Comptroller

## Frank Bayer, CPA
Executive Director of Auditing Services

**Audit Staff:**

Manuel Alban, CPA, Senior Investigative Auditor
Audra Lebowitz, Senior Auditor
Karen Francis, CPA, Auditor
Kathleen Manfredo, CPA, Auditor
Kathleen Johnsonbaugh, Auditor

DIIORIO0369

# **TABLE OF CONTENTS**

Page

LETTER OF TRANSMITTAL ..................................................................................1

EXECUTIVE SUMMARY .......................................................................................3

BACKGROUND ......................................................................................................6

SCOPE AND METHODOLOGY .............................................................................7

AUDIT FINDINGS ..................................................................................................9

CONCLUSION ......................................................................................................22

RECOMMENDATIONS ........................................................................................23

APPENDICES

      Appendix A      Agency's Response to Audit.....................................................27

      Appendix B      Exit Conference Report............................................................38

DIIORIO00370

# LETTER OF TRANSMITTAL

July 8, 2016

Mr. Joseph Williams, Commissioner
Department of Fire, Rescue & Emergency Services
P.O. Box 127
30 East Avenue
Yaphank, NY 11980

Dear Commissioner Williams:

In accordance with the authority vested in the County Comptroller by Article V of the Suffolk County Charter, a performance audit was conducted for the period January 1, 2014 through March 31, 2015, of the Department of Fire, Rescue and Emergency Services (the Department), to follow up on prior audit (Report No. 2014-02) findings and verify if the Department has implemented the Comptroller's recommendations outlined in the report. As a result of our audit testing, the audit period was expanded to include the period January 1, 2012 through June 30, 2015, for limited testing.

The objectives of our audit were as follows:

- To determine if the Department corrected employee accruals that were calculated improperly on their time and accrual records.

- To determine if the Department corrected amounts overpaid and underpaid to several employees by performing proper adjustments to their gross wages.

- To determine if the Department's employee time and accrual sheets were properly processed in accordance with applicable contracts, SOP's, MOA's, Directives of the Office of Labor Relations and related payroll documentation.

- To determine if the Department's time and accrual sheets accurately reflected employee hours worked and benefit hours accrued and utilized during the audit period.

DIIORIO00371

- 2 -

- To review the Department's current payroll procedures in order to determine if it has adequate procedures in place to record, process and properly claim payroll expenses to the County.

We conducted our audit in accordance with generally accepted government auditing standards, except for the external peer review requirement.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions, based on our audit objectives.  Further, these standards require that we understand the internal control structure of the Department and the compliance requirements stated in laws and regulations that are significant to our audit objective.

An audit includes examining, on a test basis, evidence supporting the transactions recorded in the accounting and operating records, and applying such other auditing procedures as we consider necessary in the circumstances.  An audit also includes assessing the estimates, judgments and decisions made by management.  We believe that our audit provides a reasonable basis for our findings and recommendations.

Respectfully submitted,

Office of the County Comptroller
Division of Auditing Services

DIIORIO0372

# EXECUTIVE SUMMARY

**Introduction:**
The Suffolk County Comptroller's Office has reviewed the payroll procedures of the Suffolk County Department of Fire, Rescue and Emergency Services (Department) for the period January 1, 2014 through March 31, 2015.

**Purpose:**
The purpose of our review of the Department's payroll procedures was to determine if the Department's time and accrual sheets were properly processed in accordance with applicable contracts, SOP's, MOA's, Directives of the Office of Labor Relations and related payroll documentation; to determine if the Department's time and accrual sheets accurately reflected employee hours worked and benefit hours accrued and utilized during the audit period; and to review the Department's current payroll procedures, in order to determine if the Department has adequate procedures in place to record, process and properly claim payroll expenses to the County.

Findings with an asterisk (*) were also noted in our prior audit Report No. 2014-02, issued February 28, 2014.

