UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTY PFLUG,<br><br>         Plaintiff,<br><br>  -against-<br><br>THE COUNTY OF SUFFOLK ,<br><br>         Defendants. | **DEFENDANT'S RESPONSE TO PLAINTIFF'S COUNTERSTATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**<br><br>**Docket No. 20-cv-00018 (SIL)** |

  Defendant, THE COUNTY OF SUFFOLK, by its attorney, DENNIS M. BROWN, Acting Suffolk County Attorney, submits the following statement in response to Plaintiff's Counterstatement of Undisputed Facts dated October 20, 2023 pursuant to Local Rule 56.1 and in support of its motion for summary judgment. Plaintiff's Statement of Material Facts paragraphs are followed by Defendant's responses below.

  1. In or about December 2002, Plaintiff commenced her employment with Defendant as a Public Safety Dispatcher I ("PSD I"), the position she held until her employment terminated in July 2013. Pflug Dec., ¶5.

  **Undisputed.**

  2. As a PSD I, Plaintiff's role consisted of obtaining information from 911 operators to dispatch to the police so that they could get whatever information was necessary in order to attend to the emergency. Pflug Dec., ¶6.

  **Undisputed.**

  3. In the PSD I Job Description, it is noted that the main duty of a PSD I was to "[o]perate[] a two-way radio communication system to dispatch public safety personnel to calls for assistance. May operate a telephone switchboard or complaint receiving system which

1

receives requests from the public for police or other public safety assistance." Pflug Dec., Ex. "1."

**Undisputed.**

4. Critically, nowhere in the Job Description did it state that PSD Is were required to work a certain amount of hours or, more importantly, that the ability to work overtime was an essential function of the job.

**Undisputed, as to the exact language stated in the job description.**

5. Furthermore, nothing in the Collective Bargaining Agreement between Defendant and the Suffolk County Association of Municipal Employees, Inc. (the "CBA") stated that mandatory overtime was required of employees in order to perform the essential functions of their job. Pflug Dec., Ex. "2."

**Undisputed, as to the exact language stated in the CBA.**

6. According to the CBA: Overtime work, as an opportunity, in the same or related title shall be equalized among Departmental employees as far as is practical.

> Department Heads and supervisors may require the performance of overtime or "called-in" work for reasonable periods as an obligation in cases where, because of seasonal or extraordinary requirements related to the job or because of the absence of normal personnel for whatever reason, the work is necessary to meet the normal work demands of the function of the Department or some emergency exists. Seniority shall be a criterion in the selection of employees for overtime, provided that the employees have the ability to do the work.

Id., p. 7, §6.2 (emphasis supplied).

**Undisputed, as to the exact language stated in the CBA.**

7. As well, the CBA stated that, in relevant part, that: "No individuals shall be required to work more than a normal 40 hour workweek (e.g., in a work location where employees currently

work a normal 40 hour workweek due to 'lock-in,' new employees would also work the same 40 hours)." Id., p. 13, §8 (emphasis supplied).

**Undisputed, as to the exact language stated in the job description.**

8. When Plaintiff commenced her position with Defendant, working overtime was voluntary. Pflug Dec., ¶10.

**Disputed. Overtime was voluntary, however if there were no more volunteers to fill the spaces, then it was mandatory. Plaintiff testified that when she first started working for the County, she worked mandated overtime. Gabor Decl. Ex. B, 16:10-12, 21:6-13, 35:24 -36:8, Gabor Decl. Ex. G,16:11-17:7, 18:8-11, 24:5-12, 25:2-10, Gabor Decl. Ex. BB ¶ 5.**

9. As well, when Plaintiff was employed by Defendant, it issued Suffolk County's Anti Discrimination and Anti Harassment Policy Statement (the "Anti-Discrimination Statement"). Pflug Dec., Ex. "3." Pursuant to this Statement, Defendant stated that it would not discriminate against individuals with disabilities and that it would provide reasonable accommodations to those with disabilities as required under the Americans with Disabilities Act. Id. The Statement further noted that no retaliation would take place to those who engage in protected activity by complaining of discrimination or for seeking a reasonable accommodation. Id.

