UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KRISTY PFLUG,

                            Plaintiff,                        **MEMORANDUM AND ORDER**

   -against-                                        20-cv-00018 (SIL)

COUNTY OF SUFFOLK,

                            Defendant.
----------------------------------------------------------------x

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this disability discrimination action is Defendant County of Suffolk's (the "County" or "Defendant") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rule of Civil Procedure ("Fed. R. Civ. P."). *See* Defendant's Motion for Summary Judgment ("Defendants' Motion" or "Def. Mot."), Docket Entry ("DE") [30]. Plaintiff Kristy Pflug ("Plaintiff" or "Pflug") opposes. *See* Memorandum of Law in Opposition to Defendant's Motion ("Opposition" or "Opp."), DE [30-32]. By way of Complaint dated January 2, 2020, later modified by an Amended Complaint dated March 10, 2021, Plaintiff commenced this litigation against the County, asserting claims for failure to accommodate, intentional discrimination, retaliation and disparate impact pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.* ("ADA") and the New York State Human Rights Law, N.Y. Executive Law § 290, *et seq.* ("NYSHRL").[1] *See* Complaint, DE [1]; Amended Complaint, DE [26].

---

[1] At the time the Complaint was filed, there were two additional plaintiffs, Anne Di Iorio and Joseph Montaldo. *See* Complaint, DE [1]. After some discovery, the parties agreed to sever Di Iorio's and

For the reasons set forth herein, the Court concludes that Pflug's claims are barred by a prior release of all claims against the County. Accordingly, Defendant's Motion is granted, and the Amended Complaint is dismissed with prejudice.

I.   BACKGROUND

A. Facts

The following facts are taken from the pleadings, affidavits, exhibits, and the parties' Local Civil Rule 56.1(a) statements. *See* Defendant's State of Undisputed Material Facts ("Def. 56.1"), DE [30-2]; Plaintiff's Response to Defendant's Rule 56.1 Statement with Plaintiff's Statement of Material Facts ("Pl. 56.1"), DE [30-33]; Defendant's Response to Plaintiff's Counterstatement of Facts ("Reply 56.1"), DE [30-54]. Unless otherwise noted, these facts are not in dispute.

1.   The Public Safety Dispatcher Position

Plaintiff Pflug was hired by the County as a Suffolk County Police Department ("SCPD") Public Safety Dispatcher I ("PSD I") in December of 2002. Def. 56.1 ¶ 1. The SCPD Communications Section – which includes PSD Is – operates 365 days a year, 24 hours a day. *Id.* ¶ 69. The unit must be operational and fully staffed at all times. *Id.* A PSD I receives information from a 911 emergency complaint operator, dispatches the calls to police sector cars and coordinates efforts to respond to the emergency with a particular SCPD precinct. *Id.* ¶ 3.

According to Defendant, overtime was always mandatory for all PSD Is and each employee was informed of this requirement upon hiring. *See id.* ¶ 73. Pflug

---

Montaldo's claims from this action on February 2, 2021, and Pflug filed the Amended Complaint thereafter. *See* DEs [25] – [26].

asserts that when she was hired, overtime was voluntary. *See* Pl. 56.1 ¶ 8.[2] If a PSD I called in sick and no one volunteered, another PSD I would be required – based on seniority – to work overtime. *See* Def. 56.1 ¶ 9. Overtime was assigned in four-hour increments either at the beginning or end of a PSD I's assigned shift. *Id.* ¶ 72. The requirement to perform overtime was referred to as a "mandate," or "working a mandate." *See id.* ¶ 18. PSD Is were also required to work six extra days per year in addition to their scheduled shifts, referred to as "X-Days." *See id.* ¶ 24.