## Summary of Findings

**Operating Efficiency:**

- The Department had insufficient internal control procedures to ensure that all Emergency Service Dispatchers (ESD's) accounted for 248 work days per calendar year as contractually required. As a result, the vast majority of ESD's failed to fulfill their required annual number of work days from January 2012 through December 2014, and for retirees through August 2015, which resulted in a total shortage of 484 work days; that equated to an overpayment of $114,277 to employees. (p.9)

- Inadequate internal controls related to the scheduling of ESD work days from January 2012 through December 2014, resulted in increased payroll costs to the County of up to $301,868. (p.10)

- The Department uses ESD's to perform clerical functions, resulting in increased payroll costs to the County totaling up to $432,636. (p.10)

- Overtime earned in the Department's Communications Division had significantly increased under the management of the current supervisor, when compared to the prior supervisor, without any significant change in personnel. We noted that the average monthly overtime of each ESD rose 142% from $732 to $1,774 per month, while the supervisor's average monthly overtime increased 338% from $1,250 to $5,474 per month. (p.10)

- The Communications Division had a substantial amount of overtime distributed to their ESD's (84%) when compared to the Department as a whole. (p.17)

- For five years, 2010 to 2014, one employee dominated overtime earnings totaling $405,488 during this period, and just prior to his retirement in 2015.  We question whether an employee working substantial overtime hours remains competent to perform public safety responsibilities. (p.17)

- *The Department failed to comply with SOP A-17 requiring written justification be sent to the Chief Deputy County Executive for employees receiving overtime in excess of 50% of their salary. (p.17)

**Internal Controls and Compliance:**

- The Department has not complied with all the recommendations of the prior audit Report No. 2014-02. (p.17)

- The Department's payroll representative did not properly calculate the gross wages for several employees who were on extended sick leave and receiving half pay, resulting in an overpayment to the employees totaling $2,629. (p. 18)

- The Department's payroll representative made numerous errors in processing one employee's time and accruals when the employee used cancer pool accruals, disability pay and half pay during the audit period. This resulted in overpayments to the employee totaling $1,394 and overstated accruals as well. (p. 18)

- The Department's payroll representative did not properly calculate the gross wages for one employee who was docked the day prior to a holiday, resulting in an overpayment to the employee of $602 (p.18)

- Employee gross wages for  pay  periods in which overtime had occurred were not always calculated properly. (p. 18)

- *The Department's payroll representative did not always properly compute the number of docked "lock in lunch" hours, resulting in employee gross wages that were improperly calculated. (p.19)

- *Department personnel did not always reconcile time and accrual records and overtime authorizations. (p.19)

- *There were numerous instances in which employee time and accrual records did not accurately reflect the employee hours worked, and benefit hours utilized, during the audit period. (p.19)

- *Accruals were not always properly adjusted for employees who were on docked payroll. (p.20)

DIIORIO0374

- *There were several instances in which employees failed to complete the required SCIN Form 17 when incurring overtime as required by Suffolk County Standard Operating Procedure A-17. (p.20)

- *There were several instances in which employee time and accrual records, overtime authorizations and applications for leave forms were not properly approved or could not be provided. (p.20)

- The Deputy Commissioner did not properly verify the attendance of employees that reported directly to him prior to approving their time sheets. (p.21)

- Computerized employee time sheets have a deficiency in that they were not fully formula protected. (p.21)

- The Department's Payroll Division used pay schedules for ESD's that are not listed in the AME contract. (p.21)

- The Department was non-compliant with the Memorandum of Agreement between Suffolk County & the Department as it pertained to "Swaps/Mutuals" for the ESD's. (p.21)

DIIORIO00375

---
# BACKGROUND
---

The Suffolk County Department of Fire, Rescue and Emergency Services (Department) is responsible for the preservation of life and protection of property from fire, the sustaining of life in medical emergencies, and the protection of public safety during natural and man-made disasters.  The Department is comprised of five divisions:

- Administration
- Fire Marshal's Office
- Fire Rescue Communications Center
- Office of Emergency Management
- Emergency Support Services

Attendance is recorded on an exception basis by using either Outlook calendars or hard copy calendars to record any accruals that employees may have used.  Each division is required to submit their time & accrual sheets, with all supporting slips, documentation and required signatures every four weeks.  All time sheets are approved by the employee's direct supervisor, and then by the Deputy Commissioner, prior to being forwarded to payroll personnel to verify attendance and mathematical accuracy.