**Undisputed.**

10. On August 3, 2012, the County issued a memorandum stating that "effective August 25, 2023, no employee will be exempted from working Mandated O/T. All employees will be considered part of the O/T Mandate pool." Pflug Dec., Ex. "4." 8

**Undisputed.**

3

11. Notwithstanding what was stated, the memo went onto state that those with medical conditions may be exempted. Id.

**Undisputed.**

12. On January 11, 2013, Defendant issued a memorandum regarding mandatory overtime (the "Overtime Mandate Memo"), which stated as follows: As per Paul Margiotta of Labor Relations, no employee will be excused from overtime. The overtime is part of the position. If they can't work overtime, they are unfit for duty and therefore cannot work their normal shift. If the employees push the issue, Civil Service Section 72 (unfit for duty and the employe will be forced to be absent for up to 1 year) proceedings can be implemented. The end result would be termination. Pflug Dec., Ex. "5."

**Undisputed.**

13. In other words, Defendant created a policy that overrode its Anti-Discrimination Statement and legal obligations under federal, state and local laws.

**Disputed.  In addition, Plaintiff does not cite to any exhibit in would support this conclusory statement.**

14. The Overtime Mandate Memo was then sent to Suzanne McBride, the Union representative, and others to implement on January 12, 2013 at 12:01 a.m. Pflug Dec., Ex. "6."

**Undisputed.**

15. Prior to taking leave in 2011, when Plaintiff was pregnant, she did not refuse overtime mandates.

**Disputed.  In addition, Plaintiff does not cite to any exhibit in would support this conclusory statement.**

16. On March 9, 2011, Plaintiff's doctor, Scott McWilliams, M.D., stated that she was being evaluated for cervical transverse myelitis. In the letter, the doctor recommended that Plaintiff "not work overnight hours as significant sleep deprivation can produce certain stressors that may exacerbate symptomologies." Pflug Dec., Ex. "7."

**Undisputed as to the exact language as purported to be stated in the document.**

17. In or about May 2011, Plaintiff was granted a parental leave of absence from June 8, 2011 through April 9, 2012. Gabor Dec., Ex. "C."

**Undisputed.**

18. As noted above, both before and after Plaintiff gave birth to her child, she was diagnosed with transverse myelitis, which is the swelling of her spinal cord. Pflug Dec., ¶22. 9

**Disputed. In her Declaration, Plaintiff states that she was diagnosed with transverse myelitis *after* she gave birth to her child.**

19. As a result, Plaintiff started getting tingling in her feet that would then spread throughout her body. Pflug Dec., ¶23.

**Undisputed.**

20. Plaintiff was told that her cervical transverse myelitis substantially impacted her ability to, among other things, work, think, stand, bend, walk and lift.

**Disputed. This is a hearsay statement which is not supported by any exhibit.**

21. Plaintiff needed to undergo extensive testing to find out the reason for the swelling in her spinal cord. Pflug Dec., ¶24.

**Undisputed.**

22. Plaintiff's doctor told her that it could take about a year to rectify the numbness and tingling so the swelling of the cord could go down. Pflug Dec., ¶25.

5

**Disputed. This is a hearsay statement.**

23. On March 9, 2012, prior to returning to work, Dr. McWilliams, M.D., reiterated that Plaintiff was being evaluated for cervical transverse myelitis and, again, recommended that she "not work overnight hours as significant sleep deprivation can produce certain stressors that may exacerbate symptomologies." Pflug Dec., Ex. "8."

**Undisputed as to the exact language as purported to be stated in the document.**

24. Plaintiff returned to work in July 2012. Pflug Dec., ¶31.

**Undisputed.**

25. On August 2, 2012, Dr. McWilliams provided a doctor's note stating that due to her medical conditions that she "not work over 8 hours in a single day for the next four to six weeks." Pflug Dec., Ex. "9."