On August 3, 2012, Lt. William Rohrer of the Communications Section ("Lt. Rohrer"), sent a memo to the SCPD Communications Section supervisors. *See* Declaration of Hope Senzer Gabor ("Gabor Decl."), Ex. H. The memo states that as of August 25, 2012, "no employee will be exempted from working mandated [overtime]," regardless of whether they were previously exempted by their supervisor for medical reasons. *Id.* Further, an employee could "submit medical documentation requesting special consideration in this matter." *Id.* On January 11, 2013, Maureen Looby of the SCPD Human Resources Bureau emailed Lt. Rohrer and others regarding overtime mandates, stating that "no employee will be excused from overtime" and that "overtime is part of the position." Gabor Decl., Ex. I. Looby further indicated that if an employee "can't work overtime, they are unfit for duty and therefore cannot work their normal shift." *Id.*

---

[2] One of Plaintiff's supervisors, Jennifer Worthington, has worked for the County since 1991 and testified that overtime mandates existed throughout her entire employment. *See* Def. 56.1 ¶¶ 52, 60.

### 2. Plaintiff's Employment as a PSD I

As noted above, Plaintiff began working as a PSD I in December 2002. Between 2002 and 2011, Pflug worked mandatory overtime. Def. 56.1 ¶ 8. By 2011, Plaintiff was working the midnight shift from 12:00 a.m. to 8:00 a.m. Def. 56.1 ¶ 14.

Pflug took parental leave from April 10, 2011 to April 9, 2012. *Id.* ¶ 11. In or around April of 2011, Plaintiff was diagnosed with transverse myelitis – or swelling of the spinal cord – which causes numbness and tingling throughout the body, as well as headaches. *See* Declaration of Kristy Pflug ("Pflug Decl."), DE [30-34], ¶¶ 22-26. In March 2012, Pflug submitted a letter from Dr. Scott McWilliams recommending that she not work overnight hours because sleep deprivation could exacerbate her transverse myelitis symptoms. *See* Gabor Decl., Ex. F.[3]

Plaintiff returned from parental leave on April 10, 2012. Def. 56.1 ¶ 12. Upon her return – in light of the letter from Dr. McWilliams – Pflug was reassigned to Rotating Squad 3, rather than the midnight shift. *See id.* ¶¶ 13-14. As a result, Plaintiff worked from 8:00 a.m. to 4:00 p.m. for five days followed by two days off and then worked from 4:00 p.m. to 12:00 a.m. for five days followed by three days off. *Id.* At this time, Pflug's supervisors were Sandy Flammer ("Flammer") and Jennifer Worthington ("Worthington"), both Public Safety Dispatchers IIs ("PSD II"). *Id.* ¶ 19. Plaintiff was also breastfeeding at this time and was provided with a room in which

---

[3] The Court notes that Dr. McWilliams's letter is dated both "March 9, 2011" and "3/09/2012." Gabor Decl., Ex. F. Pflug asserts that she was diagnosed with transverse myelitis sometime after she gave birth to her first child on April 10, 2011. *See* Pflug Decl. ¶¶ 21-22. Moreover, in her sworn declaration, Plaintiff refers to the letter as being dated March 9, 2012. Pflug Decl. ¶ 29. Based on the statements in Pflug's declaration, the Court will assume the letter was written on March 9, 2012 and the reference to March 9, 2011 is a clerical error.

4

she could breast pump at her request. *See id.* ¶ 21.[4] In that first month following her return from leave, Pflug worked mandatory overtime. *Id.* ¶ 16.

Thereafter, overtime mandates occurred "pretty much every day," and each PSD I was mandated to work overtime one to two times a week. *Id.* ¶ 17; Gabor Decl., Ex. B, Transcript of Deposition of Kristy Pflug ("Pflug Tr."), 35:21-23. Around this time, Plaintiff was "physically and mentally" stressed about working mandates and felt that she "was already pushing [herself] for [her] eight-hour shift." Pflug Tr. 43:13-19. Pflug provided three additional letters from physicians dated August 2, August 30 and November 17, 2012 from Drs. McWilliams, Katherine Wightman and Erica Jurasits, respectively, recommending that Plaintiff not work in excess of eight hours in a single shift. *See* Pflug Decl., Exs. 9 & 11; Gabor Decl., Ex. AA.