For employees in the Communications Division, verification of attendance and time & accrual accuracy are the responsibility of the division's clerk.  The Communications Division, which operates 24 hours a day, seven days a week, utilizes rotating shifts with an annual rolling calendar for each employee.  Daily attendance records are maintained by the division in a computerized Excel calendar which details the shift worked, any accruals used and any overtime worked.  Personnel in this unit are 37.50 hour employees.  However, since these employees do not leave their work station for meal breaks and have a "lock in lunch", they receive an additional 2.50 hours of pay each week.

Management employees (Bargaining Unit 21) work a 37.50 hour workweek their first year and then revert to a 35 hour workweek; these employees normally work a flexible workweek to allow for their attendance at evening meetings.  Suffolk County AME employees (Bargaining Unit 2 and Bargaining Unit 6) hired after September 3, 2001, work either a 37.50 or 40 hour workweek their first year and then revert to a 35 or 37.50 hour workweek, respectively, in accordance with the provisions contained in the Suffolk County AME Contract.

DIIORIO0376

# SCOPE AND METHODOLOGY

We conducted a performance audit of the Department for the period January 1, 2014 through March 31, 2015.  In order to accomplish the objectives as stated in the Letter of Transmittal (p. 1), we performed the following procedures:

- Reviewed relevant Suffolk County Laws, Resolutions, Standard Operating Procedures (SOP's), All Department Head Memorandums, Memorandums of Agreement (MOA's), Payroll Memorandums, the Suffolk County AME contract, the Department's Payroll Policies, and Standard Operating Guidelines (SOG's).

- Conducted interviews with Department personnel as deemed necessary to obtain an understanding of the procedures used to record and process employee time sheets.

- Interviewed Department personnel who were responsible for monitoring employee sick leave usage in order to determine if the Department was complying with the provisions of the Sick Leave Management Program.

- Obtained crystal reports from the Comptroller's Payroll Division of all Department personnel who worked from January 1, 2014 through March 31, 2015.  Using the crystal report, we randomly selected ten employees and judgmentally selected an additional seven employees for testing.

- Performed testing procedures as deemed necessary for all time and accrual sheets submitted by the above referenced seventeen employees from January 1, 2014 through March 31, 2015, in order to accomplish our audit objectives.  As a result of our findings, we expanded testing to include 2012 through 2014, for all Emergency Service Dispatchers.

- Randomly selected three [38%] part-time employees and performed testing procedures as deemed necessary for all time and accrual sheets submitted during the audit period.

- Utilizing the crystal report from the Comptroller's Payroll Division, we isolated all personnel with docked payroll and their corresponding data. Judgmentally selected the seven employees with the highest docked payroll during the audit period. Performed testing procedures as deemed necessary in order to accomplish our audit objectives.

- Utilizing the crystal report from the Comptroller's Payroll Division, we judgmentally selected the eight employees with the highest overtime payroll during the audit period.  Performed testing procedures as deemed necessary in order to accomplish our audit objectives.

DIIORIO0377

- Obtained crystal reports from the Comptroller's IFMS Unit of all Department travel and meal expenses during January 1, 2014 through March 31, 2015. Using the crystal report, we randomly selected twenty-five meal expenses and judgmentally selected seven (100%) travel expenses and performed testing procedures as deemed necessary.

- Utilizing the crystal reports from the Comptroller's Payroll Division, we performed multiple analyses as follows:

  1. Analysis to determine the increased cost to the County associated with an ESD performing clerical/administrative functions.

  2. Analyzed the overtime costs in the Communications Division associated with providing 458 days of coverage as a result of ESD's not performing their required number of annual work days.

  3. Evaluated the overtime pattern of the entire Department and its divisions for the years 2010 through 2014, and compared the Communications Division overtime cost to the entire Department.

  4. Analyzed and compared overtime incurred by the Communications Division under the former supervisor to the overtime incurred under the current supervisor.

  5. Analyzed the top five overtime earners within the Department for the years 2010-2014, to determine if overtime was consistently assigned to particular employees.

  6. Analyzed the overtime of the five ESD's who retired in 2015 over the five year period leading up their retirement to determine whether the ESD's were performing excessive overtime to spike their pension benefits prior to retirement.