**Undisputed as to the exact language as purported to be stated in the document.**

26. On August 29, 2012, yet another letter was submitted by Dr. Erika M. Jurasits, stating that "limitations to hours worked. May not work more than 8 hrs/day." Pflug Dec., Ex. "10."

**Undisputed as to the exact language as purported to be stated in the document. It should be noted that no diagnosis is contained therein.**

27. On August 30, 2012, due to complications Plaintiff's daughter was having with her health, Dr. Katherine Wightman wrote to advise that Plaintiff should "Not be scheduled for to work longer than 8 hours in a 24 hour period." Gabor Dec., Ex. AA. 10

**Undisputed as to the exact language as purported to be stated in the document. It should be noted that the note refers to Plaintiff's daughter and makes no reference to Plaintiff's alleged disability.**

6

28. On November 17, 2012, Plaintiff provided yet another "Certificate for Work Restrictions" from Dr. Jurasits instructing that her work schedule should be "limited." The letter stated that my prognoses is good "if treatment policy of limiting work schedule and counseling is followed." Pflug Dec., Ex. "11."

**Undisputed as to the exact language as purported to be stated in the document. It should be noted that no diagnosis is contained therein.**

29. The certificate also indicated that the claimants heightened anxiety as a result of the mandated overtime was resulting in headaches. Id.

**Undisputed as to the exact language as purported to be stated in the document.**

30. Because Plaintiff was breast-feeding, she was not taking any medications. Pflug Dec., ¶37.

**Undisputed as to the exact language as purported to be stated in the document.**

31. Again, the County failed to provide any accommodation to her. Pflug Dec., ¶38.

**Disputed. Plaintiff's supervisor, PSD II Jennifer Worthington was aware that Plaintiff requested a private room to pump milk, and Plaintiff was provided with one "right away". When the request came in for Plaintiff to have the room, Ms. Worthington explored the New York State parameters to learn what was needed for the room. Gabor Decl. Ex. G, 22:25-23:12, 29:22-30:5.**

32. In January 2013, the County issued the Overtime Mandate Memo. Pflug Dec., Ex. 5.

**Undisputed.**

33. On January 8, 2013, Plaintiff submitted an Internal Correspondence, under protest, about being mandated. In the memorandum, Plaintiff asked about the November 17, 2012

7

doctor's note she submitted stating that she could not work for more than eight hours. Gabor Dec., Ex. Q.

**Disputed. Although Plaintiff submitted the Internal Correspondence, no where therein is it indicated that it was done "under protest".**

34. Nothing was done to address the concern raised in Plaintiff's memorandum. Pflug Dec., ¶41.

**Disputed.**

35. On April 16, 2013, Plaintiff wrote another Internal Correspondence to address the hostile work environment she was being subjected to at the County. Pflug Dec., Ex. "12."

**Undisputed as to the exact language as purported to be stated in the document.**

36. Approximately one week later, Plaintiff followed up with another Internal Correspondence, further detailing the hostile work environment to which she was being subjected at the County. Pflug Dec., Ex. "13." 11

**Undisputed as to the exact language as purported to be stated in the document.**

37. In addition to addressing improper treatment Plaintiff had to endure, she noted that she was being targeted since her return to work as a disabled breastfeeding mother who needed to care for herself and her child. Id.

**Undisputed as to the exact language as purported to be stated in the document.**

38. Plaintiff knew that she could perform the work required of her within the eight-hour shift, which was the only accommodation she was asking for, as recommended by her doctors. Pflug Dec., ¶45.

**Undisputed as to the exact language as purported to be stated in the document.**

39. On or about June 4, 2013, Defendant, out of the blue, issued a series of disciplinary charges against Plaintiff. Pflug Dec., ¶46.

**Undisputed that Plaintiff was issued disciplinary charges, Disputed that it was out of the blue. "Plaintiff knew that there would be ramifications for her refusal to work mandates, and she knew that she "was on borrowed time." Plaintiff "knew something was going to happen" and that is why she tried to quit. Gabor Decl. Ex. B, 70:21-71:18, 71:24-72:8**

40. These charges were actually filed against Plaintiff on the very same day that she had been preparing to leave her County position due to the discrimination she was enduring based on Defendant's failure to accommodate her disabilities. Pflug Dec., ¶47.