### 3. Plaintiff's Lateness and Refusal to Work Mandates

On April 12, 2012, Plaintiff was late to work and was informally counseled by a superior. Gabor Decl., Ex. Y. Pflug was also late in returning from her meal breaks on May 4 and 21, 2012. *Id.* On May 25, 2012, Plaintiff was issued a verbal reprimand regarding this lateness and was advised that any further infraction of this nature would result in additional disciplinary action. *Id.*

On November 11, 2012, Pflug was issued a written reprimand concerning her failure to report for work on November 3, 2012, an X-Day. *See id.* ¶ 25; Gabor Decl., Ex. J. Plaintiff wrote to her superiors on November 15, 2012 and explained that she

---

[4] Plaintiff asserts that this accommodation was only provided "[w]hen [she] pushed [the issue]," but also testified that the room was provided within a week after she brought it to her supervisors' attention. Pflug Tr., 41:9-19.

5

forgot she was scheduled to work an X-Day on November 3, 2012 and that once she was reminded it was too late to get a family member to watch her child. *See* Def. 56.1 ¶ 26. PSD II Dennis Lawlor wrote a memo on November 19, 2012 regarding Pflug's failure to report to work on November 3, contradicting Plaintiff, noting that when confronted regarding her absence, Pflug stated "I don't work x-days." Gabor Decl., Ex. L; *see* Def. 56.1 ¶ 27.

On December 1, 2012, Plaintiff was late in returning from her meal break. Gabor Decl., Ex. M. In a memo to Lt. Rohrer, Pflug explained that she was late due to needing to go home to breastfeed her child and attend to her daughter's injury. *Id.*

On December 23, 2012, Plaintiff did not report for mandatory overtime scheduled for 4:00 a.m. to 8:00 a.m., prior to her regular shift. *See* Def. 56.1 ¶ 29. According to her supervisor, Flammer, Pflug explained that she did not like coming in at 4:00 a.m. for mandates because she did not want to inconvenience her in-laws to watch her daughter at that hour. *See id.* On December 25, 2012, Plaintiff again refused to report for her mandated overtime at 4:00 a.m., but indicated she could report for her normal shift at 8:00 a.m. *See* Gabor Decl., Ex. P.

Plaintiff again did not work her mandatory overtime on January 8, 2013 due to a doctor's appointment that could not be rescheduled. *See* Gabor Decl., Ex. Q. The following day, Pflug's supervisor filed a "Supervisor's Complaint Report" regarding Plaintiff's failure to report for this mandate, indicating that this was not her first failure in this regard. *See* Gabor Decl., Ex. R. Pflug testified that following this

6

incident she believed she was "on borrowed time" and "knew something was going to happen," which is why she "tried to quit." Pflug Tr. 71:21-72:8.

### 4. Internal Affairs Proceedings and Plaintiff's Resignation

According to Plaintiff, in late May 2013, she told Worthington and Flammer that she was resigning her position, effective June 5, 2013. Pflug Tr. 94:14-95:17. Pflug testified that she did not fill out any paperwork regarding her resignation until June 5, 2013 "because you do it the day you resign." *Id.* 95:18-25. According to Plaintiff, she started this paperwork on June 5, 2013, but never completed it. *Id.* 95:20-96:2. Pflug asserts that a resignation party for her was organized on June 5, 2013, which Defendant denies. *See* Pl. 56.1 ¶ 41; Reply 56.1 ¶ 41.

On June 5, 2013, Plaintiff attended a meeting with Internal Affairs, at which she was provided with union representation. *See* Def. 56.1 ¶ 42. Pflug was presented with 14 charges of misconduct and was suspended from duty without pay, effective June 4, 2013. *See id.* ¶¶ 43-44; Gabor Decl., Ex. T. The charges included ten instances of unexcused absences, three failures to work mandated overtime and a failure to renew her departmental identification card to reflect a name change. *See* Gabor Decl., Ex. T. According to Plaintiff, Defendant would not allow her to resign without addressing the charges, which the County denies. *See* Pl. 56.1 ¶ 43; Reply 56.1 ¶ 43. Pflug testified that she accepted the suspension in lieu of resigning in order to receive health insurance benefits during her suspension. *See* Def. 56.1 ¶ 45. Plaintiff contacted her union regarding the charges and was assigned union counsel.