DIIORIO0378

# AUDIT FINDINGS

**<u>Operating Efficiency</u>** – As a result of our audit of the Department of Fire, Rescue and Emergency Services for the period January 1, 2014 through March 31, 2015, and the significance of the findings pertaining to the Communications Division, we performed several analyses that disclosed questionable management practices and unnecessary increases in payroll costs related to an exorbitant amount of overtime in the Communications Division as follows:

Findings with an asterisk (*) were also noted in our prior Audit Report No. 2014-02, issued February 28, 2014

*The Department had insufficient internal control procedures to ensure that all Emergency Service Dispatchers (ESD's) were accounting for 248 work days per calendar year as contractually required. As a result, the vast majority of ESD's failed to fulfill their required annual number of work days from January 2012 through December 2014, and for retirees through August of 2015, which resulted in a total shortage of 484 work days; that equated to an overpayment of $114,277 to employees.* The Department failed to comply with a Memorandum of Agreement pertaining to dispatcher work schedules. The Memorandum of Agreement specifically states, "The chart maintains a current work schedule of 248 work days through a schedule of 242 work days reflected on the chart and 6 days to be scheduled by the Department prior to January 15th of each year." Our interviews with the Communications Division supervisor, and the clerical employee assigned the responsibility of the division's attendance and accuracy of time and accruals, were unable to provide the annual number of work days that are required by every dispatcher or a method by which each dispatcher is tracked to ensure compliance with the Memorandum of Agreement. In addition, upon inquiry with the Department's Administrator I, it was disclosed that the dispatchers were never scheduled to work their "chart/X" days in 2014. Furthermore, interviews with the dispatchers also revealed that they could not recall their last completed chart/X day.

- Testing of 2014 time records revealed forty-eight (98%) of the forty-nine dispatchers did not meet the required number of work days. Our review revealed forty-eight employees who did not meet the requirement resulting in a total shortage of 201.52 days, translating to a monetary value of $47,653.22 of salary expense for which the County received no benefit through employee work hours.

- Testing of 2013 time records revealed forty-eight [98%] of the forty-nine dispatchers did not meet the required number of work days. Our review revealed forty-eight employees who did not meet the requirement, resulting in a total shortage of 217.52 days, translating to a monetary value of $50,666.95 of salary expense for which the County received no benefit through employee work hours.

- Testing of 2012 time records revealed twenty-five (58%) of the forty-three dispatchers did not meet the required number of work days, while eighteen employees met the requirement, five of whom exceeded the number of days by 10.83, resulting in an underpayment to the employees of $3,750.89. However, the

DIIORIO00379

twenty-five employees who did not meet the requirement resulted in a total shortage of 53.97 days, translating to a monetary value of $13,182.71 of salary expense for which the County received no benefit through employee work hours.

- Lastly, during the performance of this audit, five employees retired and therefore were tested as well.  Testing of the 2015 time records for the five retirees revealed all [100%] five dispatchers did not meet the required number of work days resulting in a total shortage of 10.85 days, translating to a monetary value of $2,773.63 of salary expense for which the County received no benefit through employee work hours.

***Inadequate internal controls related to the scheduling of ESD work days from January 2012 through December 2014, resulted in increased payroll costs to the County of up to $301,868.*** ESD's were paid for 462 days which were not scheduled or worked, resulting in an overpayment to employees of $107,752 over a three year period. In addition, as a result of the inadequate controls related to this issue, overtime was incurred to cover the 458 days not worked at an overtime cost of $108,289 to $194,116.  Employees were required to account for 248 work days annually.  Due to the unique nature of the ESD's method of scheduling, they fall short of this requirement.  As a result, it was necessary that the ESD's make up this shortage through "Chart/X/training" days as documented in the MOA dated April 14, 2005.  However, it was found that the majority of ESD's did not work any additional days to make up their shortage and therefore, these days were covered by personnel receiving overtime.

***The Department uses ESD's to perform clerical functions resulting in increased payroll costs to the County totaling up to $432,636.***  The Communications Division had dispatcher's working out of title by requiring them to perform clerical or administrative responsibilities Monday through Friday.  Presently, an ESD II supervisor grade 17/step 12 is assigned the clerical functions of the Communications Division and receives overtime when covering a shift in the radio room.   In addition, the ESD II works a 40-hour week earning lock-in lunch pay and 6% rotating shift differential even though the clerical duties require only a 35-hour a week daytime employee.  Furthermore, it was revealed that although the previous clerk, a grade 12/step 9, performed the secretarial functions by herself, her replacement is aided by fellow ESD's.