**Disputed. The charges were filed on June 3, 2013, and Plaintiff asserts that she was preparing to leave the County on June 4, 2023. Gabor Decl. Ex. S.**

41. On that day, the County was well aware of Plaintiff's planned retirement as there was a resignation party planned for her that day where we were going to "celebrate" her last day at the County. Pflug Dec., ¶48.

**Disputed as to that the assertion that the "County was well aware of Plaintiff's planned retirement", and disputed that there was a resignation party or celebration planned.**

42. Instead, as noted above, Plaintiff was brought into Internal Affairs at the County and presented with the charges, despite her intention to quit that very same day. Pflug Dec., ¶49.

**Undisputed that Plaintiff was presented with charges.**

43. The County would not allow Plaintiff to resign without addressing the charges. Pflug Dec., ¶50.

9

**Disputed.**

44. The County, again, wholly ignored Plaintiff's requests for an accommodation, prompting her forced resignation on July 4, 2013. Pflug Dec., ¶51.

**Disputed.**

45. Although clearly qualified, when Plaintiff attempted to be reinstated to her position at the County in 2014, her request was denied for no legitimate reason. Pflug Dec., ¶52. 12

**Disputed. A legitimate reason was presented to Plaintiff. " Gabor Decl. Ex. W, Gabor Decl. Ex. X, Gabor Decl. Ex. B, 111:12-112:8.**

46. Finally, in addressing the purported release that Defendant relies upon for dismissal of Plaintiff's claims, it initially must be noted that Plaintiff was told that those were only going to be for her giving up her right to fight the suspension that was imposed on her in exchange for financial consideration. Nobody ever advised that this was a release of all claims Plaintiff may have against the County. Pflug Dec., ¶58.

**Disputed. Plaintiff was represented by counsel for the entire time she addressed disciplinary charges and when she signed the Stipulation and Agreement and General Release. Gabor Decl. Ex. B, 102:5-103:10. As such the County bears no responsibility for what Plaintiff was advised to do by her counsel.**

47. This was provided to Plaintiff on a take it or leave it basis and, therefore, under duress, Plaintiff signed the document at the insistence of my Union representative. Had Plaintiff known it was a general release of all claims, she never would have signed it. Pflug Dec., ¶59.

**Disputed. Plaintiff was represented by counsel for the entire time she addressed disciplinary charges and when she signed the Stipulation and Agreement and General**

10

**Release. Gabor Decl. Ex. B, 102:5-103:10.  As such the County bears no responsibility for what Plaintiff was advised to do by her counsel.**

48. In any event, Plaintiff never received the consideration promised in the agreement in order for it to be effective. Pflug Dec., ¶60.

**Disputed. At her sworn deposition, Plaintiff testified that she did receive payment. Gabor Decl. Ex. B, 108:25-109:14.**

49. Indeed, all she was supposed to get – which she did not – was the compensation she would have received for the month she was suspended the day she intended to quit; meaning she received nothing of value in exchange for the release.

**Disputed.**

50. Furthermore, despite promising not to challenge unemployment in the release, Defendant did make such a challenge to Plaintiff's application, thereby, again, nullifying any consideration provided to her as promised in the release.

**Disputed.**

51. After a hearing, the Board found that Plaintiff was entitled to unemployment benefits, stating as follows: The credible evidence establishes that claimant quit her job because she had been working mandated overtime twice per week and her doctor advised her not to work overtime. … She requested to be exempt from overtime and the employer denied this request. Because her doctor advised her not to work overtime and the employer would not accommodate this request, she had a compelling reason to quit. Plfug Dec., Ex. "15." 13

**Undisputed as to the exact language as purported to be stated in the document.**

52. Thus, the release became void once Defendant rescinded on its obligations thereunder by challenging Plaintiff's unemployment benefits, which was consideration to be provided to her in exchange for same.