*Id.* ¶ 46.  Although Pflug felt the suspension was unfair, she was advised to "take whatever the County offers you and go on your way."  *Id.*

Plaintiff was reinstated on July 3, 2013.  *See id.* ¶ 47.  Pflug reported for work on July 4, 2013 for the 8:00 a.m. to 4:00 p.m. shift.  *Id.*  At the end of her shift, Plaintiff was told she was required to work mandatory overtime from 4:00 p.m. to 8:00 p.m.  *Id.*  In response, Pflug resigned.  *See id.*

### 5. The Agreement and Release

On September 3, 2013, Plaintiff and the County entered into a Stipulation and Agreement (the "Agreement") concerning the June 5, 2013 disciplinary charges.  Def. 56.1 ¶ 48; Gabor Decl., Ex. V (Agreement).  The Agreement was reviewed by counsel on Pflug's behalf.  *See* Agreement, 1.  Pursuant to the Agreement, Plaintiff pled no contest to the disciplinary charges, and Defendant agreed to reimburse Pflug for 11 out of 30 days of her suspension, amounting to $2,466.20 in wages, provide Plaintiff with a neutral reference and not interfere with Pflug's attempt to apply for unemployment benefits.  *Id.* ¶¶ 1-3.  Plaintiff also agreed to execute a General Release (the "Release"), "releasing the County from any liability whatsoever in connection with [Pflug's] disciplinary charges."  *Id.* ¶ 4.  The Release, annexed to the Agreement, provides that Pflug:

> releases, discharges and holds harmless the [County] . . . from all actions, causes of action, [and] suits . . . whatsoever in law, admiralty or equity, which against the [County], [Pflug] . . . ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day and date of this General Release, including but not limited to all claims of any kind or any nature whatsoever which were raised, or could have

8

> been raised, in connection with [Pflug's] employment or service with [the County] arising from the disciplinary charges brought against her.

*Id.*, 4. According to Plaintiff, she signed the Agreement and Release under duress and was promised one month's compensation in exchange. *See* Pl. 56.1 ¶ 47; Pflug Decl. ¶ 51. Pflug asserts that she was told by her attorney that she must sign "to move on from the charges so [she could] leave on good graces with the County." Pflug Decl. ¶ 53; Pflug Tr. 108:17-24. Plaintiff further claims that she was told that she was only giving up her right to fight the suspension, not releasing all claims against Defendant. Pl. 56.1 ¶ 46; Pflug Decl. ¶ 58.

According to Plaintiff she "never received the consideration promised in the agreement in order for [the Agreement] to be effective." Pl. 56.1 ¶ 48. Pflug testified, however, that she received "a payment" in exchange for signing the Agreement and Release, although she did not specify the amount. Pflug Tr. 108:25-109:14. Plaintiff also asserts that Defendant challenged Pflug's application for unemployment benefits, despite agreeing not to do so, which the County denies. *See* Pl. 56.1 ¶ 50 (Pflug Decl. ¶ 61). The Unemployment Insurance Appeal Board ultimately concluded that Plaintiff was entitled to unemployment benefits based on its determination that Pflug quit her job with good cause. *See* Pflug Decl., Ex. 15, 3.