***Overtime earned in the Department's Communications Division significantly increased under the management of the current supervisor when compared to the prior supervisor, without any significant change in personnel (Figure 5). We noted that the average monthly overtime of each ESD rose 142% from $732 to $1,774 per month (Figure 1 & Figure 3); while the supervisor's average monthly overtime increased 338% from $1,250 to 5,474 per month (Figure 1 & Figure 4). At the request of the FRES Commissioner, we analyzed overtime between the prior supervisor and the current supervisor by adjusting the overtime amounts for contractual raises during the period [2011- 2% & 2012- 2%]. It should be noted that even after adjusting the overtime amounts, the average monthly overtime for both the current supervisor and ESD's still rose significantly. For each ESD it rose 131% from $732 to $1,693 per month while the supervisors monthly overtime increased 325% from $1,250 to 5,306 per month (Figure 2).*** Based on our analyses of the Department's overtime, we

DIIORIO00380

determined that although the number of personnel in  the Communications  Division did not notably differ (Figure 5), overtime rose consistently and considerably each year under the direction of the current supervisor.

DIIORIO0381

# APPENDIX B

## Audit Division Response

### Response to Conclusion:

The Departments asserts that increased minimum staffing, a prohibition on hiring (driven by the lack of a valid civil service list) plus a number of major storms were the contributing factors in the increased overtime incurred.  The Department also asserts that any analysis of increased overtime costs should factor offsetting savings and budget mitigations of which the Department puts a value of $677,619 during the period 2012-2015.  We calculated overtime for the period 2012-2015 to be $5,271,657 which is $4,594,038 more than the offsetting savings calculated by the Department.

While we realize overtime is necessary during major emergency events, those events do in fact end.  Therefore the spike in overtime should end as well.  As indicated in our report, excessive overtime was in fact the norm in the Communications Division.

The Department states our conclusion that the current division supervisor is creating an environment requiring high overtime is incorrect.  We noted the following during our audit. In the 8 months before the prior supervisor retired, overtime under his supervision was $297,882 (Jan 2010 through Aug 2010), and for the remaining 4 months after he retired (September 2010 through December 2010) overtime costs were $334,556.  Overtime costs were consistently higher once the prior supervisor retired.  Additionally, the prior communications supervisor and Clerk Typist handled all the clerical and administrative responsibilities of the Communications  Division without any additional assistance. However, the current supervisor allows an ESD II to perform clerical tasks on a full time basis while also pulling additional ESD's to assist in performing clerical functions rather than performing their dispatching duties.  The Department states that the training of any new ESD I's is being conducted by existing ESD I's and not by ESD II's.  According to the Civil Service "distinguishing features of the class" of an ESD II, "an employee in this class is responsible for the supervision and training of one shift of the Emergency Service Dispatchers". The Commissioner stated in the Public Safety Committee meeting of the Suffolk County Legislature on October 21, 2014, that even though there was an active list it would have required removing four people from the radio room to run the training program for two new ESD's for a six month period insinuating that he chose to run additional overtime instead of hiring. These decisions, made under the current communications supervisor and management, do create an environment where additional overtime is in fact necessary and mandated.

When analyzing the Department's budgets for the periods 2010 through 2015 we noted that although the Commissioner stated on numerous occasions in legislative meetings that the Department can operate within the means of the recommended budgets they in fact consistently exceeded their overtime budgets by more than 100%, essentially creating a budget deficit.

Additionally during a FRES Commission meeting in May of 2012 discussions centered around the fact that it would be more financially responsible to hire additional ESD's rather than paying

## APPENDIX B

## Audit Division Response

so much overtime. The Department states in their conclusion the need for additional staffing and also notes that overtime for the first six months of 2016 has declined by more than $202,000 over the same period in 2015 representing a 23% decline largely due to the Department filling all ESD vacancies.  We feel these statements support our findings that overtime in the past was mismanaged. Managing the number of ESD's is a predictable event and therefore any mention of a list not being available, or not hiring ESD's because training them would be counterproductive, could in fact be construed as mismanagement.

We would like to sum up with a quote from the same FRES Commission meeting in May 2012: "With all the overtime, people (ESD's) will start to snap and what is that going to cost the County?  Maybe a mistake will be made and then the County will pay dearly."  This is what the County should be considering when contemplating public safety.

DIIORIO0415