**Disputed.**

53. Subsequent to her termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, which determined that there was "probable cause" that Defendant violated her rights under the law. A copy of the EEOC Determination is annexed as Exhibit "14."

**Undisputed as to the exact language as purported to be stated in the document.**

54. The EEOC rejected any claim that Plaintiff signed her rights away in the release and found, in relevant part, as follows: A review of the evidence received during our investigation suggest Respondent by way of policies enacted in 2012 and 2013 restricted and or denied Charging Party's right to request and obtain a reasonable accommodation. Furthermore, by refusing to address any request for reasonable accommodation, Respondent failed to engage in the interactive process. Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on the basis of disability in violation of the Americans with Disabilities Act, as amended (ADA). Id.

**Undisputed as to the exact language as purported to be stated in the document.**

55. As noted in a Public Safety Meeting in 2012, the County noted that it was "severely understaffed." Pflug Dec., Ex. "15."

**Disputed. This Exhibit (Pflug Dec. Ex. "15") purports to be an Unemployment Insurance Notice of Decision.**

12

56. Employees of the County complaint about how they could be mandated at times during their shifts – requiring them to work twelve hours – which completely disregarded other obligations in life, such as family or medical issues. Id., p. 4.

**Disputed. This Exhibit (Pflug Dec. Ex. "15") purports to be an Unemployment Insurance Notice of Decision.**

57. Ms. McBride noted at the meeting that: "[f]or the PSD function, we are budgeted for 68; we currently have 55 that are filled." Id., p. 10. 14

**Disputed. This Exhibit (Pflug Dec. Ex. "15") purports to be an Unemployment Insurance Notice of Decision.**

58. This meant that the County was allowing thirteen vacancies to remain open and, instead of filling them, they still mandated employees – even those with medical conditions such as Plaintiff – to work overtime. Id.

**Disputed. This Exhibit (Pflug Dec. Ex. "15") purports to be an Unemployment Insurance Notice of Decision.**

59. The Comptroller's Office noted that the overtime mandates resulted in "increased payroll costs to the County of up to $301,868." Pflug Dec., Ex. "16."

**Disputed. This Exhibit (Pflug Dec. Ex. "16") purports to be notes from a Public Safety Committee Meeting.**

60. The Comptroller's Office noted that: "While we realize overtime is necessary during major emergency events, those events do in fact end. Therefore the spike in overtime should end as well. As indicated in our report, excessive overtime was in fact the norm in the Communications Division." Id. p. 44.

13

**Disputed. This Exhibit (Pflug Dec. Ex. "16") purports to be notes from a Public Safety Committee Meeting.**

61. The County's Budget Review Office stated that the County was severely understaffed due to overtime mandates, which resulted overtime expenditures were "in excess of $800,000 in 2011 and 2012 and were $1.5 million in 2013." Pflug Dec., Ex. "17," p. 2.

**Disputed. This Exhibit (Pflug Dec. Ex. 17) purports to be an audit from the Comptroller's Office.**

62. The Budget Review Office noted that "[n]ot only is that a substantial amount of overtime for a relatively small number of moderately salaried civilian positions, it also puts a tremendous burden on these employees to perform at a high level of competence without creating extremely poor working conditions." Id.

**Disputed. This Exhibit (Pflug Dec. Ex. 17) purports to be an audit from the Comptroller's Office.**

Dated: Hauppauge, New York
November 3, 2023

Respectfully submitted,

DENNIS M. BROWN
Acting Suffolk County Attorney
*Attorneys for the Defendant*
*County of Suffolk*

100 Veterans Memorial Highway
Post Office Box 6100
Hauppauge, New York 11788
(631) 853-5822

BY: *Hope Senzer Gabor*
Hope Senzer Gabor
Assistant County Attorney

14

TO:  Yale Pollack, Esq.
     LAW OFFICES OF YALE POLLACK, P.C.
     66 Split Rock Road
     Syosset, New York 11791

15