### B. Procedural History

Following her employment with the County, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Pl. 56.1 ¶ 53. On February 19, 2016, the EEOC determined that there was probable cause that the County discriminated against Pflug on the basis of disability in

violation of the ADA. Pflug Decl., Ex. 14. Specifically, the EEOC rejected Defendant's argument that Plaintiff waived her right to file a charge by signing the Agreement and Release and found that the County failed to engage in an interactive process to arrange a reasonable accommodation. *See id.*

On January 2, 2020 Plaintiff, along with Anne Di Iorio and Joseph Montaldo – two other County employees – commenced this action against Defendant, asserting causes of action for: (1) failure to accommodate under the ADA, (2) failure to accommodate pursuant to NYSHRL, (3) intentional discrimination under the ADA, (4) intentional discrimination pursuant to NYSHRL, (5) retaliation under the ADA, (6) retaliation pursuant to NYSHRL, and (7) disparate impact under the ADA. *See* Complaint, DE [1]. Following some discovery, the parties agreed to sever Di Iorio's and Montaldo's claims from this action on February 2, 2021. *See* DE [25]. Plaintiff thereafter filed the Amended Complaint on her own behalf and asserting the same claims on March 20, 2021. *See* Amended Complaint, DE [26]. On May 26, 2021 the parties consented to this Court's jurisdiction for all purposes. *See* Consent to Jurisdiction by US Magistrate Judge, dated May 26, 2021.[5]

Following the completion of discovery, Defendant's Motion was filed on November 3, 2023. *See* Def. Mot. For the reasons set forth below, the Court concludes that Pflug's claims are barred the Release. Accordingly, Defendant's Motion is granted, and the Amended Complaint is dismissed with prejudice.

---

[5] This action was originally assigned to the Honorable Dora Lizette Irizarry, then later reassigned to the Honorable Arthur D. Spatt on April 27, 2020, and later reassigned again to the Honorable Sandra J. Feuerstein on June 30, 2020. *See* Order Reassigning Case dated Apr. 27, 2020; Order Reassigning Case dated June 30, 2020.

## II.     SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). In deciding the motion, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party"). In determining

11

whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sep. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## III. DISCUSSION

Defendant seeks summary judgment dismissing the Amended Complaint in its entirety, arguing that there are no genuine issues of material fact and each of Plaintiff's claims fail as a matter of law. *See* Memorandum of Law in Support of Motion for Summary Judgment, DE [30-1], 1. As a threshold matter, the County asserts that it is entitled to summary judgment on Pflug's causes of action because Plaintiff waived all claims against the County by signing the Release. *Id.*, 15-16. The Court agrees. Accordingly, and for the reasons set forth below, Defendant's Motion is granted, and the Amended Complaint is dismissed with prejudice.

### A. **Effect of a General Release Under New York Law**[6]

Under New York law, the enforceability of releases of employment discrimination claims is generally analyzed under the same principles of contract law as any other release of claims. *Johnson v. Lebanese Am. Univ.*, 84 A.D.3d 427, 429,

---

[6] Although the Agreement does not contain a choice-of-law provision, both parties assume New York law governs its interpretation. Accordingly, the Court applies New York law. *See Henneberry v. Sumitomo Corp. of Am.,* No. 04-civ-2128, 2005 WL 991772, at *5, n. 3 (S.D.N.Y. Apr. 27, 2005) ("Where the parties so assume, the Court need not address choice of law *sua sponte*.").

12

922 N.Y.S.2d 57, 59 (1st Dep't 2011). To that end, "a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced." *Hui-Wen Chang v. New York City Dep't of Ed.*, 412 F. Supp. 3d 229, 243 (E.D.N.Y. 2019) (applying New York law). "Where the language of a release is clear, effect must be given to the intent of the parties as indicated by the language employed." *Tromp v. City of New York*, 465 F. App'x 50, 51 (2d Cir. 2012) (internal quotation marks omitted). "[T]he mere recitation of the specific claims underlying a settlement will not undermine the broad prophylactic effect of general release language." *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 278 (E.D.N.Y. 2013) (applying New York law).

Moreover, "the enforceability of a release does not depend on whether the releasor was subjectively aware of the precise claims to which the release pertains upon executing the release." *Clark v. Buffalo Wire Works Co.*, 3 F. Supp. 2d 366, 373 (W.D.N.Y. 1998) (construing New York law). A release of claims, however, is not valid unless the releasor receives something of value in exchange. *See id.* "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).

### B. The Release Bars Plaintiff's Claims

Here, the language of the Release is broad and unambiguous on its face, referring to "all actions, causes of action, [and] suits . . . whatsoever in law, admiralty or equity" Pflug has or had against the County, without temporal limitation.

13

Agreement, 4. Although the Release specifically refers to claims arising out of the disciplinary charges against Plaintiff, such language does not limit an otherwise general release of claims. *See Vornado,* 987 F. Supp. 2d at 278. Further, while Pflug asserts that she believed she was only waiving her right to fight her suspension, *see* Pl. 56.1 ¶ 46, Plaintiff's subjective belief does not impact the legal effect of the Release. *See Clark*, 3 F. Supp. 2d at 373 (rejecting plaintiffs' argument that general release was unenforceable based on their subjective knowledge).

In addition, it is undisputed that Pflug was represented by counsel in connection with her disciplinary proceedings and at the time she signed the Agreement. *See* Def. 56.1 ¶ 46; Pflug Decl. ¶ 53; Pflug Tr. 108:7-24. Plaintiff claims that she signed the Agreement under duress, *see* Pf. 56.1 ¶ 47, although this conclusory assertion is made without further explanation or evidentiary support and so cannot be credited. *See Arnow v. Aeroflot Russian Airlines,* 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) ("[C]onclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment.").

Pflug further argues that the Release is invalid because she did not receive the promised consideration in exchange. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion ("Opposition" or "Opp."), DE [30-32], 11-13. According to the Agreement, the County agreed to pay Plaintiff $2,466.20 in wages for 11 out of the 30 days of her suspension, to provide Pflug with a neutral reference and not to interfere with her application for unemployment benefits. *See* Agreement, ¶¶ 1-3. Plaintiff asserts that, contrary to these terms, and with no explanation or

14

corroborating evidence, that she was promised a full month's compensation, *see* Pl. 56.1 ¶ 47, but concedes that she in fact received payment following the execution of the Release. *See* Pflug Tr. 108:25-109:14. And while Plaintiff claims that Defendant challenged her application for unemployment benefits, *see* Pl. 56.1 ¶ 50, the Unemployment Insurance Appeal Board's decision makes no reference to any challenge or opposition by the County, and she was awarded the benefits she sought. *See* Pflug Decl., Ex. 15. As a result, there is no genuine dispute of material fact that Plaintiff received consideration in exchange for signing the Agreement and Release.

Given that the Release's unambiguous language precludes any claim by Plaintiff against the County and that Pflug knowingly agreed and received consideration in exchange, the Court concludes that the Release bars all of Plaintiff's causes of action. *See Hui-Wen Chang,* 412 F. Supp. 3d at 244 (granting summary judgment in defendant's favor where plaintiff signed general release of all claims). Accordingly, Defendant is entitled to summary judgment on all claims, and the Amended Complaint is dismissed with prejudice.[7]

---

[7] In light of this conclusion, the Court need not address whether Plaintiff's causes of action fail on their merits. The Court notes, however, that in a sister case involving Pflug's former co-plaintiff, the Honorable Judge James M. Wicks reached the merits of Di Iorio's claims and granted summary judgment in favor of the County on all causes of action. *See Di Iorio v. Cty. of Suffolk,* No. 21-1273, 2024 WL 1908602, at *10-21 (E.D.N.Y. May 1, 2024) (dismissing ADA intentional discrimination, disparate impact, failure to accommodate and retaliation clams and declining to exercise supplemental jurisdiction over state law claims).

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that Pflug's claims are barred the Release. Accordingly, Defendant's Motion is granted, and the Amended Complaint is dismissed with prejudice.

Dated:	Central Islip, New York
	August 5, 2024			**SO ORDERED:**

					<u>/s/ Steven I. Locke</u>
					STEVEN I. LOCKE
					United States Magistrate Judge